UNITED STATES DISTRICT COURT
FILED
MAY 22 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
ROCHESTER DIVISION

----------------------------------------------X

**FRANCIS ELLIS**

                    **PLAINTIFF,**                           **COMPLAINT AND INJUCTION**

           **- against -**                                   **19 CV 6380 CJS**

**UNIVERSITY OF ROCHESTER,**

                    **DEFENDANT.**                           **DEMAND FOR JURY TRIAL**

----------------------------------------------X

The Plaintiff, Francis Ellis, pro se, complains about the Defendant, the University of Rochester, as follows:

## NATURE OF ACTION

1.      This is a gender and race discrimination case brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d *et seq.* ("Title VI"). Plaintiff also brings related common law breach of contract claims.

## JURISDICRTION AND VENUE

2.      This Court has jurisdiction over Plaintiff's Title IX and Title VI claims pursuant to 28 U.S.C. § 1343. The Court has jurisdiction over Plaintiff's common law claims pursuant to 28 U.S.C. § 1367 because those claims closely relate to Plaintiff's federal claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

3.      Venue is proper pursuant 42 U.S.C. § 1391(b) because the Western District of

New York: Rochester Division is the judicial district in which all of the events or omissions giving rise to the claims occurred, including but limited to Defendant's breach of federal law as well as binding contracts entered into with Plaintiff, which are at issue here.

## THE PARTIES

4.     Plaintiff Francis Ellis ("Plaintiff" or "Ellis") is a resident of Delaware County in the Commonwealth of Pennsylvania.

5.     Defendant University of Rochester ("Defendant" or "Rochester") is a private university located in Monroe County in the State of New York, which, *inter alia*, seeks and receives federal funding. As such, Rochester is an "education program or activity receiving Federal financial assistance" within the meaning of Title IX and Title VI.

## FACTS RELEVANT TO ALL CLAIMS

6.     In 2010, Ellis satisfied all of the requirements for a Master of Science in Education (M.S.Ed.) degree from the University of Pennsylvania, and did, in fact, receive that degree on December 16, 2010.

7.     After earning his Master's degree, Ellis applied to Rochester's Human Development in Educational Contexts Ph.D. Program ("Ph.D. Program") and was subsequently offered admission in or about spring 2011.

8.     The Program is offered through Rochester's Warner Graduate School of Education and Human Development ("Warner").

9.     In offering Plaintiff admission as a student, which he accepted, Rochester formed a contract with Ellis. In exchange for payment of the required tuition, other charges and fees, completion of the prescribed course of study, and compliance with its rules, regulations and requirements, Rochester agreed to provide Plaintiff with a course of study sufficient and adequate

to enable him to obtain a doctoral degree, and to, in fact, award him such a degree.

10.     Ellis matriculated in to the Rochester Ph.D. Program in or about August 2011.

11.     By matriculating as a student there, Ellis specifically agreed to be bound by Rochester's [Code of conduct, honor system, rules, within the graduate studies manual].

12.     The graduate studies manual applies to graduate students throughout the university.

13.     During the relevant period, Rochester also had a Non-Discrimination Policy wherein the college affirmatively promises not to violate civil rights laws such as Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), which is reproduced in relevant part here:

> The University of Rochester values diversity and is committed to equal opportunity for persons regardless of age, color, disability, domestic violence status, ethnicity, gender identity or expression, genetic information, marital status, military/veteran status, national origin, race, religion/creed, sex, sexual orientation or any other status protected by law. Further, the University complies with all applicable non-discrimination laws in the administration of its policies, admissions, employment, and access to and treatment in University programs and activities.

14.     Although he agreed to be bound by these rules and others while at Rochester, Ellis never received training or any other guidance on compliance with Title IX.

15.     Ellis is a gay black man.

16.     In the Fall of 2013, Rochester Professor Logan Hazden subjected Ellis to racially-motivated insults, such as telling Ellis he should "stay out of trouble." That a Black graduate student like himself was problematic and prone to mischief.

17.     Hazden had no basis for believing Ellis was prone to causing or being in trouble.

18.     In May 2014 Ellis was sexually man handled by Martin Lynch, Ph.D. The inappropriate act was emotionally disturbing, but out of fear of retaliation Ellis continued his

work.

19.     In November 2014, Ellis considered applying for two Ph.D. programs in African-American studies at institutions other than Rochester.

20.     During that time period, Ellis emailed Rochester Professor Lucia French ("French") to request a Letter of Recommendation from her to be included as part of those potential Ph.D. applications.

21.     In that request, Ellis made no mention of any plans to leave the Rochester Ph.D. program because he had no plan to leave at that time.

22.     That same day, Ellis replied to French via email. In the email, he copied Dr. Kathryn Douthit, Associate Professor and Chair of the Program, as well as his sponsor (advisor) Dr. Dena Swanson, Assistant Professor and Warner's Diversity Officer. Swanson also a member of Ellis's comprehensive exam committee.

23.     In the same emailed reply to French, Ellis also explained that he and other students of color at Warner have felt that "there are systematic issues and policies that hinder their [academic] efforts." Ellis expressed concern about Warner's ability to "foster diversity, inclusion, and retention" in the Program, given that out of the Program's 22 graduates only one is black. Ellis cited funding resources and "delays in feedback" on his comprehensive exam submissions as some difficulties that he has faced at Warner, and that both he and other students of color had previously expressed concern that they are provided inadequate opportunity to participate in faculty manuscripts.

24.     On November 20, 2014, Ellis met with Douthit and Swanson separately. In each meeting, Ellis expanded on his complaint of diversity concerns that he had mentioned in his email to French. Ellis also noted that he and other students of color felt that Rochester's environment

can be toxic for students of color.

25.     On November 28th, 2014, Ellis sent an email to a Program listserv. The email contained a link to a website that documented Ellis's then-recent trip to Ferguson, Missouri.

26.     Later that day, French sent Ellis a personal reply to his listserv message. In the email, French noted a recent news report about a "61 year old (African-American) who stabbed/killed a teenager (also African-American) … (very close to my home). A drug deal gone bad." French continued, "All high-school students [in the area] can easily acquire marijuana and other drugs from one or more of their classmates." French further opined that such high school students "may well be greedy idiots who fail to pay off their contact in the city."

27.     Ellis found French's reply discriminatory and distressing due to its gratuitous mention of a black man killing a black teenager; the emphasis on the reported context of a "drug deal gone bad"; the speculative characterization of the dead black teenager as a "greedy idiot"; and the unstated implication that the classmates from whom students would obtain drugs are black, and/or that the students' "contact[s] in the city" are black.

28.     In June 2015, Ellis moved to Atlanta for an internship, and although this move ended his residency in the Program at Rochester, he remained a full time student in the Program and still planned to finish it and obtain his Ph.D. from Rochester.

29.     In 2015 Ellis received notice that he was not given a passing grade on the methods portion of his comprehensive exam.

30.     On November 7th, 2015, Ellis drafted a letter to Douthit and Brent titled "Letter of Diversity and Equity in Education Grievance." Ellis emailed the letter four days later. The letter stated, *inter alia*:

> I … request review of this letter of diversity and equity in education grievance.

> This letter ... serves to provide a broader understanding to the impact of "social climate" on my academic performance and the hindrance of scholarly growth that I have endured in the ... program. [M]y hope is that this letter examines the relationship of the history of documented climate issues and [their] impact on me as [they] relate[] to the availability of resources, productivity, and progress. ... [B]efore I proceed with the details ... I want to mention that often issues of racism, equity, and inclusion are not reported to faculty or administrators in the Warner School given the climate and fear of retribution. My fellow doctoral student colleagues and recent alumni have voiced fear of retribution ....

31.    On November 11th, 2015, Ellis also emailed to Douthit and Brent a "Letter of Academic Grievance."

32.    On November 13, 2015, Brent emailed Ellis stating that he has

> had the opportunity to discuss your comprehensive exam appeal with Dr. Swanson (sponsor) and Dr. Douthit (... Program Chair). The purpose [of] our meeting was for me to understand better the structural elements of your exam (i.e., exam question timing and reviewer assignments). I also reviewed carefully the policy that guides ... comprehensive exams. Dr. Swanson will contact you shortly to discuss the balance of options that the ... comprehensive exam policy affords you.
> With regard to your Letter of Diversity ... I would like to arrange a time where Dr. Douthit and I can speak to you directly. I refrain currently from inviting Dr. Swanson to such a meeting, only because your letter was directed to Dr. Douthit and me, and only copied Dr. Swanson. That said, if you desire, I would welcome the opportunity for Dr. Swanson to participate in either her capacity as your sponsor, Warner's Diversity, or both. To best facilitate such a meeting, we may wish to wait until you return to Rochester.

33.    On November 17, 2015, Ellis emailed Brent with Douthit and Swanson copied. In the email Ellis stated, *inter alia*, "I appreciate the update ... and will be willing to come to Rochester to meeting with you, Dr. Douthit and Dr. Swanson ...."

34.    Although less than a week earlier Brent had suggested "we ... wait until you return to Rochester" before holding any meetings, Brent replied to Ellis on November 18, 2015 that he "would not wish to you to incur the expense to travel from Atlanta to Rochester and return" in order for Ellis meet with him, with Douthit, and with Swanson. Brent instructed Ellis:

"When your internship ends and you do return to Rochester, please contact me." Douthit and Swanson were copied on this email.

35.     On November 20, 2015, undergraduate students at Rochester submitted a petition to the university's administration complaining about discrimination.

36.     On November 23, 2015, Ellis permitted Brent to forward Ellis's Letter of Diversity and Equity in Education Grievance letter to the Dean of Warner, Raffaella Borasi. Brent supplied the letter to Borasi later that day.

37.     On November 25, 2015, Borasi emailed Ellis with Brent copied. In the email, Borasi stated, *inter alia*: "I have contacted the Office of Counsel, and a representative of that office will contact you soon to further explore the matter."

38.     In late November or early December 2015, Ellis was informed that he would have an opportunity to rewrite the methods portion of his comprehensive examination.

39.     On December 7, 2015, Dr. Ellen Volpe—then an Assistant Professor at the University at Buffalo and a member of Ellis's comprehensive exam committee—offered to meet with Ellis to assist him with feedback/advice for his rewrite. Volpe noted that she "would prefer to wait until [she] is done grading" before having the meeting, perhaps "wait[ing] until the new year."

40.     On December 9th, Swanson scheduled a meeting with Ellis to take place on January 4th, 2016.

41.     As part of the offer to rewrite, Ellis was required to submit an "evaluative statement" by December 15th, 2015. Despite Brent's instruction that Ellis should wait until the end of his internship to meet with Brent and Ellis's comprehensive exam committee members, and Volpe's scheduling of a meeting to take place the following year, Ellis was told that the balance of

the rewrite assignment would be due on February 26, 2016.

42.     During this same timeframe, Ellis was periodically communicating with Catherine

Nearpass, an investigator, and attorney from Rochester's Office of Counsel.

43.     On December 16, 2015, Ellis wrote to Nearpass:

> Due to the serious nature of the accounts in the grievance letter, I
> am recommending alternative actions moving forward. ... it would be a
> disservice to put myself and those students through the continue[d]
> emotional trauma that we have endured as students of color .... Students
> mentioned ... fear of retaliation ....
>
> The purpose and intent o[f] the "Diversity and Equity in Education
> Grievance" letter is to bring formal attention to ongoing climate issues
> within the Warner School to faculty and administrators. ... your initial
> email (even though with well intent), was viewed by some students ... as a
> more formal procedural academic witch-hunt. ... I decline ... based [on
> the] recommendation of those mentioned and my representative to
> disclose th[ose students'] names ....
>
> The [grievance letter]'s submission ... was prior to the
> undergraduate student petition on November 20, 2015 and had no relation.
> .... The following recommendations were discussed with [previously-
> referenced referenced unnamed students] as well as select members of
> SADE (Students of the African Disapora in Education), a Warner graduate
> student group. Given President Joel Seligman['s] response ... many
> students ... feel that the email and the initiative outlined to form a
> commission on racial relations at the University ... failed to speak directly
> to the pertinent racial climate issues ....
>
> A revised plan/strategy, or commission is recommended to address
> ...graduate students .... More specifically, as it relates to the Warner
> School, my hope is that Dean Borasi will create a roundtable or forum ....
> Furthermore, my hope is that there will be a 'no tolerance' policy ... for
> those who willfully engage in racial discrimination and harassment ....
>
> [G]iven that each student mentioned in my grievance letter has had
> their own individual experiences with racial discrimination ... it was
> expressed to me that they might file a formal complaint directly with your
> office after their departure from the university.

44.     On January 1st or 2nd of 2016, Ellis was sexually assaulted.

45.     On January 3, 2016, Ellis emailed Volpe, copying Swanson. In the email Ellis

stated "given a medical injury, I will not be able to attend to the outline till I'm out of recovery as

recommended by my doctor. Anticipated date will be January 21st, 2016 or later. I will keep you

posted of my progress."

46.     On January 9, 2016, Swanson emailed Ellis with Volpe copied, stating "I hope your rehab and recovery is still going well and that you are able to reschedule your meeting with Dr. Volpe soon."

47.     On January 11, 2016, Ellis emailed Swanson noting that he would be in Rochester for a few days and offering to schedule an informal meeting subject to Swanson's availability. Ellis also emailed Volpe stating the same information.

48.     Later that day, Volpe suggested to Ellis that she and Ellis meet on Wednesday (January 13, 2016) at Panera, a local restaurant.

49.     Swanson replied that she already had commitments during the days that Ellis would be in Rochester.

50.     On January 13, 2016 at 9:30 AM, Ellis and Volpe met at Panera. During the meeting, Ellis disclosed to Volpe that he had been sexually assaulted, and he explained the nature/scope of the resulting injury.

51.     Ellis was sexually assaulted two more times before the end of the spring 2016 semester.

52.     On May 18, 2016, Ellis emailed Swanson stating "I wanted to schedule a meeting with you to discuss the revised comps to be submitted to Dr. Volpe. It[ has] been some time given that I had an injury ... ." Ellis sent a similar email to Volpe on the same day.

53.     That day, Swanson replied, "As we'd agreed, the revised comp was due earlier in the term which would allow a reassessment of the comp for a grade to be submitted this term. The department did not grant a new due date .... You can ... speak with Dr. Brent about your options for a formal appeal ...."

54.     Shortly after receiving Swanson's email, Ellis emailed Brent asking to schedule an appointment to discuss an appeal given "it appears I missed the deadline given my injury[.]"

55.     Brent emailed Ellis a memorandum about the grade appeal process.

56.     Also on May 18, 2016, Ellis emailed Swanson, Lynch, and Volpe a grade appeal request, and copied Brent on the email.

57.     Ellis's grade appeal request explained that he would like a grade change from an E (fail) to an I (incomplete) "given the medical injury that I suffered in Spring 2016."

58.     On May 19, 2016, Brent replied to Ellis via email with Swanson and Douthit copied. In the email, Brent stated

> Your letter of appeal is unclear with regard to whether or the extent to which your noted injury prohibited you from meeting the stated deadlines. I note that those who wish to postpone their program because of a medical issue may apply for a medical leave, see page 26 of the Graduate Bulletin at the following link. http://www.rochester.edu/GradBulletin/PDFbulletin/Grad_Bulletin14-16.pdf.
> If you wish to apply for a medical leave please make your request to me directly. If you do not wish to apply for a medical leave, your committee may seek additional information regarding the basis of your appeal.

59.     Later in the day Ellis and Brent had a phone conversation in which Brent advised Ellis to write a letter appealing his grade and to limit the content of his to the injuries he had suffered.

60.     On May 20th, 2016, Ellis emailed Brent with Swanson and Douthit copied. In this email, Ellis noted that the February 2016 due date had been set *before* the January 2016 sexual assault. Ellis also noted that he had not been aware of the extent of the recovery he would need, and that it was recommended "that [he] take several weeks to recover." Ellis explained that he was not aware that he "should have immediately … requested the postponement" of the due date. He also observed that taking medical leave did not seem appropriate at that time (late May 2016)

because his physical injuries had healed. Furthermore, Ellis noted that student loans were his only income at the time, and after speaking with the Registrar, Crys Cassano, Ellis "believed that any medical leave would suspend [his] ability to take student loans."

61.     Ellis sent Brent a second email on May 20th, 2016. In that email, Ellis wrote:

Good Morning Brian,

Is it possible to speak with you in regards to the revised appeal request? Before I resubmit, I have concerns about the equitable review given my prior experience. Also of concern, from my original academic and diversity in equity grievance many issues highlighted were left unaddressed and placed me in an even marginalized place. Given the nature of the Grade Appeal request solely on the basis of academic performance, evaluation, and feedback, I want to make sure that I am moving forward [in a way that] ensures the well[]being of myself as well as students that may[ now] or in the future be in [a] similar predicament.

62.     After this second email, Brent called Ellis. In the call, Brent asked Ellis if he had actually been sexually assaulted, then opined that any sexual assault should not have precluded Ellis from completing his comprehensive exam within the spring term. Brent explained that medical leaves are reserved for students who have an illness or who have been in a severe accident.

63.     On May 24, 2016, following Brent's suggestion, Ellis emailed a "Revised Grade Appeal Letter" to Swanson, Lynch, and Volpe, with Douthit and Brent copied.

64.     On the same day, Ellis corresponded with Cassano, the Registrar, to request that a copy of his "RTS Letter from [his] doctor" be included in his file and to ask the date that his spring 2016 grade was recorded so that he can calculate the 30-day timframe for an appeal.

65.     On May 31, 2016—a week after submitting his revised appeal letter—Ellis contacted Swanson, Douthit, and Brent via email requesting confirmation of receipt of his letter. Ellis also expressed concern about the summer session and the possibility of missing any

deadlines for a grade appeal.

66.    Swanson, Douthit, and Brent replied to verify receipt, and Brent stated "the committee will review your appeal in a timely manner."

67.    On June 1, 2016, Swanson emailed Ellis with Douthit, Brent, Lynch, and Volpe copied, stating "the committee reviewed your request for a grade appeal and have attached a document sharing our decision. Due to travel logistics, I will be off email today and have limited access for the next week. Drs. Brent and Douthit have been copied to address questions you may [have]."

68.    The document, which states it is "[s]ubmitted by the Comprehensive Exam Committee for Francis Patrick Ellis," is not signed but lists the names, titles, and addresses of the committee members (Swanson, Lynch, and Volpe) and also notes copies to Brent and Douthit.

69.    The June 1, 2016 appeal denial letter states:

> You have appealed your comprehensive examination committee for a grade change from an E to an I .... Granting the appeal would allow you to submit your qualifying methods exam paper after not meeting the spring term deadline. If granted, you have requested a revised submission date of June 30, 2016.
> In consideration of your appeal, the committee has reviewed feedback and communications related to all your comprehensive exam submissions and resubmissions. Particularly important however, in the review was information you shared regarding an injury you incurred in Atlanta in early January and a physician's note regarding your current status. Your appeal has requested the committee consider your injury as the sole factor prohibiting you from meeting the conditions of the resubmission.
> The leniency provided by the committee in passing your literature and theory comp submissions was predicated on your addressing concerns raised in those reviews when writing your final methods comp. The most recent opportunity to submit a revised methods comp was your third, exceeding opportunities generally offered students with challenging life circumstances. Nevertheless, a clear stipulation in allowing the resubmission was that a grade would need to be submitted at the end of the term. In considering the injury as a factor in you not meeting the conditions of a third resubmission .... The following information was considered:
> •       ... Swanson was notified of your injury during an email exchange you had with Dr. Volpe to request your meeting with her be rescheduled; there was no

further communication with her … regarding the injury or its impact.
- You were able to attend an in-person meeting with Dr. Volpe in Rochester on January 13, 2016 in which creating a matrix for examining methods in the literature being reviewed was discussed. No further communication was made with her directly or indirectly.
- Dr. Swanson communicated with you via email on March 14, 2016 regarding your attendance at the Society for Research on Adolescence conference …. The only concern you raised as a potential hindrance … was financial; no update regarding your resubmission was provided.
- You did not contact committee members nor … administrators regarding your academic status until after the Spring 2016 term, well beyond the resubmission due date.
- Clearance to return … without reference to the scope of injury, limitations, and recovery period, is provided by a physician after the Spring 2016 term ended and the appeal process had started.

Based on the … factors noted, there is no indication that the injury prevented you from attending to the resubmission criteria or following up to assess viable options given your circumstances. As such, your appeal for a grade change and request for an extension to resubmit are denied.

70.     That same day, Ellis contacted Morgan Levy, the Director of Equal Opportunity Compliance and Title IX Coordinator, and left her a voicemail message. She returned the call that afternoon and Ellis filed a sexual assault report with her office verbally. Ellis explained [to her and at the time of filing the complaint?] that he had felt enormous pressure to give up his privacy because his "valid medical request from a licensed medical professional" was treated as "not valid."

71.     On June 2, 2016, Ellis emailed Douthit requesting that she serve as his "Title IX … advocate given … [his] injury fall[s] under the scope of that statute. Please let me know… You are the only person I feel comfortable with."

72.     Douthit and Ellis talked on the phone that day. Afterward, Douthit emailed Ellis stating, *inter alia*: "If you officially send me a short note telling me that you would like to appeal the decision made by your committee to deny you a time extension for submission of your latest comp revision, that is all you need to do. I don't need any additional details beyond the request."

73.     Ellis drafted the suggested request that same day (June 2nd, 2016). In the request, which is addressed to Douthit and Brent, Ellis stated that he appeals the comprehensive committee's denial of his

> original grade appeal request for a time extension for submission of my latest (methodology exam) revision/resubmission. I formally request … a grade change from an E to I for the academic term Spring 2016 … . As mentioned in prior communications, there were medical related injuries (in accordance to reporting Title IX incident), which have been noted with the university's office of EOC-Morgan Levy, that limited my ability to complete my doctoral exams [by the February 26, 2016 deadline]. I graciously request for the extension date to be granted for the date of August 31, 2016 … Lastly, I … ask if the additional circumstances not be disclosed outside of those informed (… Douthit, … Brent, & Morgan Levy).

74.     In response to Ellis's request of Douthit to be his Title IX advocate, she offered support but explained that due to her role in the appeal process, he would need to have someone else serve in that role for him.

75.     On June 6th, 2016, Ellis emailed the appeal request to Douthit with Brent copied.

76.     On June 14th, 2016, Douthit emailed Ellis stating "I am attaching my response to your appeal … Let me know if this works for you."

77.     The appeal response states, *inter alia*, "the original deadline for this submission, February 26, 2016, was communicated to you by Dr. Swanson on December 1, 2015, and was based on a consensus of your comprehensive examination committee. Predicated on compelling supplemental information, I am granting you an extension for submissions of the … methods examination question to September 15, 2016. In light of this extended deadline, the 'E' grade will be removed from your transcript and replaced with an 'I' grade reflecting that your comprehensive exam is incomplete at this time."

78.     On September 15, 2016—the deadline for the rewrite—Ellis emailed Douthit with

the rewrite attached. Ellis also included a file that contains information that addresses the feedback he received on a prior version of that portion of the comprehensive exam. Ellis also mailed a hard copy of the files he attached and noted tracking information in the email.

79.     On September 22, 2016, Ellis emailed Brent asking to schedule an appointment to discuss "future directions given that I've submitted my [rewrite]."

80.     On September 23, 2016, Brent replied to Ellis asking him whether he's in Rochester. Ellis replied that he's still in Atlanta and that he has an appointment for a phone call with Swanson later in the month. Ellis noted in his reply that he's available for a phone call from Brent at Brent's convenience.

81.     On October 20, 2016, Ellis emailed Douthit to follow up on the rewrite he had submitted on September 15, 2016.

82.     The next day, Douthit replied to Ellis that she is almost finished reviewing the rewrite and will get back Ellis next week.

83.     On November 2, 2016, Ellis submitted a grade appeal. In the appeal, Ellis complained of "persistent and unaddressed issues of bias, prejudice, and discrimination that have fueled this unfair comprehensive examination administration and process and that has hindered my success, my feelings of safety as a student, and has hindered my physical health."

84.     On November 3, 2016, Ellis emailed Douthit stating, *inter alia*,

I was taken aback by the email I received from Dr. Swanson in terms of comprehensive exam extension results. ... I was anticipating receiving my examination results (with feedback) ... from [you as a part] of my agreed appeal. I was not informed of the review by committee members given that they had already made [their] final evaluations in May 2016. ...

Given [the committee's] final feedback in May 2016 of 'no pass' and [per] university policy [about] grade appeals, and also [from] conversations with you [and] Dr. Brent, it was my understanding that the review of my appeal and rewrite exam would now be exclusively reviewed by you .... Feedback from the recent submission ... would be provide[d] by you and contain either a pass or no pass. In

the case of a 'no pass' from [you], I would then be al[lowe]d to receive an independent review/appeal from the associate dean (now senior associate Dean Dr. Brian Brent). Further[]more, [per] university policy, I can appeal to the Dean of Warner and if unsatisfied with that decision I would be given the opportunity to appeal to the University Dean of Graduate Studies.

My concern[] is ... [committee members'] time given [that] ... the[y] have already exhausted the [number] of times they are permitted to give feedback on an exam. ...

My concern [is also e]nsuring that I receive a fair [and] reasonable evaluation. If possible I prefer we speak via phone (and maybe in [the] future in person).

85.     On November 3, 2016, Douthit replied to Ellis stating in relevant part:

[T]he last appeal was not about a grade based on content, but rather about a due date. This meant that the committee had not actually exhausted the number of times they could review the content. Much of what you understood to be the process of appealing to me, and then [to] Dr. Brent, concerning the content would now officially be in effect. Hence what you experienced was an additional chance at successfully completing the exam. ... So rather than this process being one that would prevent you from going through the normal stepwise fair appeal process, it actually added another opportunity for evaluation by the committee. ...

I would like to talk to you as soon as possible so that you can understand your options at this point.

86.     Ellis replied to Douthit listing his phone number and availability for a phone call.

87.     On December 2, 2016, Ellis emailed a 27-page appeal to Douthit with Brent, Swanson, Lynch, and Volpe copied.

88.     On December 7, 2016, Brent emailed Ellis with Douthit copied. Brent stated in relevant part:

Our Grade Appeal Policy (see attached) requires that I first direct your written appeal to the instructor, in your case the two comprehensive committee members charged with assessing exam question #3. I note that your appeal indicated that you would "rather expedite this process to the next level" (p.2). I wrote to inform you that I am obligated to conduct the appeal process as the Grade Appeal Policy dictates. Accordingly, Dr. Lynch and Dr. Volpe are presently attending to your grade appeal. I have asked that they attend to the appeal in a timely manner.

89.     The same day, Ellis replied to Brent with Douthit copied. In his email, Ellis stated:

I have no reservations for the written appeal to be directed to the instructor. And am aware of the policy. The appeal letter was written to be facilitated and directed to all parties within the email.

To clarify, what I meant is that I'm aware numbering #2 as it stated in my letter. (Refer to Contested Grade Appeal letter first page).

I believe in a phone conversation with you Brian I noted the following and expressed how I would be proceeding forward. Upon receipt of my contested appeal letter which would automatically directed to the instructors (committee members) by the chair (Dr. Douthit), I personally will abstain from review of the following statement: "the instructor is required to justify his or her decision in writing from the student" as stated in the following of the "Grade Appeal Policy" that you forwarded.

I am obliged not only to receive this rebuttal (justified decision) but the policy requires the administration to afford instructors that right to express clarification to their denial or approval of the contested grade.

So to make a long story short, my statement of "I rather expedite this process to the next level" simply means that (I said this via phone conversation) upon receipt of justified decision from committee members I will abstain from reviewing any detailed response besides the words of the contested appeal being "denied or approved".

The reason for this that I'm not morally obligated to entertain or respond to any bias or response based on prejudice. Nor does the "Grade Appeal Policy" you provided state that I must read or respond directly to committee members "elaborated/detailed" justified decision.

My reasoning is based on the fact that I have for several years been very attentive to communications and responding to feedback and fully adhering to feedback. I rather not become entangled in the idea of going back and forth in debate style with committee members and the "Grade Appeal Policy" does not disclose or state this type of debate style. I don't believe that's beneficial and all prior communications with committee members have run its course.

So to simply put it my use of the world "expedite" truly means that I just won't be reading a "justified response" nor will I participate in a "debate style" which would delay my time in the appeal process. My contested grade appeal letter was detailed enough to be reviewed and received from instructor level all the way to the University Dean. The purpose was to make sure that I don't physically drain myself in a process that hinders or violates my rights as a student.

Brian thank you for the email. It gave me the opportunity to clarify my statement. I also fully understand what the "Grade Appeal Policy" dictates and what you as well as Dr. Douthit are obliged to do.

Lastly, upon completion of the contested grade appeal review letter by committee members. Can Dr. Douthit provide an additional email just stating the denial or approval of the contested grade nothing more. I fully am aware that a form of communication "justified decision" is required

from committee members and that can be sent to me without any
hesitation. I just want two emails, one with a simple statement of "denied
or approve" and the other which the policy obliges to do "justified
decision"
Hopefully this email is clear. If not please let me know.

90.    On December 19, 2016, Nearpass sent Ellis an email confirming receipt of his

November 2, 2016 letter and including a questionnaire designed to determine whether the

University's Policy against Discrimination and Harassment ("Policy 106") "is the appropriate

process for reviewing your concerns." Nearpass is "responsible for assessing and investigating

complaints under" Policy 106.

91.    Ellis replied to Nearpass stating, *inter alia*,

I am more than willing to answer[] your questions in order to assist in

determining if policy 106 is applicable. However, I prefer taking things

one step at a time. Currently, I have submitted a contested grade appeal

letter to my department chair which notably has been forwarded to your

office given the notations of bias, prejudice, discrimination during the

process and administration of exam. I prefer waiting [until] the appeal

process has concluded before proceeding forward to Policy 106. The

purpose of that is not to exhaust or inundate myself with continued trauma

through multiple simultaneous processes. I've been told that the grade

appeal process should not take long. ... I believe my grade appeal letter

was ... detailed enough to provide your office at least a foundation of the

concerns in terms of climate issues ....

92.    On December 20, 2016, Ellis emailed Brent and Douthit stating he received

correspondence from Nearpass regarding his contested grade appeal "as it related to bias,

discrimination, etc." Ellis continued "I wanted to update you that I informed Ms. Nearpass that I

am willing to partake in her questionnaire once the contested grade appeal process has concluded.

I prefer taking things step by step...."

93.     On January 19, 2017, Brent sent an email to Ellis denying his appeal. In his email,

Brent states:

> I have received and reviewed Dr. Lynch's and Dr. Volpe's
> responses to your written grade appeal for EDE 555 Comprehensive Exam
> Research. Both reviewers stand by their original assessment of your work
> (i.e., failing grade/no pass). In an e-mail directed to me dated 12/7/16 you
> expressed your desire not to review their responses. As we discussed, I am
> obligated by policy to forward Dr. Lynch's and Dr. Volpe's responses and
> do so as attachments rather than text so you may manage them
> accordingly.
> The Grade Appeal Policy now affords you the opportunity to
> pursue your appeal with the Program Chair, Kathryn Douthit. Though you
> initially indicated your intent to do so, I need to confirm you want to move
> to the next level of the appeal process. Further, should you choose to
> continue the appeal, you may supplement your original appeal with any
> materials you deem relevant to your case.
> Please contact me with any questions.

94.     That same day, Ellis sent an email to Douthit with Brent copied confirming

"receipt of the denial of contested grade appeal received from Dr. Brian Brent (Senior Associate

Dean) via Dr. Ellen Volpe and Dr. Martin Lynch." In the email, Ellis requested an appeal "to the

department chair level" and states he is "committed to appealing the decision ... upwards ...."

95.     On January 26, 2017, Ellis sent Nearpass an email with his responses to the Policy

106 Questionnaire attached. In his responses, Ellis states in relevant part:

- I believe that my academic rights with the exam evaluation exceeding one
  semester was on the basis of my race ....
- I believe that Dr. Lynch's unavailability and hi[s] not fully reading the
  methodology exam during its initial submissions was predicated on my
  race.
- ....
- I feel that mentorship was inadequate by White faculty members .... [M]y
  white counterparts ... were afforded in some cases double to triple [the]

amount of opportunities ....

- On May 18, 2016 I submitted a medical extension request to my comprehensive examination committee given that I was not able to fulfill and submit an additional exam. On June 1, 2016 the extension request/appeal was denied. I believe this request/appeal was denied on the basis of race and sexual orientation. .... Despite medical documentation being provided ... my request was denied. After the denial, I appealed to the Department Chair with the assistance of Morgan Levy to further advocate my Title IX request given that the extension request was [due to] sexual assault .... Despite ... depriv[ation] ... of my privacy, I provide[d] further details ... only to academic leadership ... they eventually approved my request even though harm in the initial denial had already been done.
- There have been numerous cases ... [of] microaggressions, bias[ed] treatment, and discrimination. ... []Logan Hazen, Ed.D.[] subjected me to racially motivated insults .... The emotional distress I endured ... made me fell [like] a Negro "boy" living in Selma, AL during the 1950s ....
- On November 28, 2014 I sent a listserv email to select Warner Faculty, Staff, Students, and community members. .... A tenured Warner faculty emerita sent me an email response .... paragraphs [contained] racial slights and insults towards people of color. ... [Dr. French] wrote a microaggressive dis[d]ain for all those Black victims and assailants in criminal cases. .... [Receiving the email] was disruptive to my learning process but I was no longer able to receive mentorship, advisement, or recommendations as a result .... I had reservations about this faculty member's racial intolerance before this incident ....
- [W]hat is most disturbing is the university's inability to protect victims such as myself from the harsh victimization of []retaliation. ... I have already been subjected to []retaliation given my initial grievance letters and complaints ....have been denied.

96.     On January 30, 2017, Ellis submitted a complaint against Rochester to the U.S. Department of Education's Office for Civil Rights. In the letter, Ellis complains of racial discrimination and gender discrimination. Ellis also alleges retaliation in the denial of his exam appeal, and notes racial microaggressions from Lynch and Volpe.

97.     On February 1, 2017, Ellis emailed Nearpass "Please forward my in-person interview request (travel expense) to Gail Norris (General Counsel) and President Joel Seligman. My request is appropriate and should be accommodated. I'll await their decision."

98.     On February 7, 2017, Norris replied to Ellis with Nearpass copied. In the email,

Norris states that Nearpass had conveyed Ellis's request for travel expenses to pursue an investigation under Policy 106. Norris shared the request with President Seligman. The university denied the request and offered a phone or skype conversation as alternatives.

99.     The same day, Ellis replies to Norris with Nearpass copied. In his email, Ellis stated his concerns about privacy in a phone or skype interview. Ellis continued that he has provided very detailed responses in his formal complaints and grievances, which he felt should be sufficient for any information the university needs. He continued that the university has not addressed the concerns raised in those complaints. Ellis noted that he is open to alternative interview methods, and suggested the possibility of doing an interview via certified mail.

100.     On February 28, 2017, Ellis supplied two supplements to his US Department of Education complaint. One supplement noted that although all but one of the incidents he had described "fall[s] outside of the 180-day timeliness requirement," he is alleging "a constant and persistent pattern" of discrimination as well as retaliation. In the other supplement, Ellis notes that the same committee members who had initially denied his medical extension retained decision-making power later on, during in the appeal process, and that "the academic policy in place did not [prevent this] continued retaliation and discrimination." Ellis also complained that he was never referred to counseling services or other assistance resources.

101.     On April 4, 2017, Douthit emailed Ellis a denial of his appeal. Subsequent quotation is from a later document: Brent's letter of May 13, 2017. In the letter denying the appeal, [Brent] stated: "Douthit determined that the originally assigned failing grade for [Ellis's] third comprehensive examination should stand (i.e., failing grade/no pass)."

102.     On April 6, 2017, Ellis supplied a fourth supplement to his complaint to the US Department of Education. In it he emphasizes retaliation: "The retaliation occurred from the

internal complaints submitted on the department, dean, and HR level within the university as well as notification of intent to file [a] complaint with the U.S. Department of Education Office for Civil Rights. The date of the retaliation occurred on the following dates: January 19, 2017 and April 4, 2017." Ellis alleges that his January 19, 2017 grade was a result of his [stated intention to file a] complaint [US DOE]. In the supplement Ellis also alleged that his grade evaluation on April 4, 2017 was a direct result of his complaint.

103.    On April 12, 2017 Ellis met with Douthit and Brent. In the meeting, Ellis complained of mistreatment following sexual assault, and noted (as described later to the US Department of Education) that his "gender identity was an issue for them and that they felt [his] sexual assault did not affect [his] performance. It was clear that they felt that it was better to dissolve me from studies th[a]n [to] address [his] complaints ...."

104.    Also on April 12, 2017, Ellis emailed Borasi and Brent a file requesting that Douthit and Brent "abstain from the review process" and that "an 'independent review committee be created with your consultation and consent.'"

105.    On April 13, 2017 Ellis indicated his desire to appeal to the Associate Dean.

106.    On April 26, 2017, Ellis emailed Borasi, Brent, and Douthit requesting confirmation of receipt of his email from April 12, 2017 (two weeks earlier). Brent and Douthit confirmed receipt and Brent noted "I am reviewing your requests ...."

107.    On May 1, 2017, Brent emailed Ellis stating "I have reviewed your appeals and made a determination in your favor. Please see the attachment."

108.    Also on May 1, 2017, the Title IX Coordinator informed Ellis that she would not investigate his sexual assault case.

109.    On May 3, 2017, Ellis wrote to the US Department of Education requesting

requesting that the Office for Civil Rights refile his complaint "appropriately and place it in evaluation stage." In the letter, Ellis also noted additional retaliation: Ellis described the April 12, 2017 meeting, and added that after that meeting he didn't have an opportunity to speak with either of them.

110.   On May 13, 2017, Brent wrote a letter to Ellis. The letter states:

I write, in part, to address your Appeal Request: Abstention from Review dated April 12, 2017 and, in part, your Grade Appeal initiated in November 2016.

Thus far, you have engaged in two levels of the appeal process. The instructors of record for your third comprehensive exam question stood by their original assessment of your work (i.e., failing grade/no pass) (e-mail communication 1/19/2017).

The Grade Appeal Policy then afforded you the opportunity to pursue your appeal with the Program Chair, Kathryn Douthit, and you elected do so (1/19/2017). Program Chair Douthit determined that the originally assigned failing grade for your third comprehensive examination should stand (i.e., failing grade/no pass) (April 4, 2017).

You now request (April 12, 2017) that Dr. Douthit and I abstain from the review process and an "independent review committee be created with your consultation and consent." I note that I am obligated to comply with the Warner Graduate School of Education and Human Development Grade Appeal Policy. The Warner School Grade Policy does not afford you the option of an independent review committee to consider your appeal. Therefore, I decline your request to appoint such a committee.

You also request that I, the party with whom your appeal now resides, suspend your appeal review until the "conclusion of the U.S. Department of Education for Civil Rights review." Warner Policy does not afford candidates the opportunity to postpone or delay the appeal process once initiated.

The Grade Appeal Policy afforded you the opportunity to appeal Program Chair Douthit's decision to the Associate Dean. During our phone conversation on April 13, 2017 you indicated your desire to do so. I have reviewed your appeal and, for the reasons below, will afford you the opportunity to "restart" comprehensive exam question three (i.e., methodology).

Preliminarily, I would like address several of the grounds for appeal that you have raised.

One issue of concern you raised involves the administration and process of the exam. You claim that "the persistent and unaddressed issues of bias, prejudice, and discrimination that have fueled this unfair comprehensive examination administration and process and that has hindered my success, my feelings of safety as a student, and has hindered my physical health" (Contested Grade Appeal, November 2, 2016, p. 17). Upon reading this passage, I referred your appeal to the University's Office of Counsel for assessment in accordance

with HR Policy #106. That is the only University process available for addressing claims of discrimination based on race or other protected class. I understand you have been in contact with the Office of Counsel, and I am therefore unable to address this particular concern.

A second issue that you raise involves "the blatant denial of my medical appeal for a comps extension on June 1, 2016 by the committee members. By those actions solely, I have determined "NO CONFIDENCE" in the fair, reasonable, equitable evaluation in this examination process" (Contested Grade Appeal, January 19, 2017, p. 24). I note that the committee is unaware of the circumstances surrounding your medical extension request as evidenced by their response to your extension request (Committee Response to Revised Grade Appeal, June 1, 2016). Further, Dr. Douthit, informed of the factors underlying your request, granted your request for an extension on appeal (June 14, 2016). Therefore, I do not approve your appeal based on this issue.

A third issue that you raise is that your exam did not receive a "timely" review. Dr. Douthit's assessment of your appeal indicates she previously attended to this concern by affording you, during a previous grade appeal, a third revision of your comprehensive exam. As she notes, "I consider irregularities in the process to have been resolved prior to your current appeal submission" (Douthit Appeal Review, April 4, 2017). Accordingly, I do not approve your appeal based on this issue.

The remaining grounds for your appeal, challenging the merit of the reviewers' comments and the CHD department's evaluative process I consider to be moot and I will not decide them. This is because I find an issue with the comprehensive exam three's administration, though not raised by you directly, that prompts me to accept your appeal. Specifically, your description of the examination process revealed that Dr. Swanson and Dr. Lynch were initially the primary readers for comprehensive exam three, and reviewed and provided feedback on your work for the initial submission, a first revision, and a second revision. Subsequently, Dr. Swanson, in good faith and with the belief that the likelihood of your successful completion of the exam would be enhanced, engaged Dr. Volpe to serve as a reader in her stead for the third revision.

The CHD Comprehensive Examination Guidelines specify that "two committee members are responsible for evaluating each paper" (p. 7), but does not dictate that the set of committee members remain the same throughout a given exam's assessment. Accordingly, I do not think that involving Dr. Volpe was in any way a violation of CHD guidelines. Nevertheless, I believe changing reviewers likely explains why your final revision deviated from earlier submissions prompting Dr. Lynch to note he was "puzzled by the student's choice to review a completely new set of studies, in this way effectively avoiding an opportunity to benefit from feedback on prior versions of the paper." In short, I hold that had your reviewers remained Dr. Lynch and Dr. Swanson, you might better have been able to meet satisfactorily the demands of comprehensive exam three.

I direct your committee to "restart" the process for comprehensive exam three. In other words, your committee should specify the question for

comprehensive exam three and regard your first response as the initial submission.   Subsequent revisions, if needed, will comply with the CHD Comprehensive Exam guidelines, including the specified review schedule.
Please contact me if you have any questions.

111.   On May 17, 2017, Ellis emailed Brent and Borasi a letter. In the letter, Ellis disputed Brent's characterization of the appeal having been granted in Ellis's favor because it "allowed" him to restart the exam rather than having him receive a passing grade for the work (including revisions) he had already performed. Ellis had requested that his already-submitted materials be reviewed by other professors due to his prior complaints of sex and gender bias.

112.   On May 21, 2017, Ellis submitted a complaint to the US Department of Justice's Civil Rights Division, Education Opportunities Section. In the complaint, Ellis complained of race and gender discrimination in the timeframe of January 2016 to May 2017.

113.   On May 24, 2017, Brent emailed Ellis confirming receipt of Ellis's May 17, 2017 letter and states "I understand that you do not want to pursue the Warner grade appeal policy … unless I abstain and appoint an independent review committee. As I have said, I am not willing to do either [of those things]. If and when you wish to pursue the appeal under the Warner policy, please let me know. I will take no further action at this time."

114.   On July 18, 2017, Ellis wrote to the US Department of Education's Office of Civil Rights in response to a request for additional information from Compliance Team Investigator Stacy Bobbitt, and also to emphasize a timely retaliation claim. In the letter, Ellis noted that during the April 12, 2017 meeting he complained of discrimination and the lack of support he received as a victim of sexual assault. Ellis complained that the response was hostile and skeptical of his claim of sexual assault. Ellis was asked if he is gay as a result of the sexual assault. Ellis was told that there are limited resources available to male victims of sexual assault. Ellis also noted that he made attempts to schedule follow-up meetings for discuss his graduate studies but he

was not afforded the opportunity. Ellis complained that the denial of an additional meeting was retaliatory.

115.   As a result of the misconduct described herein, Plaintiff has sustained significant emotional and physical distress, and economic damage.

116.   As a result of the race and sex discrimination federal complaint the University of Rochester in Spring 2019 has dismissed Mr. Francis Ellis without proper or any official notice, in addition placing a hold on his account, no registration allowed, and baring him from the university in retaliation. The only access Mr. Ellis has is transcript request.

## INJUCTION

117.   The Plaintiff Francis Ellis requests an immediate injunction order for relief of the student debt occurred under the breach of contract and discrimination endured by the University of Rochester to all loan lenders until this civil complaint is resolved.

## JURY DEMAND

122.   Plaintiff demands a trial on all issues triable by a jury.

## PRAYER

**WHEREFORE**, Plaintiff respectfully prays for a judgment as follows and that this Court declare that the acts and practices complained of herein are in violation of pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d *et seq.* ("Title VI"). Plaintiff also brings related common law breach of contract claims.

123.   Compensatory damages to the Plaintiffs for injury, emotional distress, and for medical expenses;

124.   Punitive damages against the Defendant UNIVERSITY OF ROCHESTER;

125.   Attorney's fees and cost; and

126.   Such other further relief as the court deems just and proper.

Respectfully Submitted

Dated this 19th day of May, 2019

_____/s/ Francis P Ellis_____

Complaint Francis P Ellis

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Western District of New York  ☑

| | | |
|---|---|---|
| FRANCIS ELLIS | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | |
| v. | ) | Civil Action No.   **19 CV 6380** CJS |
| UNIVERSITY OF ROCHESTER | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  UNIVERSITY OF ROCHESTER
263 WALLIS HALL
ROCHESTER, NY 14627-0040

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   FRANCIS ELLIS
203 MARKET ST
MARCUS HOOK, PA 19061

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  _____05/21/2019_____            _____
                                                                                *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

19 CV 6380 CJS

JS 44  (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

USDC-WDNY
MAY 22 2019
ROCHESTER

## I. (a) PLAINTIFFS
FRANCIS ELLIS

**(b)** County of Residence of First Listed Plaintiff   DELAWARE (PA)
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*  PRO SE
203 Market St Marcus Hook , PA 19061 (215) 429-1447

## DEFENDANTS
UNIVERSITY OF ROCHESTER

County of Residence of First Listed Defendant   MONROE (NY)
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☒ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
Title IX of the Education Amendemnts of 1972, U.S.C.§ 1681 and Title VI of the Civil Rights Act of 1964, 42 U.S.C.
Brief description of cause:
Race and Gender Discrimination, common law breach of contract.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions:)*
JUDGE _____   DOCKET NUMBER _____

DATE   05/21/2019
SIGNATURE OF ATTORNEY OF RECORD
Pro Se Francis Ellis

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____