UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

FRANCIS ELLIS,

                        Plaintiff,

    v.                                         19-CV-6380 CJS
                                            DECISION and ORDER

UNIVERSITY OF ROCHESTER,

                        Defendant.

─────────────────────────────────

## INTRODUCTION

*Pro se* Plaintiff,[1] Francis Ellis, brings this action complaining of discrimination, harassment, and retaliation under Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–88, and breach of contract under New York State law.  Now before the Court is a motion for summary judgment (ECF No. 169) pursuant to Fed. R. Civ. P. 56 by University of Rochester ("Defendant").  For the reasons discussed below, Defendant's motion is granted, and the action is dismissed.

## FACTUAL BACKGROUND

Briefly, Plaintiff describes himself as "a gay black man,"[2] and his primary claim is that he received a failing grade on his pre-doctoral-dissertation examination due to discrimination and retaliation.  He also maintains that Defendant subjected him to a hostile educational environment and breached a contract to provide him with a discrimination-free education.  The Defendant

---

[1] Plaintiff previously had retained counsel for several months before discharging his attorney and continuing *pro se*.

[2] Complaint at ¶ 15.

University denies those allegations and maintains that Plaintiff failed his examination despite being given preferential treatment.  Specifically, Defendant indicates that Plaintiff failed his exam based on the evaluations of a three-member faculty committee that he selected, including the committee chair, who is an African-American professor, and that despite such failure the University deviated from its usual grading practices and gave him several additional opportunities to re-take the exam, which he also failed, and that the University nevertheless offered him one final opportunity to pass the exam, which he declined.

The specific relevant facts, viewed in the light most-favorable to Plaintiff and with all reasonable inferences drawn in his favor, are as follows.[3]  In March 2011, Plaintiff enrolled in Defendant's Human Development in Educational Contexts Ph.D. Program ("Program") in the Warner Graduate School of Education ("Warner School").  Def. Statement of Facts, ¶ 1, Nov. 1, 2021, ECF No. 169-120.  The Program requires Ph.D. candidates to pass a "Comprehensive Examination" before beginning their dissertations.  *Id.* at ¶ 2.  The Comprehensive Examination is comprised of three written papers: (1) a "Theory" paper; (2) a "Literature" paper; and (3) a "Methods" paper.  *Id.* at ¶ 3.  Each paper is graded by two members of a three-person committee selected by the student, and are assigned a grade of "pass" or "fail."  *Id.* at ¶¶ 6–7.  Committee members are not required to be employees of the University.

---

[3] To the extent that certain information set forth in Plaintiff's Counterstatement of Facts does not appear in this Decision and Order, it is because it is either not factual (*i.e.*, unsupported/conclusory assertions or argument) or not relevant to the legal issues in this action.  As just one example of this, in response to Defendant's factual statement that Plaintiff admitted in an email (which is part of the record) that he had been negligent in failing to request an extension of a deadline, Plaintiff makes the following argumentative and conclusory assertion: "Despite the statement in the email that the victim stated he was 'negligent' in delay, the Plaintiff is not negligent as that places blame on the victim for being sexually assaulted." Pl. Stmt. Of Facts at ¶ 68; *see also, id.* at ¶ 101 ("Brent['s] May 13, 2017 decision directing the Plaintiff to 'restart' the comprehensive exam . . . was morally and ethically wrong, based in bias and discriminatory practice[.]").  As discussed further below, such argumentative statements are not entitled to be accepted as true for purposes of a summary judgment motion.

Importantly, to pass the Comprehensive Examination, students must achieve a passing grade on each of the three papers, and are allowed one resubmission per paper. *Id.* at ¶ 5. Ordinarily, students receiving a failing grade on a resubmission are dismissed from the Ph.D. program and must petition the faculty for readmission. *Id.*

Plaintiff's chosen Comprehensive Examination Committee consisted of the committee chair, Dr. Dena Swanson ("Swanson"),[4] Dr. Martin Lynch ("Lynch"), and Dr. Ellen Volpe ("Volpe") ("the Committee"). *Id.* at ¶ 8. Swanson and Lynch were both associate professors of the Warner School and employees of the defendant University, and Swanson, like Plaintiff, is African American. Volpe was a faculty member of the University at Buffalo School of Nursing, and therefore not an employee of Defendant. *Id.*

Unrelated to his Comprehensive Examination, in the Fall of 2013, Plaintiff alleges that on between six-and-nine occasions, Professor Logan Hazen ("Hazen") subjected him to "racially motivated insults" by telling him, at the conclusion of their conversations, to "stay out of trouble." These conversations occurred while Plaintiff was working for Hazen as a research apprentice.[5] Plaintiff, who maintains that he never heard anyone else use that expression,[6] contends that he found that phrase "stay out of trouble" "racially insulting," and that on approximately three occasions he asked Hazen not to use it, and that Hazen responded by saying, "African American

---

[4] As the Committee Chair, Swanson usually was the Committee member to correspond directly with Plaintiff about the comprehensive exam.

[5] Pl. Deposition at p. 70 ("I think I had a research apprenticeship with him during that term.").

[6] Pl. Deposition at p. 72.

males should stay out of trouble."[7]    Hazen was never involved in the review or grading of Plaintiff's Comprehensive Exam.

On January 29, 2014, Plaintiff submitted the first of his three Comprehensive Exam papers (the "Theory Paper"), which was reviewed by Swanson and Volpe.  On March 18, 2014, Volpe reported that her "major concerns" about the paper were that it" did not flow well," lacked supporting literature for its claims, had "stylistic issues," and was poorly organized.[8] Nevertheless, Swanson and Volpe agreed to give the paper a "marginal pass[ing grade]," meaning that it received a passing grade even though problems with the quality of the writing were "of sufficient concern to [cause the Committee to] consider [requiring Plaintiff to make] a resubmission."  Brent Decl., Ex. E, p.3, ECF No. 169-10; Def. Statement of Facts at ¶¶ 11, 14. In sum, the Committee cautiously gave the paper a passing grade with the expectation that Plaintiff's subsequent submissions would be better.[9]

On February 12, 2014, Plaintiff submitted his Literature paper, which received a failing grade from both Volpe and Lynch.  Def. Statement of Facts at ¶¶ 15–19.  In that regard, on March 26, 2014, Volpe indicated that the paper suffered from many of the same problems as

---

[7] Pl. Dep. At pp. 69-74, 80-81.  In several written complaints to the University about the incident written before this action was commenced, Plaintiff uniformly indicated that Hazen stated only, "Stay out of trouble," which Plaintiff interpreted as "implying" that African American males should stay out of trouble.  However, during Plaintiff's deposition, when defense counsel pressed him on why he would interpret the statement "stay out of trouble" as a racial insult, Plaintiff asserted that Hazen had *expressly* stated that "African American males should stay out of trouble." *Id.* at pp. 79-81.  Despite this apparent embellishment of what Hazen actually said, the Court does not resolve issues of credibility on a summary judgment motion and accepts as true Plaintiff's deposition testimony for purposes of this Decision and Order.

[8] Def. Stmt. Of Facts at ¶ 13.

[9] *See, e.g.*, email dated September 5, 2015 from Dr. Swanson, ECF No. 184 at p. 133 ("With each of these [(referring to the Literature paper and the Theory paper)], there were a few significant areas of concern to address in developing the [doctoral] proposal if all comp papers are passed; while the comps met the basic criteria for passing, the proposal would be expected to meet a much higher quality of writing and conceptual framing as expounded on in the feedback provided.").

Plaintiff's Theory paper and, additionally, that Plaintiff lacked proficiency with citations, was unsystematic in his evaluation of the relevant literature, had relied on outdated literature, and had overlooked some key research.[10]  Similarly, on March 26, 2014, Lynch indicated that he found too many problems with spelling, grammar and style to give the paper a passing grade.[11]

On February 26, 2014, Plaintiff submitted his Methods paper, the third and final aspect of the comprehensive examination.

On April 17, 2014, Plaintiff resubmitted the Literature paper.

On June 2, 2014, Lynch gave Plaintiff's re-submitted Literature paper a passing grade, though he indicated that the paper still had numerous problems, including "a number of grammatical problems" and a general failure to follow "APA format."[12]  Lynch indicated that Plaintiff "need[ed] to put substantial effort into improving his academic writing skills, including making use of all of the resources available . . . perhaps even taking a doctoral-level course in academic writing, such as those offered at Warner."  Lynch Decl., Ex. E, p.2, ECF No. 169-94; *see*, Def. Statement of Facts at ¶¶ 21–22.  Volpe similarly gave the resubmitted paper a passing grade.

On June 23, 2014, Plaintiff learned that Lynch had been awarded a Fulbright Scholar Award.  According to Plaintiff, he was "very excited for Dr. Lynch's accomplishments and sent him a congratulations email."[13]  Subsequently, in connection with the Fulbright Award, Lynch

---

[10] Def. Stmt. Of Facts at ¶ 17.

[11] Def. Stmt. Of Facts at ¶ 18; *see also, id.* at ¶ 8 (Lynch reported that there were "quite a few issues . . . having to do with spelling, grammar, and use of APA style.").

[12] Def. Stmt. Of Facts at ¶ 21.

[13] ECF No. 185-1 at p. 46.

traveled to Russia, and remained there for approximately one year,[14] communicating with the other Committee members and Plaintiff exclusively by email.

On July 1, 2014, with the Committee's permission, Plaintiff revised his Methods paper, before it was graded, to incorporate feedback he had received from the Committee about his Theory and Literature papers.[15]  Def. Statement of Facts at ¶¶ 24–26.[16]

During the Fall Semester of 2014, and unrelated to the comprehensive examination or any class that Plaintiff was then taking, Plaintiff and professor Lucia French ("French") had an email exchange concerning a social-media post that Plaintiff had written concerning race and criminal justice.[17]  French referred, in passing, to an incident in the news in which an African-American adult had killed an African-American youth in a dispute over drugs near her home. Plaintiff found French's statement about the incident offensive and racially insulting insofar as it made "gratuitous reference" to the race of the individuals involved.

As for Plaintiff's Methods paper, on September 18, 2014, Lynch preliminarily commented to Swanson that it appeared Plaintiff had "put quite a lot of work into the paper," but that Plaintiff's writing was nevertheless problematic, since, for example, it "demonstrate[d] a lack of clarity about the relevant quantitative methods under investigation[.]" Lynch Decl., Ex. J, p.2, ECF No. 169-99.  Consequently, Lynch gave the paper a failing grade.  Volpe also gave the paper a failing

---

[14] ECF No. 185-1 at p. 46.

[15] Because the deadlines for the three papers were relatively close in time to each other, Plaintiff had submitted the Methods paper without the benefit of the Committee's feedback on the first two papers.

[16] On September 6, 2014, Plaintiff submitted his Methods paper again to Lynch and Swanson, at Swanson's request, because there had been a delay in providing Plaintiff feedback on the paper.  Lynch Decl., Ex. I, p.2, ECF No. 169-98.

[17] *See*, Complaint at ¶ 25 (Indicating that French was responding after Plaintiff "sent an email to a Program listserv.  The email contained a link to a website [apparently a Gofundme website] that document [Plaintiff's] then-recent trip to Ferguson, Missouri.").

grade, thus requiring a resubmission.  In that regard, Swanson emailed Plaintiff and explicitly cautioned him to address all the Committee members' comments and to carefully proofread the revised paper "because (without a formal appeal) this would be the last opportunity for a resubmission." Brent Decl., Ex. K, p.2, ECF No. 169-16.  Two days later, Plaintiff formally resubmitted his Methods paper.  *See*, Lynch Decl., Ex. K, p.2, ECF No. 169-100.

On October 13, 2014, Lynch emailed Plaintiff asking him for a "clean copy" of his Methods resubmission, since the copy Plaintiff had submitted still bore editorial comments from the first submission.   Swanson again urged Plaintiff, before sending the clean copy to Lynch, to first devote more time to editing it, since, "[g]iven the consistency of the feedback [Plaintiff had] received over time, [Swanson] wanted to make sure this last [submission] read[] well and [was] structurally and conceptually sound to mitigate potential concerns or challenges regarding [Plaintiff's] status in the program."  Brent Decl., Ex. L, p.2, ECF No. 169-17; *see*, Def. Statement of Facts at ¶¶ 30–31.  The extent to which Plaintiff heeded that advice is unclear, since he submitted a "clean copy" of his Methods resubmission to Lynch that same day, October 13th. Def. Statement of Facts at ¶ 32.

On October 18, 2014, Lynch provided Swanson with his assessment of Plaintiff's Methods paper resubmission, namely, that "even with the benefit of having received feedback on his first submission, [and] even with the benefit of (evidently) having received professional writing assistance—[Plaintiff's Methods resubmission] d[id] not meet the minimum standard that [Lynch] would expect of a Ph.D. candidate."  Lynch Decl., Ex. N, p.2, ECF No. 169-103.  Lynch further noted that he was "not sure . . . that [Plaintiff] ha[d] adequately demonstrated his understanding of the methods and methodologies of the studies that [Plaintiff] [] reviewed" and that he "suspect[ed] that [Plaintiff] would have *considerable* difficulty at the dissertation stage."  *Id.*

7

(emphasis in original).   Consequently, Lynch gave the re-submitted Methods paper a failing grade.

Volpe similarly gave the paper a failing grade.   Consequently, Swanson notified Plaintiff that he had not received a passing grade on his Methods resubmission and had therefore failed his Comprehensive Examination.  *See*, Def. Mem. of Law, at 5, ECF No. 169-121.

On November 13, 2014, Plaintiff emailed Lynch, copying Swanson and Dr. Kathryn Douthit ("Douthit"), Chair of the Warner School's Counseling and Human Development Department, acknowledging that he had failed the comprehensive exam.   Def. Statement of Facts at ¶ 36.   Plaintiff simultaneously "extend[ed] [his] deep gratitude for [Lynch's] support, mentoring, and feedback during [his] coursework and comprehensive exams."  Lynch Decl., Ex. O, p.2, ECF No. 169-104.  More specifically, Plaintiff wrote to Lynch:

> Even though I did not meet your minimum standard that you expected in a Ph.D. candidate, I want to extend my deep gratitude for your support, mentoring, and feedback during my coursework and comprehensive exams.  Your mentoring to students including myself is admirable and appreciated.
>
> ***
>
> You last evaluation gives me a basis for evaluating my own work and development. It is unfortunate that I did not pass the methodological exam, but your feedback gives me a basis for continued growth in my future academic and scholarly pursuits.  I truly appreciate your time and review over the past year.  Have a happy and joyous Thanksgiving.  Blessings.

ECF No. 169-57 at p. 4.

Subsequently, however, Plaintiff began to complain about alleged racial "issues" at the University.  On November 18, 2014, Plaintiff sent an email to French thanking her for writing him a "neutral" letter of recommendation,[18] but also purporting to express concerns over alleged

---

[18] Plaintiff sent the message to French after she had indicated that she could not provide a positive recommendation for him due to his poor academic performance, and that she did not think he would be successful in any subsequent doctoral program.  In particular, French stated: "I want to let you know that if I write

"systematic issues and policies that hindered" "students of color" at the Warner School.  Douthit Decl., Ex. C, pp.2–3, ECF No. 169-59.  In that regard, Plaintiff stated that he had not previously "explicitly discussed" his concerns "with faculty," but wanted French to be aware of them. (He also copied-in Douthit and Swanson on the message)  In particular, Plaintiff opined that "there [was] still a legacy of institutional stratification that is salient in the doctor student experiences which hinders the academic trajectories of students of color," and that while there was "faculty, staff, and administrators members [sic] who [were] committed to diversity and social justice," there were "systemic issues and policies that hinder[ed] their efforts."  As evidence of that, Plaintiff asserted that since 1976, twenty-two students at the University had received a "Doctor of Philosophy degree in Human Development," only one of whom was "Black/African American."  In his letter, Plaintiff did not mention either Hazen's alleged offensive statements in 2013 or French's alleged racially-offensive comments to him earlier that semester, nor did he assert that any staff member had discriminated against him personally, or that his failure to pass his comprehensive examination had been due to discrimination.

On January 7, 2015, in an email to Douthit and Swanson, Plaintiff appealed the failing grade on his Methods resubmission.  Def. Statement of Facts at ¶ 38.  In his appeal, Plaintiff stated that Lynch was "an exceptional scholar, valued asset, and mentor in this process," and that, accordingly, he "di[d] not contest Dr. Martin F. Lynch's final evaluation" of his Methods resubmission.  Plaintiff stated, though, that there was a "need for a collective group of mentoring

---

a letter of recommendation for you as you apply to other graduate schools, that letter would be relatively neutral, only confirming that you had taken courses with me and had served as my teaching assistant.  I would not write, in that letter, that your literature review in Spring 2013 was very poorly written and that you did not take me up on my offer to help you revise it so that you could have guided practice in learning to write a literature review.  I would not write that your committee members were very disappointed with your comprehensive exams.  I have assumed that you were not academically successful at Univ. of Pennsylvania.  And at this point it appears that you are not being academically successful at Warner.  I don't see why things would be different in a third doctoral program."

to foster the development of all students regardless of background and to outline issues that hinder the academic growth of students who have historically be [sic] disenfranchised with the HD [Human Development] program." ECF No. 169-60 at p. 4.  By that, Plaintiff evidently meant that his inability to pass the Comprehensive Exam was the result of the University's failure to provide "mentoring" to minority students.

Douthit and Swanson subsequently discussed Plaintiff's appeal, and Douthit asked Swanson to review the Methods paper to see whether she agreed that it deserved a failing grade. Swanson did so, and concurred with the assessment of Lynch and Volpe that the paper did not deserve a passing grade.[19]  Nevertheless, Douthit decided to allow Plaintiff to make an additional resubmission.   In February 2015, Swanson informed Plaintiff that he would be given the opportunity to resubmit his Methods paper for a second time, thereby exceeding the usual "one resubmission rule" for comprehensive exam papers.  Def. Statement of Facts at ¶¶ 39–41; *see*, Brent Decl., Ex. M, p.2, ECF No. 169-18.

On May 10, 2015, Plaintiff re-submitted his Methods paper for a second time.   The following month Plaintiff left Rochester and moved to Atlanta, Georgia, to pursue an internship. *Id.* at ¶¶ 42–43.

In the fall of 2015, Lynch and Volpe each evaluated Plaintiff's second resubmission and concluded that it did not deserve a passing grade.  *See, id.* at ¶¶ 44–48.  For example, Lynch stated:

> In my view, a comprehensive exam should be clean enough to eat one's breakfast off of it on the *first* submission; unfortunately, in the first 10 p[ages] of this third attempt I have already made 48 marginal comments and an uncounted number of textual edits . . .  including quite a number of issues to which I called attention in earlier versions of the paper.  . . .  [I]t's a bit frustrating to me, as reviewer, to be

---

[19] Def. Stmt. Of Facts at ¶ 40.

encountering many of the same issues on this third iteration that I noted in previous versions – it almost feels like carelessness (in the literal and figurative sense) on the writer's part.

ECF No. 169-106 at p. 3 (emphasis in original).  Volpe, meanwhile, commented that, among other problems with the paper, Plaintiff "seem[ed] to lack the ability to synthesize the literature in order to make meaningful conclusions."[20]  Consequently, on October 22, 2015, Swanson informed Plaintiff via email, with copy to Douthit, that Plaintiff's second resubmission (his third submission of the Methods paper overall) "did not meet the criteria for a pass," and that she "kn[e]w of no other paths [for Plaintiff] to pursue."  Douthit Decl., Ex. H, p.2, ECF No. 169-64.

On November 11, 2015, having again failed the Comprehensive Exam, Plaintiff emailed two academic grievance letters to Dr. Brian Brent ("Brent"), Associate Dean of the Warner School.  Def. Statement of Facts at ¶ 50.  The letters were entitled "Letter of Academic Grievance" and "Letter of Diversity and Equity in Education Grievance," respectively.   In his "Letter of Diversity and Equity" Plaintiff generally reiterated the same theme expressed in his earlier letter to French, namely, that "students of color" at the "93 percent White" University faced a difficult, "toxic" "social climate" that was "not unique just to the Warner School but maybe [sic] the climate of academia in general."  Plaintiff also vaguely referred to "salient issues of diversity and equity," and further alleged that "systematic oppression serves as foundation in institutional policies and procedures" at the University.   Plaintiff also claimed that he had personally experienced "racism and racial microaggressions[21] [that had] legitimately hindered [his]

---

[20] Def. Stmt. Of Facts at ¶ 45.

[21] Plaintiff explained that "microaggressions are subtle insults (verbal, nonverbal, and/or visual) directed toward people of color, often automatically or unconsciously.  Racial microaggressions furthermore, 'is a modern form of racism.'"

academic performance [and] productivity," and, as evidence of that, asserted that there was "only 1 Black faculty member out of the 13 within the department of counseling and human development."  Also, as evidence of so-called "verbal microaggression" to which he had been subjected, Plaintiff alleged that "a Warner faculty member," evidently referring to Hazen, had "on repeated occasions implied[22] that [he] should stay out of trouble," which had caused him "emotional distress" that made him "feel as if [he] was a 'Negro boy' living in Selma, AL, during the 1950s not even seen as a man."  Plaintiff also vaguely asserted that "the climate" at the University had "impacted [his] doctoral academic experience," though he again stopped short of blaming such "climate" for his failure to pass the Comprehensive Exam.  Plaintiff closed his "Diversity and Equity letter" by expressing the hope that there would be "a strategic plan on facilitating climate that is culturally supportive to students of color."

Plaintiff's "Letter of Academic Grievance," meanwhile, complained primarily about the "review" that had been given to his Methods paper by the Committee members.  In that regard, Plaintiff began by stating that he was "deeply appreciative of the feedback/review" he had received, which he had found "extremely valuable."  However, Plaintiff complained that the timing of the feedback had not been optimal for him "to developmentally grow as the 3 [C]ommittee members may have anticipated growth to occur."  Plaintiff indicated, for example, that Lynch had been slow to provide feedback on his Methods paper, and implied that Lynch may not have given the task the proper attention, since he had been on leave, in Kazan, Russia, for his Fulbright Fellowship at the time.  Plaintiff also stated that it might have been helpful for him if Committee members had directed him to completely re-write his papers rather than make revisions. ("Even though the revision comments were individually addressed, it may have been beneficial for the

---

[22] *See* footnote 5 above.

reviewer to request a "rewrite" (completely new exam) instead of attending to the initial request for revisions."). Plaintiff also repeated his earlier contention about the need for additional mentoring at the University, and further suggested that additional procedures, such as "a pre-comprehensive examination meeting" and "methodological training and support" would have been helpful to him. Plaintiff closed his letter by stating that he hoped it would serve "as an avenue of appeal in [his] particular case, but also [as] an expression of concern for other students who may not have been afforded the opportunity" to advocate for themselves.

The University forwarded Plaintiff's "Diversity and Equity Letter" to its Office of Counsel as a potential complaint under "Policy 106," the University's internal policy on discrimination and harassment. *Id.* at ¶¶ 50–51. Catherine Nearpass ("Nearpass"), an investigator from Defendant's Office of Counsel, contacted Plaintiff, who told Nearpass that "[t]he purpose and intent o[f] the 'Diversity and Equity in Education Grievance' letter [had been] to bring formal attention to ongoing climate issues within the Warner School" and to provide some recommendations on how to address discrimination within the school going forward. Compl., ¶ 43, May 22, 2019, ECF No. 1; *see*, Def. Statement of Facts at ¶ 52.

On December 1, 2015, at the direction of Douthit and/or Brent, Swanson notified Plaintiff that the University would allow him to make a third resubmission of his Methods paper, with a deadline of February 26, 2016. Def. Statement of Facts at ¶¶ 54–55. Swanson indicated that such resubmission would be Plaintiff's last opportunity to pass the comprehensive exam, short of a formal appeal process. *See, id.* at ¶ 54.

However, on January 3, 2016, Plaintiff notified Swanson and Volpe by email that he had sustained a "medical injury" and could not "attend to his [Methods paper] outline till [he was] out

of recovery as recommended by [his physician] . . . [a]nticipated [to be] . . . January 21st, 2016 or later."  Brent Decl., Ex. U, p.2, ECF No. 169-26; Pl. Deposition at p. 115.

Later in January 2016, Plaintiff traveled to Rochester and, while there, met with Volpe to discuss an outline for the third resubmission of his Methods paper. *See*, Def. Statement of Facts at ¶ 59.  During this meeting, Plaintiff maintains that Volpe commented in passing that "African-American students often struggle in doctoral programs," which Plaintiff contends was both false and a racist "microaggression."

Plaintiff contends that during this same meeting he told Volpe that the "medical injury" he had sustained in December 2015 was the result of a sexual assault against him in Atlanta. Plaintiff maintains that he also verbally conveyed that same information to Swanson at some point in or about January 2016.  There is no evidence of record, however, that at the time of such conversations Plaintiff ever expressly told Volpe or Swanson that he was unable to meet the February 26th deadline, nor did he request or obtain an extension of that deadline.[23]

Plaintiff subsequently failed to submit his Methods paper by the February 26th due date, or at any point thereafter during the Spring 2016 semester.  *Id.* at ¶ 60.

Consequently, on May 18, 2016, at the conclusion of the semester, the University assigned Plaintiff a failing grade for his Comprehensive Examination.  That same day, Plaintiff filed a formal appeal of the failing grade. *See, id.* at ¶ 62.[24]  In his appeal, Plaintiff requested that

---

[23] Plaintiff admittedly did not request an extension of the deadline until May 18, 2016, the same day that he received a failing grade for the comprehensive exam, after not handing in his resubmission of the Methods paper by February 26, 2016.  Complaint at ¶ ¶ 52-53.

[24]  Plaintiff suggests that Defendant did not enter a failing grade for his comprehensive exam course on or before May 18, 2016.  *See*, Pl. Statement of Facts, ¶¶ 62–67, Mar. 1, 2022, ECF No. 185.  However, it is clear that Plaintiff's failing grade was entered on or before May 18, 2016, because he submitted a formal grade appeal letter to Swanson, Lynch, Volpe, and Brent that same day, May 18, 2016. *See*, Brent Decl., Ex. AA, p.2, ECF No. 169-32; Complaint at ¶ 56.

he be given a *nunc pro tunc* extension of the missed February 26th deadline for the third resubmission of his Methods paper, and that his grade be changed "from an E (failure) to an I (incomplete) while [he] . . . finish[ed] the reassessment exam."   Brent Decl., Ex. AA, p.3, ECF No. 169-32.  The "sole" reason that Plaintiff offered in support of the appeal was a "medical injury that [he] suffered in Spring 2016 (mid-January)."[25]   At some point during discussions with the University about the appeal, Plaintiff indicated to Douthit and Brent that the injury he sustained was related to a sexual assault against him that had occurred in Atlanta.[26]

Plaintiff made clear, however, that he was "not contesting the evaluations and feedback [previously] given" by the Committee members, and he admitted that he had missed the February 26th deadline due to his own "negligence in the delay of not following up with [his] [medical] progress."  *Id.* at p.4.[27]  Plaintiff further stated, in pertinent part:

> I believe that the feedback in terms of all 3 exams was critical, enhanced my own development, and provided me a new lens for reading and responding to reviewed feedback.  I truly value the feedback that I have received from the committee members.  I also appreciate the individual mentoring that I have received from all 3 committee members.
>
>                                 ***
>
> Given the unique contribution that each of my committee members brought to my design and writing of the prior exam submissions, I am not contesting the evaluations in feedback given on the basis that I feel that it was critical to my

---

[25] *See*, ECF No. 169-32 at p. 3 ("I am requesting that an extension of the reassessment exam be granted given the medical injury that I suffered in Spring 2016 (mid-January)."; *see also*, ECF No. 169-37 at p. 4 ("Your appeal has requested the committee consider your injury as the sole factor prohibiting you from meeting the conditions of the resubmission.") (referring to Plaintiff's failure to meet the February 2016 deadline).

[26] ECF No. 169-37 at p. 4.  Again, Plaintiff maintains that he also verbally told this to Volpe and Swanson in or about January 2016.

[27] *See*, ECF No. 185-1 at p. 17 ("Despite me informing my committee members (Dr. Ellen Volpe and Dr. Dena Swanson) of my injury in person and via email, it was my negligence given my injury in the day of not following up with my progress.  Given the medical events, and personal experiences I was not readily able to submit the exam on the deadline that I had originally agreed upon, and for that I apologize.").

understanding of my topic of inquiry and the development of analytical skills in my growth as a scholar.

ECF No. 169-32 at pp. 3-4.

Brent referred Plaintiff's appeal to the Committee for a decision on whether to grant an extension.[28]  The Committee discussed the matter and voted to deny the appeal.  In that regard, Lynch indicated, for example, that he did not think Plaintiff had shown that he actually had been unable to submit his paper on time, and that he did not think Plaintiff would likely benefit from a further extension of time in any event, since Plaintiff had already failed on multiple occasions to correct the problems that had led to his Methods paper receiving a failing grade.[29]  Volpe, meanwhile, indicated that she did not think Plaintiff had been diligent in pursuing the matter.[30] Swanson also voted to deny Plaintiff's request.

On June 1, 2016, Swanson informed Plaintiff that the Committee was denying his appeal, noting that his "most recent opportunity to submit a revised [M]ethods [paper had been his] third [opportunity], exceeding opportunities generally offered [to] students with challenging life circumstances."  Brent Decl., Ex. FF, p.4, ECF No. 169-37.[31]  Swanson stated that there was "no indication that [Plaintiff's] injury [had] prevented [him] from attending to the resubmission criteria or following up to assess viable options [sooner] given [his] circumstances."  *Id.*  Swanson noted, for example, that even despite his alleged injury, Plaintiff had been well enough to travel

---

[28] Def. Stmt. Of Facts at ¶ 71.

[29] Def. Stmt. Of Facts at ¶ 74.

[30] Def. Stmt. Of Facts at ¶ 72.

[31] As the Complaint notes, Swanson also pointed out in passing that the Committee had been "lenient" in awarding passing grades to Plaintiff's Literature and Theory papers. *Id.* at ¶ 69 ("The leniency provided by the Committee in passing your literature and theory comp submissions was predicated on your addressing concerns raised in those reviews when writing your final methods comp.").

to Rochester and meet with Volpe in January 2016, and to attend, and make a presentation at, "the Society for Research on Adolescence conference" in March 2016. ECF No. 169-70 at p. 4; Complaint at ¶ 69.[32]

That same day, June 1, 2016, Plaintiff telephoned Morgan Levy ("Levy"), the University's Title IX Coordinator and Director of Equal Opportunity Compliance, purportedly to seek her assistance both in appealing the Committee's denial of his request for an extension of time and to obtain "services" for sexual assault victims. Plaintiff indicated at his deposition that he told Levy the following: "I told her my predicament. I told her about the sexual assault. I told her about the comprehensive exams. I told her that I needed assistance as it related to services for sexual assault victims and completing my exam."[33] It is undisputed that the person who assaulted Plaintiff in Atlanta was not "connected with the University of Rochester."[34] Plaintiff maintains that Levy told him that there were no "services" available for him, since the sexual assault had occurred "off campus," in Georgia.[35] During discovery in this action, Plaintiff asked Levy whether she recalled this telephone conversation, and Levy testified that she did, stating Levy further stated, in pertinent part:

> You and I had, I think, one conversation. When you had called my office. And asked for assistance with an incident that had happened. In another state, and I assisted with that.

***

---

[32] Plaintiff's Complaint also indicates that by mid- to late-January 2016, he was able to travel to Rochester and have various meetings with faculty. Complaint at ¶ ¶ 47, 50.

[33] Pl. Dep. At p. 130.

[34] Pl. Dep. At p

[35] Pl. Dep. At p. 130-132. Plaintiff indicated that he could not recall exactly whether Levy told him that she could not investigate his claim or whether she could not provide any services. ("I believe she was referring to services that the University could provide but I know it was – it's my assumption and I don't want to speculate.").

You had called to request assistance.  And had shared that you had been sexually assaulted by I believe it was someone who you' d met through work and you had shared that you needed some extra time to complete some thing I don't know if it was a project or comps or something like that and we talked through kind of what I could do to help in that situation since the person who you had reported was responsible for assaulting you, was not connected to the university in any way, and so we talked about providing a connection to resources and seeing if I could assist with getting some more time for you to be able to complete the work that you needed to complete.

***

We [also] discussed resources related to being a victim of sexual assault.  I recall talking about how we could try to connect you to a not-for-profit organization like we would have in Rochester, but where you were living at the time.  My recollection is that you had made a report to the police and had access to resources or got information from resources about them.

***

I recall from your conversation that I explained that I could not open an investigation into this matter because the person who was accused of the assault was not connected to the university and that there was the circumstances surrounding what happened were not part of the university's educational program or activity, and therefore we didn't have jurisdiction over the other person that would allow us to do an investigation.

***

My recollection of our conversation is that I asked what resources you would like to be connected to.  We discussed how I could help try to identify resources in the state that you were located [in] and you declined my assistance.  That your focus was really on needing to get extra time for work that needed to be completed for the Warner School.

***

[Your complaint about the sexual assault against you in Atlanta] isn't something that we could pursue as Title IX complaint, because it wasn't, it was not an allegation in connection with the educational program or activity.

***

[I]t wasn't something that could be considered a Title IX complaint because the person who assaulted you was not connected to the university and the incident was not connected to the university.

ECF No. 184 at pp. 192-193, 198.[36]  Subsequent to her telephone conversation with Plaintiff, Levy assisted him in appealing the Committee's denial of his request for an extension of time to re-submit his Methods paper.[37]

Plaintiff also subsequently contacted Brent, who told Plaintiff that he could appeal the Committee's decision to Douthit.[38]  On June 6, 2016, Plaintiff appealed the Committee's denial (of his request for a *nunc pro tunc* extension of the missed February 26th deadline) to Douthit.[39]

On June 14, 2016, Douthit overturned the Committee's decision, granted Plaintiff another opportunity to resubmit his Methods paper, and changed Plaintiff's grade to "incomplete" in the interim.[40]  Douthit indicated that her decision to deviate from the Committee's ruling was based on "compelling supplemental information," evidently referring to additional information that Plaintiff provided to her concerning the alleged sexual assault in Atlanta.[41]  In doing so, Douthit

---

[36] *See also*, Levy Affidavit, ECF No. 169-118 at pp. 1-2 ("The University could not investigate the reported sexual assault due to the fact that it involved an assailant that was not affiliated with the University and could not provide direct services to Plaintiff in connection with his reported sexual assault given his physical presence in Atlanta, Georgia (rather than Rochester, New York)."

[37] At his deposition, Plaintiff implied that he could not recall whether Levy had assisted him in appealing the Committee's decision. Pl. Dep. At pp. 132-133. However, contemporaneous with the events (in his response to the University's Policy 106 questionnaire, discussed below), Plaintiff admitted that Levy provided assistance with his appeal: "After the denial, I appealed to the Department Chair of my degree program with the assistance of Morgan Levy to further advocate my Title IX request given that the extension request was further predicated on [a] sexual assault incident."

[38] Def. Stmt. Of Facts at ¶ 78.

[39] Def. Stmt. of Facts at ¶ 79.  In arguing for the reversal of the Committee's decision, Plaintiff characterized the alleged sexual assault in Atlanta as a "Title IX incident," even though Levy, the University's Title IX officer, had already told him that the incident did not fall under Title IX. See, Complaint at ¶ 73.

[40] Def. Stmt. Of Facts at ¶ 80.

[41] Complaint at ¶ 77.  Plaintiff admits that he provided more information to Douthit and Brent about the situation than he previously provided to the Committee. *Id.*at ¶ 95.  In particular, Plaintiff told Nearpass that after the Committee denied his request for an extension of time, he "provided further details . . . only to academic leadership," referring to Douthit and Brent. *Id.*  Moreover, Brent, in a communication in May 2017, observed that when the Committee denied his request for an extension of the missed February 26th deadline, it had been "unaware" of the particular circumstance of his alleged injury. *See*, Complaint at ¶ 110 ("I note that the Committee is unaware of the circumstance surrounding your medical extension request as evidenced by their response to

essentially granted Plaintiff all the relief he had requested.  On September 15, 2016, Plaintiff resubmitted his Methods paper, for the third time.[42]

However, this re-submission (Plaintiff's third resubmission and fourth overall submission of this Methods paper) also failed to earn a passing grade from the Committee.  Lynch assessed the paper and stated:

> In general, the paper seems to be somewhat better organized than previous efforts.  However, I am puzzled by [Plaintiff's] choice to review a completely new set of studies, in this way effectively avoiding an opportunity to demonstrate the ability to benefit from feedback on prior versions of the paper.
>
> Having said that, if [Plaintiff] had reviewed these new studies and demonstrated that he had learned from the *kind* of feedback he had received previously, I might be more favorably disposed to his current effort.  As it is, even a cursory review of the paper turned up for me an unacceptable number of grammatical errors and stylistic problems.  In addition, the review of the studies remains somewhat superficial and not particularly critical.  I would not be able to give a passing grade to this paper were it a first submission; I am even less inclined to pass it given the multiple iterations that have preceded it. . . .
>
> To reiterate, my determination is that the current submission does *not* meet the minimum threshold to receive a passing grade.

Lynch Decl., Ex. X, p.2, ECF No. 169-113 (emphasis in original).  Volpe also gave the paper a failing grade, and in doing so provided feedback similar to Lynch's:

> I have read [Plaintiff's] submission.  I am sorry to say that I cannot provide a passing grade.  I had high hopes but it appears he still lacks demonstration of sufficient understanding at this point.  My biggest concern was the fact that he was unable to stay on task to his research question or the purpose of the paper. . . . Another concern is the lack of skill in synthesis.  Basically the three papers are presented and given a detailed report of what was

---

your extension request.").  Overall, the record very strongly suggests that Plaintiff never disclosed the fact that his "injury" was the result of an alleged sexual assault until *after* the Committee had denied his request for an extension of the missed February 26th deadline.  However, Plaintiff maintains in this action that he had previously told Swanson and Volpe orally, in January 2016, that his injury was the result of a sexual assault, and the Court will treat that bare assertion as true for purposes of this Decision and Order.

[42] Def. Stmt. Of Facts at ¶¶ 81–82 .

> written in each paper.  He even cites their limitation and strengths and uses
> their own rationale for the rationale of their study.  Additionally—he only
> used 3 studies—all from one research team.  It demonstrates a lack of
> understanding of the field.  I have attached my comments so that you can
> see on what my decisions were based.

Douthit Decl., Ex. V, p.2, ECF No. 169-78.  Swanson accordingly notified Plaintiff that "both

reviewers found [his] paper unsatisfactory in meeting the minimum expectations of the

comprehensive exam."  Brent Decl., Ex. II, p.2, ECF No. 169-40.  The result of this decision was

that Plaintiff again failed the Comprehensive Examination.

Plaintiff subsequently wrote to Douthit to complain about the Committee's decision.

Plaintiff indicated that he had expected that it would be Douthit herself, and not the Committee,

that would review his third resubmission of his Methods paper.  Plaintiff indicated that his

"concern" was not so much with the grade given by the Committee, but that he feared he would

be perceived as having taken up too much of the Committee members' "valuable time," and also

that he wanted to ensure that he received "a fair reasonable evaluation."[43]  Plaintiff further

asserted that the Committee members' latest review had been procedurally improper,

purportedly since they had already "exhausted the number of the times they [were] permitted to

give feedback on an exam," even though the additional reviews by the Committee had been the

direct result of his requests for additional opportunities to submit his Methods paper.[44]  Douthit

---

[43] ECF No. 185-1 at p. 80 ("My concern, is less on the grade evaluation given by my committee
members, but more so I am saddened on utilizing their valuable time given that the[y] have already exhausted the
amount of times they are permitted to give feedback on an exam.  I value their precious time and commitment in
working with me.  It places me in a position of being perceived as over utilizing committee members' time.").

[44] Complaint at ¶ 84.

responded that Plaintiff's understanding was incorrect, and that although she had granted him

the additional extension of time, it was not her role to grade the resubmitted paper.[45]

On December 2, 2016,[46] Plaintiff sent Brent, Douthit, Swanson, Lynch, and Volpe a third

"contested grade appeal," now requesting that his failing grade on the Comprehensive

Examination simply be changed to a passing grade.  *See*, Def. Statement of Facts at ¶ 87.  This

time, however, Plaintiff blamed the failure of his paper on the attitudes of the Committee

members, accusing them of what he referred to as "inherent bias."  For example, the appeal

stated:

> [I]t is clear and evidence of the bias in grade evaluations given that revisions
> exceeded more than two.  In am [sic] no way confident that this initial appeal will
> be given favorable consideration, and it is clear that inherent bias has been the
> basis of evaluation by reviewers.  I'm extremely saddened and disheartened that I
> have been the victim of this given my commitment to equity and social justice here
> during my time at the Warner School.  The following statement is a sample of the
> inherent bias from email communications of Comp Extension Results dated
> November 2, 2016 mentioned by program reviewer Dr. Martin Lynch:  "I am even
> less inclined to pass it given the multiple iterations that have preceded it."  Despite
> the inherent bias by committee exam reviewers, I am extremely grateful for the
> exemplar [sic] service, time, review, and feedback.

Brent Decl., Ex. JJ.

Plaintiff went on, in the appeal, to explain why he disagreed with various criticisms by the

committee members about his papers.  For example, Plaintiff disputed Lynch's comment that

several passages in his Methods paper "seem[ed] very close to plagiarism."  *Id*.  Plaintiff further

---

[45] Complaint at ¶ 85 ("The last appeal was not about a grade based on content, but rather about a due
date.  This meant that the committee had not actually exhausted the number of times they could review the
content.").

[46] The appeal itself is dated November 2, 2016. ECF No. 185-1 at p. 25.

complained that the evaluations of his work had been "administered without [his] consent,"[47] and that he had "no confidence" in the appeal process, even though every appeal to that point had ultimately been decided in his favor. *Id.* ("I have ruled 'no confidence' in the following processes of appeals that will prelude forward given the persistent and unaddressed issues of bias, prejudice, and discrimination that have fueled this unfair comprehensive examination administration and process that has hindered my success, my feelings of safety as a student, and has hindered my physical health."). Plaintiff also asserted that the Comprehensive Exam process had gone on too long, which violated his "academic rights." *Id.*

Plaintiff next raised objections about the individual Committee members, whom he had selected. Starting with Swanson, Plaintiff stated that he was "concerned" that she might have been overburdened due to being "the only Black women faculty member in Warner School." As for Volpe, Plaintiff asserted that he believed "consciously or unconsciously she has intermittently placed her advantages (privileges) in her mentoring capacity, evaluation and feedback during this comprehensive examination process." [sic]

Finally, as to Lynch, Plaintiff again complained that Lynch had been unavailable due to his Fullbright Fellowship in Russia, and that he had been slow in providing feedback. Indeed, Plaintiff argued that Lynch's membership on the Committee had, in hindsight, due to Lynch's other commitments, resulted in "an extreme violation of [his] academic rights." *Id.* Plaintiff also suggested that Lynch was biased against him, for two reasons: First, Plaintiff had "felt a sense of bias and ill feelings" from Lynch after Lynch reviewed his LinkedIn Profile;[48] and, second,

---

[47] On this point, Plaintiff objected to the fact that the committee members were involved in the appeal process. Plaintiff evidently expected that Douthit would make a determination without input from the committee. *See*, Complaint at ¶ 84.

[48] Plaintiff later admitted that he had no evidence that Lynch had ever seen his LinkedIn profile.

Lynch's assessment, that Plaintiff's Method's paper deserved a failing grade, since it was poorly written even after multiple revisions, "reflect[ed] inherent bias in examination evaluation." *Id.*

Plaintiff's appeal further mentioned that he had previously filed complaints relating to alleged discrimination at the University, and that he believed that institutional racism had affected his failure of the Comprehensive Exam.  As part of that discussion Plaintiff admitted that he had no information that the Committee members were aware of his prior complaints.[49]

Plaintiff closed the appeal by insisting that he was an "outstanding student" whose "academic rights" had been violated due to "conditions of bias, prejudice, or discrimination." *Id.*

Plaintiff followed up with a letter to Douthit and Brent, requesting that the University inform him of the outcome of the appeal without providing him any further explanation of the reasoning for the decision, since he was not interested in knowing or responding to the comments of the Committee members, as he believed that their statements would be biased and prejudiced. *See*, Complaint at ¶ 89 ("I'm not morally obligated to entertain or respond to any bias or response based on prejudice.  Nor does the "Grade Appeal Policy" you provided state that I must read or respond directly to committee members' 'elaborated/detailed' justified decision. . . .  I just won't be reading a 'justified response' nor will I participate in a 'debate style' which would delay my time in the appeal process.").

Since Plaintiff's appeal contained allegations of bias, the University forwarded it to Nearpass, at the Office of Counsel, who provided Plaintiff with a questionnaire to determine whether his concerns implicated Policy 106, the University's anti-discrimination policy.  *Id.* at ¶

---

[49] *See*, ECF No. 185-1 at p. 185-1 at p. 41 ("I am unaware if the two reviewers (Dr. Martin Lynch & Dr. Ellen Volpe) are aware or were informed of the two-filed lengthy documents and its contents given to administration (leadership).").

88.   However, Plaintiff declined to complete the questionnaire at that time, stating that he preferred to wait until after his appeal was decided. *See*, Compl. at ¶ 91.

On January 19, 2017, Brent notified Plaintiff that the Committee had denied his appeal, and that Plaintiff could appeal the ruling to Douthit.   That same day Plaintiff wrote a three-page supplemental appeal to Douthit.[50]  Plaintiff asserted that Volpe and Lynch had not bothered to carefully review his appeal, and that they were, in his opinion, motivated by "bias and willful discrimination."[51]  Plaintiff further stated that in general, "the Committee members, faculty, and university leadership ha[d] subjected [him] to an unfair, unjust, hostile, bias, racially toxic climate," which he claimed was the reason he had left Rochester and moved to Atlanta.[52]

A week later, Plaintiff submitted a response to Nearpass's Policy 106 questionnaire, in which he alleged, among other things,  that any delay by the University in issuing a final ruling on his appeals had been due to his race; that Lynch's evaluation of his papers was racist; that he had not received proper mentorship from "White faculty members"; that White students were given greater opportunities than he had received; that the denial of his request in May 2016 for a further extension of time to submit his Methods paper (which Douthit had later granted), had been due to discrimination on the basis of his "race and sexual orientation"; that he had experienced verbal "racial microaggressions" from university staff, referring to the aforementioned comments by Hazen and  French; and that he had experienced "retaliation." Complaint ¶ 95.

---

[50] Complaint at ¶ 94; Appeal, ECF No. 185-1 at pp. 90-92.

[51] ECF No. 185-1 at p. 91.

[52] ECF No. 185-1 at p. 92.  Although, in the Complaint in this action Plaintiff states that he "moved to Atlanta for an internship." Complaint at ¶ 28.

Plaintiff subsequently requested an in-person meeting with University officials in Rochester, which the University declined after Plaintiff insisted that the University pay for him to fly to Rochester from Atlanta. Complaint at ¶¶ 97-99.  Instead, the University offered to meet with Plaintiff via-videoconference, but he rejected that offer due to purported concerns about his privacy. Complaint at ¶ 99.[53]

On January 30, 2017, Plaintiff filed a complaint against the University with the U.S. Department of Education ("Department of Education").  Plaintiff subsequently filed several supplements to that complaint.  Those submissions to the Department of Education are not part of the record before the Court.  However, Plaintiff maintains that they alleged "racial" and "gender" discrimination, including "racial microaggressions from Lynch and Volpe," and complained about the denial of his academic appeal, retaliation, the denial of "counseling services or other assistive resources," the failure to "support him" as a victim of sexual assault, and the denial of his request for an additional extension of time on his third resubmission of the Methods paper (which Douthit later granted). Complaint at ¶ ¶ 97, 100, 102, 114.

On April 4, 2017, Douthit denied Plaintiff's appeal and concurred with the Committee's decision to assign a failing grade to the Methods paper resubmission. Def. Statement of Facts at ¶¶ 92, 95.  Again, in that regard, the failing grade was based on review of the paper by Lynch and Volpe.  Douthit emphasized, however, that as part of her decision, and out of a concern for fairness to Plaintiff, she had also asked Swanson to review the paper, and that Swanson had agreed that the paper deserved a failing grade. Pl. Dep. At p. 159.

---

[53] In the Complaint, Plaintiff asserts that a meeting was unnecessary in any event since he "ha[d] provided very detailed responses in his formal complaints and grievances , which he felt should be sufficient for any information the University need[ed]." Complaint at ¶ 99.

On April 12, 2017, Plaintiff submitted an email to Brent, Douthit, and Dr. Raffaella Borasi ("Borasi"), Dean of the Warner School, requesting a further appeal, in which an "independent review committee [would be] created from faculty [having] no knowledge of [him] as a student, and no knowledge of [his] prior complaints, grievances, or appeals." Brent Decl., Ex. QQ, p.3, ECF No. 169-48. As part of that same message, Plaintiff noted that he had filed a complaint against the University with the Department of Education's Office for Civil Rights in January 2017.[54]

On May 13, 2017, Brent denied Plaintiff's request for an "independent review committee," stating that the appointment of such a committee was not an option under the Warner School's grade policy. Def. Statement of Facts at ¶ 97. However, Brent offered Plaintiff the chance to "restart" his Methods paper from scratch, including the opportunity for one resubmission, thereby essentially granting Plaintiff two additional opportunities to pass the Comprehensive examination. Id.[55] This brought to seven the total number of opportunities that the University gave Plaintiff to attain a passing grade on the Methods paper, not counting the February 26, 2016, extended deadline that he missed.

Plaintiff, though, rejected Brent's offer, stating that he was "declin[ing] any attempt to subject [him] to racial and sex discrimination by placing [him] in a hostile classroom environment (re: ED 555 Comps Exams)." Brent Decl., Ex. SS, p.6, ECF No. 169-50. Brent acknowledged Plaintiff's decision and instructed Plaintiff to let him know "[i]f and when [Plaintiff] wish[ed] to

---

[54] ECF No. 185-1 at p. 124.

[55] The reader will recall that in one of his previous appeals Plaintiff had specifically indicated that he would have preferred to have had an opportunity to completely re-write, rather than revise, a paper that received a failing grade.

pursue [any] appeal" under the Warner School's policy.  Brent Decl., Ex. TT, p.2, ECF No. 169-51.  Plaintiff never did so.[56]

On October 27, 2017, the Department of Education's Office of Civil Rights ("OCR") denied Plaintiff's complaints after finding that the University "had proffered legitimate, non-retaliatory reasons" for its actions, including for how it had handled Plaintiff's comprehensive examination, and that Plaintiff had failed to provide any evidence that Defendant's proffered reasons were pretextual. Brent Decl. Ex. XX.

On May 22, 2019, Plaintiff commenced this action, proceeding *pro se*.  The unsworn *pro se* Complaint loosely tracks the factual history set forth above.  However, the Complaint additionally alleges that in "May 2014 [Plaintiff] was sexually man handled by [Lynch]."  Although, Plaintiff never mentioned such an incident in his academic appeals, written grievances, telephone conversation with Levy (the University's Title IX Officer), or complaints to the U.S. Department of Education.

Nevertheless, Plaintiff now alleges that in May 2014,[57] Lynch "sexually manhandled" him by touching his genital area on one occasion.[58]   Lynch denies this accusation, though for purposes of the instant Decision and Order only the Court assumes that the incident occurred,

---

[56] For the Fall 2018 semester, Plaintiff requested to enroll in the University's ED 999 doctoral dissertation course "until legal/civil litigation is completed."  Brent Decl., Ex. VV, p.3, ECF No. 169-53.  Brent permitted Plaintiff to register for the class, but informed Plaintiff that he would "not be permitted to register [in the future] if [he] [was] not engaged actively in the appeal process" regarding the May 13, 2017, decision to deny Plaintiff's request for the creation of a new committee to review his papers.  Id. at p. 2.  Plaintiff neither pursued such an appeal nor restarted his Methods paper. Def. Stmt. of Facts at ¶¶ 101–04.  Consequently, Plaintiff was not permitted to register for the Spring 2019 semester.  Compl. at ¶ 116.

[57] Pl. Deposition at pp. 46, 84, 137.  The Complaint indicates only that the sexual manhandling occurred "in May 2014." Complaint at ¶ 18.  At Plaintiff's deposition he stated that the sexual manhandling incident occurred in May *2013*, Pl. Dep. At p. 84, but it appears he misspoke, and that his recollection on that point was refreshed by Defendants' counsel, *id*.  .

[58] Plaintiff was age 33 at the time. ECF No. 184 at p. 159.

since Plaintiff testified to that effect at his deposition.  Plaintiff contends that prior to this lawsuit the only person he ever told about this event was Dr. Swanson, [59] on an unspecified date in 2014, and that he did not ask her to "do anything" about the information.[60]  Swanson, who was not a "mandated reporter" of such information under Title IX or other law,[61] denies that Plaintiff ever made such a report to her.[62]  Nevertheless, viewing the evidence in the light most-favorable to Plaintiff, the Court will assume in this Decision and Order that Plaintiff told Swanson about the alleged sexual manhandling by Lynch.  Although, there is no evidence that Swanson ever relayed that information to Lynch, Volpe, or anyone else affiliated with the University.[63]

In any event, with the inclusion of this allegation, the Complaint in this action purports to state broad claims for "gender and race discrimination" under Title VI and Title IX, as well as common-law claims for breach of contract, based on the following instances of alleged

---

[59] ECF No. 190-2 at p. 14.

[60] Pl. Dep., ECF No. 190-2 at p. 13 ("[D]id you ask her to do something about this?  A. I didn't ask her specifically to do anything.  Q. Did you ask her not to do anything about this?  A. No.  Q. Did you put anything in writing to Dr. Swanson about this?  A. No.").

[61] ECF No. 184 at p. 201 (Deposition of Title IX Coordinator Morgan Levy, that at the relevant time University faculty members were not "required reporters of sexual harassment to the University.").  In 2021, during discovery in this action, Plaintiff asked Douthit in a deposition "what *is* the policy" when a student notifies a faculty member about a sexual assault, and Douthit indicated that the faculty member should report the matter to the University's Title IX officer. Douthit Dept, ECF No. 184-1 at p. 8. (emphasis added).  However, it cannot be reasonably inferred from that exchange that Douthit was talking about a policy that existed in 2016, and Levy's uncontroverted deposition testimony is that the University's Title IX policy changed significantly after the events at issue in this lawsuit.

[62] ECF No. 185 at p. 53, Redirect Answer No. 25.

[63] ECF No. 185 at p. 153 ("I had no knowledge or awareness of any such report.").  Morgan Levy, the University's Title IX Officer at the relevant time, testified at her deposition that she never received any report of a sexual assault by Lynch, and that she did not even know who Lynch was. Levy Dep., ECF No. 184 at p. 206.  Despite the absence of any evidence that anyone besides Swanson had notice of this alleged "sexual manhandling" by Lynch, and despite the fact that Plaintiff never raised this allegation in any of his written complaints to either the University or the U.S. Department of Education,  Plaintiff essentially attempts to make this incident the centerpiece of his opposition to the summary judgment motion, referring to it twenty-three (23) times in his 30-page Memo of Law.

discrimination: 1) in 2013, Hazen told plaintiff to "stay out of trouble," which Plaintiff insists was a "racially-motivated insult";[64] 2) in May, 2014, Lynch "sexually manhandled" Plaintiff on one occasion; 3) in November, 2014, French made comments that Plaintiff maintains were racially offensive; 4) in late 2015, Plaintiff received a failing grade for the Methods portion of his comprehensive exam; 5) in January, 2016, Volpe stated that "African American students struggle in doctoral programs,"[65] which Plaintiff maintains was false and racially offensive; 6) on May 18, 2016, the University formally assigned Plaintiff a failing grade for the comprehensive exam (after he failed to make the third resubmission of his Methods paper by the February 26, 2016, deadline); 7) on June 1, 2016 the Committee denied Plaintiff's request for an extension of the missed February 26, 2016, deadline (though Douthit later granted the extension); 8) also on June 1, 2016, Levy indicated that she could not investigate Plaintiff's claim, that he had been sexually assaulted in Atlanta, under Title IX;[66] 9) in November 2016 the Committee gave a failing grade to Plaintiff's third resubmission of his Methods paper; 10) in January, 2017, the Committee denied Plaintiff's appeal of the failing grade given to his Methods paper; 11) in April, 2017, Douthit denied Plaintiff's appeal from the Committee's decision denying his appeal; 12) on April 12, 2017, Plaintiff complained to Brent and Douthit about "discrimination and the lack of support he [had] received as a victim of sexual assault," but they were "hostile and skeptical" of his claims

---

[64] In his deposition, Plaintiff testified that Hazen used that phrase "about six to nine times" "in passing" during conversations between them while Plaintiff was working for Hazen as a research apprentice. Pl. Dep. At p. 70.  At deposition, after Defendants' counsel asked Plaintiff a number of questions concerning why Plaintiff would interpret the phrase "stay out of trouble" as a racial insult, Plaintiff stated, contrary to what he put in the Complaint, that Hazen actually stated that "*African American males should* stay out of trouble." Pl. Dep. At p. 81.

[65] Pl. Dep. At p. 74.

[66] The unsworn Complaint indicates that this incident took place in 2017.  However, it seems clear that this is a typographical error, since Plaintiff testified at his deposition that he had only one conversation with Levy, which had to have been in June 2016, since that is when Levy, in response to her conversation with Plaintiff, assisted him in appealing the Committee's decision to deny his request for an extension of time.

and refused to schedule additional meetings with him;[67] 13) in May, 2017, Brent declined to create an independent review committee or to give a passing grade to Plaintiff's third resubmission of his Methods paper, but stated that Plaintiff could restart the Methods paper from scratch; and 14) in Spring 2019, the University "dismissed" Plaintiff as a student.

The Complaint does not clearly articulate how these events fit into Plaintiff's broad claims of discrimination, retaliation, and breach of contract.  However, Plaintiff's deposition testimony purports to clarify that point,[68] and the Court accordingly construes the Complaint liberally to mesh with the theories Plaintiff laid out at his deposition.  For example, Plaintiff testified that Hazen, French, and Volpe discriminated against him on the basis of race by making racially insulting comments,[69] and that the comments by Hazen and Volpe were also discriminatory on the basis of sex, since they referred to Black males in particular.[70] The Complaint does not expressly refer to a hostile environment, but the Court infers from Plaintiff's deposition testimony that he is asserting claims of a hostile educational environment on the basis of both race and sex, involving things such as the alleged racial "climate" at the University and the alleged verbal "microaggressions" by Hazen, French and Volpe.

Plaintiff also testified that Lynch discriminated against him on the basis of sex, by sexually assaulting him.  Plaintiff testified that he did not believe Lynch, Swanson, Douthit or Brent had

---

[67] There is no contemporaneous record of such a meeting, and Defendant apparently denies that such a meeting occurred. *See, e.g.* Answer at ¶ 103.

[68] Pl. Dep. At p. 73.

[69] Pl. Dep. At pp. 45-46, 61, 66, 69-76.

[70] Pl. Dep. At pp. 76, 78, 83.

otherwise discriminated against him on the basis of race,[71] though he later testified that "the Committee," consisting of Lynch, Volpe and Swanson, discriminated against him on the basis of sex and race by denying his request for an extension of time on his third resubmission of his Methods papers, since he believes the Committee treated him differently than it would have treated a white female who had requested an extension of a deadline after claiming to have been sexually assaulted.[72]  Plaintiff also indicated that Levy discriminated against him on the basis of sex when she told him she could not initiate a Title IX investigation into his claim that he had been sexually assaulted in Atlanta by someone unaffiliated with the University.[73]

Plaintiff also testified at his deposition that the failing grades he received on his Methods paper were in retaliation for his "protected activity" in complaining about sex discrimination and race discrimination.  Regarding complaints about race, Plaintiff cited the two letters that he wrote in 2015, and "verbal grievances" that he made to Douthit and Brent about the alleged "verbal microaggressions" by Hazen, French, and Volpe.[74]  Regarding complaints about sex, Plaintiff contends that he verbally complained to Swanson about Lynch's "sexual manhandling."[75]  The Court understands Plaintiff to be claiming that to the extent he received failing grades or his various appeals were denied, those decisions were retaliatory.  Plaintiff also alleges that Brent

---

[71] Pl. Dep. At p. 77.

[72] Pl. Dep. At pp. 96, 109.

[73] Pl. Dep. At pp. 128-134.  Levy testified at deposition, and Plaintiff has not provided proof to the contrary, that when she spoke on the telephone with Plaintiff on one occasion, she perceived that he was a male, but was unaware of his race or sexual orientation.

[74] Pl. Dep. At p. 137.

[75] *See*, Pl. Dep. At p. 137 ("I complained about the sexual manhandling to Dr. Swanson and I felt that his actions, meaning Dr. Lynch, in terms of his evaluation of my paperwork was a result of that.").

retaliated against him by requiring him to "re-start" his Methods paper, rather than simply giving his already-submitted paper a passing grade.

Finally, regarding his claim for breach of contract, the Complaint implies that the University breached "a promise not to violate civil rights laws."   In particular, the Complaint states:

> During the relevant period, Rochester also had a Non-Discrimination Policy wherein the college affirmatively promises not to violate civil rights laws such as Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), which is reproduced in relevant part here:  "The University of Rochester values diversity and is committed to equal opportunity for persons regardless of age, color, disability, domestic violence status, ethnicity, gender identity or expression, genetic information, marital status, military/veteran status, national origin, race, religion/creed, sex, sexual orientation or any other status protected by law. Further, the University complies with all applicable non-discrimination laws in the administration of its policies, admissions, employment, and access to treatment in University programs and activities."

Complaint at ¶ 13.  At his deposition, Plaintiff testified that he was basing his breach-of-contract claim on a promise, contained within his "admissions package," by the University to provide students "with an institution that is free from discriminatory actions." Pl. Dep. At pp. 167, 170. Plaintiff further testified to his understanding of the provision that the University allegedly breached, stating: "[T]he provision is to provide an institution that is free from discriminatory actions, a safe space for all students to share ideas and to have a phenomenal educational experience without being subjected to any form of discrimination or any form of trauma or whatnot." Pl. Dep. At p. 167.   Plaintiff further contends, at various places in his submissions, that the Committee members breached their obligations to him under the University's academic

policies, such as by failing to grade his papers in a timely fashion or by failing to follow the appropriate "comps policy" for evaluating comprehensive exams.[76]

Following the completion of pretrial discovery, on November 1, 2021, Defendant filed the subject motion for summary judgment and served the *pro se* Plaintiff with the required *Irby* Notice, ECF No. 169-122.  Defendant first contends that "many of Plaintiff's Title VI and Title IX claims are premised on alleged discriminatory and retaliatory events falling well outside the three-year statute of limitations (before May 22, 2016) and must be dismissed."  More specifically, Defendant maintains that the following actions occurred outside the limitations period:  The so-called verbal "racial microaggressions" consisting of the statements in 2013 by Hazen that Plaintiff should "stay out of trouble," the statement by French in 2014 that referred to the race of a crime victim and perpetrator, and the statement by Volpe in January 2016 that African-American students "struggle in doctoral programs"; the alleged "sexual manhandling" by Lynch in 2014; the alleged discrimination in January 2016, consisting of the failure to provide Plaintiff the same accommodation that would have been given to a white female victim of a sexual assault; and the alleged discrimination, on or about May 18, 2016, of assigning a failing grade  to Plaintiff on his comprehensive examination after he missed the February, 2016, deadline for the third resubmission of his Methods paper.

Defendant next maintains that Plaintiff cannot establish a prima facie case of discrimination under Title VI or Title IX, for the following reasons: 1) He cannot establish that he was treated less-favorably than similarly-situated students outside of his protected class, since he was actually treated more-favorably; 2) he suffered no adverse action, since the University

---

[76] *See, e.g.*, Pl. Stmt. Of Facts at ¶ ¶ 17, 21; see also, id. at ¶ 46 (Asserting that Plaintiff's breach of contract claims is based in part on the fact that he had to wait "an excessively long time" to receive feedback from Lynch).

kept granting his appeals and giving him additional opportunities to revise his Methods paper, including a final offer to completely re-write the paper, which he declined; 3) to the extent he complains that Brent discriminated against him by requiring him to re-start his Methods paper, rather than simply giving him a passing grade, he cannot demonstrate that he was qualified to continue into the dissertation phase of the doctoral program, since he failed the pre-dissertation comprehensive examination; and 4) he cannot proceed on a "disparate impact theory of liability" based on the proportion of black students or faculty, since such theory is "unavailable under Title VI and Title IX as a matter of law."

Defendant also asserts that Plaintiff cannot demonstrate a prima facie case of retaliation under Title VI or Title IX for the following reasons: 1) there is no evidence of a causal nexus between any protected activity and any alleged adverse educational decision, since, for example, Plaintiff did not engage in any protected activity until after he had already received a failing grade on his Methods paper in November 2014; and 2) Plaintiff cannot rely on mere temporal proximity to establish a causal nexus, since the problems with his writing that led to his receipt of a failing grade on the comprehensive exam were consistently pointed out by the Committee members both before and after such protected activity.

Further, Defendant contends that even assuming *arguendo* that Plaintiff could establish a prima facie case of either discrimination or retaliation, it has provided legitimate non-discriminatory and non-retaliatory reasons for the grades that were given to Plaintiff on the comprehensive exam and the decisions that mere made concerning his appeals, "[n]amely, that the academic judgments and decisions by the decisionmakers were based solely on their independent evaluation and assessment of the quality of Plaintiff's work, as well as applicable

University policies and processes,"[77] and that Plaintiff cannot show that such reasons were a pretext for discrimination as he would be required to do under the *McDonnell Douglas* burden-shifting framework.

For example, with regard to the alleged racial discrimination under Title VI, Defendant contends that as evidence of pretext/discriminatory intent, Plaintiff relies on stray remarks from people who were either not involved in the decision-making process or not employed by the University.  Specifically, Defendant states that the alleged verbal "racial insults" by Hazen, French, and Volpe, do not create any triable issue of fact as to pretext, since the alleged insults were mere "stray remarks," Hazen and French had no involvement in grading Plaintiff's papers or deciding his appeals, and Volpe was not an employee of the University.   Otherwise, Defendant maintains that Plaintiff relies only on "speculation," "conjecture," and "unsupported beliefs that he was subjected to racial discrimination and  treatment," which fail to create a triable issue of fact.

Similarly, regarding alleged sex discrimination under Title IX, Defendant argues that Plaintiff cannot show the reasons proffered by the University are pretextual.   For example, Defendant states that Plaintiff's insistence that Hazen's "stay out of trouble" comments were based on Plaintiff's "gender" is unsupported, and that the comments were mere stray remarks in any event.  Defendant maintains that the alleged "sexual manhandling" by Lynch also fails to show pretext, since it is time barred, and since Lynch was consistently critical of Plaintiff's writing before and after the alleged incident.  Defendant further contends that the Committee's denial of Plaintiff's request for an extension of the missed February 26, 2016, deadline is also not evidence of pretext, and that the University ultimately granted his request in any event.

---

[77] Def. Memo of Law at p. 22.

Defendant further asserts that Levy's denial of Plaintiff's request that she investigate the sexual assault against him in Atlanta and provide him with services is not evidence of pretext, since Levy's decision had nothing to do with Plaintiff's sex.  Rather, Levy explained that the alleged assault did not fall under Title IX since it occurred off campus and the perpetrator had no connection to the University.  Defendant states that any suggestion of pretext is further refuted by the fact that Levy assisted Plaintiff with his successful appeal of the Committee's decision denying his request for an extension of time.  Defendant essentially maintains that Plaintiff cannot cite anything except his own subjective beliefs as evidence of pretext.

Next, Defendant maintains that Plaintiff cannot establish that he was subjected to a hostile educational environment based on race or sex, for the following reasons: 1) the alleged racial/sexual  comments by Hazen, French and Volpe, in addition to being time-barred, are not sufficiently severe or pervasive as to create a racially- or sexually-hostile environment in any event; 2) the alleged "sexual man-handling" by Lynch is both time-barred and insufficient to create a hostile environment; and 3) the University's failure to investigate the alleged assault against Plaintiff in Atlanta by someone unaffiliated with the University is not actionable since the University had no control over that situation and no authority to take remedial action.

Lastly, Defendant asserts that Plaintiff cannot demonstrate a claim for breach of contract, since, for example, the alleged breach involves the University's failure to uphold its general statement that it provides an academic environment consistent with federal and state anti-discrimination laws, which, as a matter of law, is not actionable.

Plaintiff opposes the motion. (ECF Nos. 184-185).  Although, Plaintiff, despite being served with Defendant's *Irby* notice, did not submit any opposing affidavit.  Rather, he submits a Memorandum of Law (ECF No. 184) and a Counterstatement of Facts (ECF No. 185), which,

like his Complaint, are unsworn.  Nevertheless, Plaintiff contends that "the evidence supports that [he] was subjected to discrimination based on race, sex, sexual assault, and retaliation by professors" (ECF No. 184 at p. 3), and that there are triable issues of fact precluding summary judgment.  As an example of such an issue of fact, Plaintiff argues, with regard to the initial denial of his request for an extension of the missed February 26, 2016, deadline (which was later granted), that "[o]nly a court can determine if sexual assault of Black males should be afforded reasonable academic accommodations in comparison to their White female counterparts."[78]

Regarding the statute of limitations, Plaintiff argues that his claims are all related and therefore timely under the "continuing violation doctrine."  For example, he argues that the "verbal microaggressions" by Hazen, French, and Volpe, the alleged "sexual manhandling" by Lynch, and the initial denial of his request for an extension of the missed February 26, 2016 deadline (that was later granted) are all part of the same hostile environment.[79]  Plaintiff also states that, "The Plaintiff's hostile educational and work environment [sic] comprised and created a series of separate acts that collectively constitute unlawful educational and employment [sic] practices."[80]

Plaintiff further contends that he can demonstrate prima facie claims under Title VI and Title IX.  In opposition to Defendant's contention that there is no evidence of disparate treatment, Plaintiff insists that he told Volpe and Swanson in or about January 2016 that he had been

---

[78] Pl. Memo of Law at p. 4 (This argument assumes, without having shown, that Plaintiff was treated differently than a white female, and also incorrectly assumes that it is the court's role to resolve issues of fact).

[79] Pl. Memo of Law at pp. 14-15.

[80] Pl. Memo of Law at p. 26.

injured by a sexual assault, and that the Committee's subsequent decision to deny him an extension of the missed February 26, 2016 deadline was therefore disparate treatment, purportedly since the Committee would have accommodated "any other student irrespectively of their race, gender, sexual orientation, or disability."[81]   On this point, Plaintiff argues that *Defendant*

> cannot produce any viable evidence that at the time of the notification of the Defendant assault [sic] they provided any accommodations, services or resources or that their treatment of the Plaintiff would have been the same regardless of his race, gender, sexual orientation, or disability.

Pl. Memo of Law at p. 16.  In other words, Plaintiff argues that Defendant has not shown that it treated him the same as it would have treated someone not of his same protected category.

Plaintiff similarly asserts that Levy discriminated against him on the basis of sex, purportedly by refusing to provide him with "resources" following the sexual assault against him in Atlanta that she would have provided if he had been "a white female student."[82]  Again, Plaintiff argues that it is Defendant's burden to show that it did *not* treat him differently.[83]   Relatedly, Plaintiff argues that "there is no factual evidence (email, recorded phone calls, or direct testimony from the Plaintiff) supporting the notion that Plaintiff declined any services from the Defendant."[84] (Although, this argument overlooks the unrefuted testimony of Levy, quoted earlier, that she

---

[81] Pl. Memo of Law at p. 16.

[82] Pl. Memo of Law at p. 7 ("The [University] mantains programs, services, and referrals for woman [sic] sexual assault victims off campus whom are affiliated with the institution, which represents inequity in the distribution of resources.").  However, Levy's sworn deposition testimony was that she offered to assist Plaintiff in finding resources for sexual assault victims in Atlanta, where he was living, but Plaintiff declined, and Plaintiff's unsworn assertions to the contrary do not create a triable issue of fact.

[83] Pl. Memo of Law at p. 16 ("Nor has Defendant provided any evidence that disputes the notion that it does not treat Black gay male students differently from their White female counterparts.").

[84] Pl. Memo of Law at pp. 16-17.

offered to assist Plaintiff in locating services for sexual assault victims in Atlanta, but he declined her offer.[85])

Alternatively, Plaintiff contends that the record contains proof that similarly-situated students outside of his protected classes were treated more favorably than he was.[86]  `In particular, he cites information provided to him by the University registrar, purportedly showing that between 1976-2008, "zero (0) Black males [were] conferred the HD4 degree, while 8 males of another race [were] awarded the HD4 degree."[87]  Plaintiff also cites testimony by Douthit that she could recall one student who had passed the comprehensive exam without any resubmissions, who was a white male.[88]

In response to Defendant's contention that Plaintiff suffered no adverse discriminatory action, Plaintiff insists that he did, citing the fact that the Committee denied his request for an extension of the missed February 26, 2016, deadline, even though Douthit later granted the extension.[89]  Plaintiff also contends that he suffered an adverse action because he was "constructively discharged" from the University after he declined Brent's direction to "re-start" his Methods paper, since it would have required him to continue working with the Committee, whom

---

[85] Plaintiff has not provided any sworn testimony to the contrary.

[86] Pl. Memo of Law at p. 21.

[87] Pl. Memo of Law at p. 21.

[88] Pl. Memo of Law at p. 21.

[89] Pl. Memo of Law at p. 17 (Plaintiff insists that he was harmed by this decision, despite everything that happened subsequently, including Douthit granting the extension and Brent offering him two more opportunities to pass the exam, stating: "The original comprehensive exam committee members . . . have never provided an alternative grade evaluation or opportunity to restart the exam after their June 1, 2016, decision letter.").

he claims had already discriminated against him, such as by denying his request for an extension of the missed February 26, 2016, deadline.[90]

Plaintiff also maintains that he was qualified to continue in the doctoral program, since he had been accepted into the program to begin with.[91]   Alternatively, he argues that to the extent he was not qualified due to having failed the comprehensive exam, such failure was due to discrimination.

Concerning his retaliation claim, Plaintiff maintains that he has shown a causal nexus between his protected activity and the alleged retaliatory acts, based on temporal proximity.   In particular, Plaintiff argues that in "the Spring of 2014" he told Swanson that Lynch had sexually "manhandled" him, and in November 2014 he received a failing grade on the Methods paper. Plaintiff also argues that Defendant is incorrect to assert that there were consistent problems with all three of his comprehensive exam papers (both before and after his protected activity), since the first two papers eventually received passing grades.[92]   Plaintiff also contends that the various "verbal microaggressions" he claims to have experienced were retaliatory, and that the individuals who uttered them "specifically targeted [him] because [he] stood up and complained of the harassment and abusive treatment."[93]   Indeed, Plaintiff seems to contend that all of the alleged discriminatory acts he experienced were retaliatory in nature, including the alleged "sexual manhandling" by Lynch in May 2014.[94]

---

[90] Pl. Memo of Law at pp. 17-18.

[91] Pl. Memo of Law at pp. 18-19.

[92] Pl. Memo of Law at p. 23.

[93] Pl. Memo of Law at p. 23 Again, however, this argument misstates the record.

[94] Pl. Memo of Law at p. 23 ("The Plaintiff thus has shown causation indirectly through evidence such as disparate treatment, making inappropriate and insulting comments based on race, subjecting the Plaintiff to

41

Plaintiff next maintains that any reasons proffered by Defendant are pretextual.   As evidence of this, Plaintiff first cites the verbal microaggressions by Hazen and French, which, he contends, are evidence of pretext since those two individuals had "managerial/supervisor roles" over Plaintiff's employment at the University as a graduate assistant.   Plaintiff next argues that the alleged verbal microaggression by Volpe is evidence of pretext, since Volpe "was employed as a paid nurse practitioner" at the University during the relevant period.   Primarily, however, Plaintiff contends that the reason Defendant has cited for his failure on the comprehensive exam, namely, the poor quality of his writing, is pretextual, since Lynch sexually assaulted him and therefore had reason to retaliate against him. *See, e.g.*, Pl. Stmt. Of Facts, ECF No. 185 at ¶ 34 ("The Plaintiff['s] failing grade was issued by Dr. Martin Lynch in retaliation of the Plaintiff declining Dr. Martin Lynch's sexual advances after being sexually assaulted/sexually manhandled by Dr. Martin Lynch in May 2014.").   As further evidence of this Plaintiff insists that Lynch's "grade evaluations changed after Plaintiff was sexually assaulted by him."[95]   Plaintiff also maintains that some of Lynch's criticisms, such as his statement that there were sections in Plaintiff's paper that "seem[ed] very close to plagiarism," were not accurate.[96]

As for his breach of contract claim, Plaintiff states that a contract was formed between himself and the University when he signed an Offer of Admissions, the terms of which can be gleaned from the University's "documents," including "the university catalog."[97]   Plaintiff

---

sexual manhandling/sexual harassment/sexual assault, and denying/not affording him reasonable services for victims of sexual assault in comparison to White female counterparts.").

[95] Pl. Stmt. Of Facts at ¶ 69.

[96] Pl. Stmt. Of Facts at ¶ 84.

[97] Pl. Memo of Law at p. 27.

contends that the University breached this contract by not strictly following its own policies and procedures, such as when it changed various due dates for his papers.[98] Plaintiff further states that it was a breach of his contract with the University to allow the Committee to conduct more than two reviews of his papers:

> In accordance with the Grade Appeal Policy, Dr. Martin Lynch was not authorized to "re-review or provide evaluation" given that he had already exhausted these in two prior appeals submitted to the Committee. Dr. Brian Brent permitted these transgressions through written actions counters that claim [sic] and violates the Plaintiff's academic rights and breaching his contract with the University[.]

Pl. Stmt. Of Facts at ¶ 90. Plaintiff also maintains that the University failed to follow its own general anti-discrimination policy when it allowed the discrimination that he claims to have experienced.

Defendant filed a reply asserting that Plaintiff's opposition relies "almost exclusively on conclusory allegations[,]unaccompanied by any sworn declaration or excerpt of his own sworn testimony to such allegations, which is plainly insufficient to create a material issue of fact to defeat summary judgment."[99] More specifically, Defendant contends that Plaintiff's "continuing violation" argument regarding the statute of limitations is meritless; that he has not shown a prima facie case of discrimination under either Title VI or Title IX and has failed to appreciate his burden of proof related thereto, especially with regard to showing disparate treatment;[100] that

---

[98] *See, e.g.,* Pl. Memo of Law at p. 5 ("[T]he Warner Grade Appeal Policy does not afford such action to change due date."); *see also, id.* at p. 6 ("Dean Borasi never responded to the Plaintiff's appeal submitted on April 12, 2017 in accordance to Warner Appeal Policy.").

[99] Def. Reply at p. 1.

[100] Defendant reiterates that to the extent Plaintiff attempts to rely on statistical evidence, he fails since such evidence shows neither intentional discrimination by the University nor that he was similarly situated to the other students. Defendant further contends that the "two primary adverse actions" emphasized in Plaintiff's response – the initial denial of his request for an extension of the missed February 26, 2016, deadline and his

he has not made a prima facie showing of retaliation since he has shown neither a causal nexus nor a retaliatory adverse action within the limitations period;[101] that he has failed to create ay triable issue of fact concerning pretext, since he has not refuted the University's showing that the complained-of decisions were based solely on legitimate evaluations of his academic performance, as well as on the University's policies and procedures;  that he has failed to show a hostile work environment was created either by the alleged "verbal microaggressions," since they were not sufficiently severe or pervasive, or by the "sexual manhandling" incident, since even assuming he reported the incident to Swanson he has not shown either that she was deliberately indifferent to what he told her or that she had the requisite supervisory authority to address the problem; and that he has not shown a breach of contract based on either a violation of the University's express policies or the alleged "arbitrary" retaliatory actions of Lynch.[102]

Plaintiff filed a motion for leave to submit a sur-reply, but the Court denied that request.[103]

---

alleged "constructive discharge" from the University—are not actually adverse actions since Douthit later granted the extension and since Plaintiff declined Brent's offer to allow him to restart the Methods paper.

[101] Defendant contends that Plaintiff failed the comprehensive exam in November 2014, six months after he claims he was "manhandled" by Lynch and reported the matter to Swanson.  Defendant argues that this passage of time is too great to establish causal nexus based on temporal proximity alone, and that the alleged adverse act is time-barred in any event.  Defendant maintains that this is true regardless of whether the alleged protected activity is considered to be Plaintiff's report of the matter to Swanson or his rejection of Lynch's alleged sexual advance.  Defendant further points out that none of the actions by anyone except Lynch and Swanson could qualify as retaliation since the other actors had no notice of the alleged "sexual manhandling" or of Plaintiff's statement to Swanson.

[102] Defendant argues that these claims are not contained in the Complaint and are also frivolous.

[103] Plaintiff requested leave to submit a sur-reply, on the ground that Defendant had raised "novel arguments" in its reply.  However, the Court denied that application and indicated that if Defendant had raised novel arguments in its reply that the Court would decline to consider them.  Having now reviewed all the papers the Court finds that Defendant did not impermissibly raise new arguments in its reply. On the other hand, Plaintiff clearly attempts to raise a new argument in his motion for leave to file a sur-reply.  Specifically, Plaintiff now maintains, in his unsworn application, that in addition to telling Swanson about the alleged "sexual manhandling" by Lynch, he also told Douthit and Brent that same information during later "conversations" on unspecified dates. However, the Court finds no prior reference to such "conversations" involving the "sexual manhandling" anywhere in the record.  Indeed, there is no evidentiary proof in admissible form that Plaintiff ever notified Douthit or Brent, or the U.S. Department of Education for that matter, about the alleged sexual manhandling by Lynch.

The Court has carefully considered the parties' submissions and the entire record.

## DISCUSSION

Plaintiff's *Pro Se* Status

Plaintiff is proceeding *pro se* and the Court must therefore construe his submissions liberally to raise the strongest arguments that they suggest. *See, e.g., Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[T]he pleadings of a *pro se* plaintiff must be read liberally and should be interpreted 'to raise the strongest arguments that they suggest.'" *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).").

Rule 56

Defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56.  Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

---

Consequently, the Court declines to treat that untimely and unsworn assertion as true for purposes of this Decision and Order.

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[104] To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts will grant *pro se* litigants "some latitude in meeting the rules governing litigation," "but conclusory statements or mere allegations are not sufficient to defeat a summary judgment motion." *Hassan v. Town of Brookhaven*, 831 Fed.Appx. at *28-29 (2d Cir. Dec. 15, 2020) (mem) (footnotes and internal quotation marks omitted).  Moreover, where, as here, a *pro se* non-movant has been warned that he needs to submit affidavits or other admissible materials to create a triable issue of fact,[105] he cannot rely on unsworn materials to defeat a properly-supported summary judgment motion. *See, Salahuddin v. Goord*, 467 F.3d 263, 278 (2d Cir. 2006) ("Salahuddin received adequate notice that he needed to submit affidavits or other admissible evidence to create a genuine factual dispute on his claims, *see* Notice to Pro Se

---

[104] "The substantive law governing the case will identify those facts which are material and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)." *Heard v. City of New York*, 319 F.Supp.3d 687, 692 (S.D.N.Y. 2018).

[105] "[A] *pro se* party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.g., Irby v. New York City Transit Auth.*, 262 F.3d 412, 413–14 (2d Cir.2001)." *Capogrosso v. Lecrichia*, No. 07 CIV. 2722 (BSJ), 2010 WL 2076962, at *4 (S.D.N.Y. May 24, 2010).

Litigant Opp. Mot. for Summ. J., Docket No. 54; S.D.N.Y. R.C.P. 56.2, but he points only to his unsworn complaint to dispute Frey's version of events. Thus, we accept Frey's account of the facts. *See Matsushita Elec. Corp.*, 475 U.S. at 586, 106 S.Ct. 1348."); *see also, Kaplan v. Cnty. of Warren*, No. 1:19-CV-941, 2021 WL 4134758, at *1 (N.D.N.Y. Sept. 10, 2021) ("While courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.' *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).").

Here, Defendant served Plaintiff with the required *Irby* Notice (ECF No. 45) and supported its motion with several affidavits.  Plaintiff did not submit an opposing affidavit.  Instead, Plaintiff's response to Defendant's motion consists of a counterstatement of facts and a memorandum of law, both of which, like his Complaint, are unsworn. (ECF Nos. 184-185).  The only sworn statements from Plaintiff are those contained in his deposition testimony.  Otherwise, Plaintiff relies on deposition testimony from other persons and various exhibits that would likely be admissible at trial if a sufficient foundation was laid.[106]

> Any Claims for Employment Discrimination, Sexual Orientation
> Discrimination, Intentional Infliction of Emotional Distress, and
> Violation of Privacy Are Dismissed

As a preliminary matter the Court points out that Plaintiff's opposition papers allude to claims that that are either being raised for the first time in response to Defendant's motion or that were previously abandoned.  To begin with, the Complaint does not purport to assert claims for employment discrimination, and gives no indication that Plaintiff was ever employed by the

---

[106] *See, Selvam v. Experian Info. Sols., Inc.*, 651 F. App'x 29, 32 (2d Cir. 2016) ("Affording Selvam the special solicitude that his submissions are due, we conclude that the GE letters themselves, as well as the underlying records leading GE to write the letters, would almost certainly fall within the hearsay exception for business records, Fed. R. Evid. 803(6), and thus would be available at trial.").

University.   Nevertheless, in his response to Defendant's summary judgment motion, Plaintiff abruptly now refers to employment discrimination claims, and to the fact that he was, at some point, employed by the University as a graduate assistant.[107]  Similarly, Plaintiff's Memo of Law in opposition to Defendant's summary judgment motion refers to a claim for Intentional Infliction of Emotional Distress ("IIED") and a claim for Invasion of Privacy,[108] even though neither of those claims is asserted in the Complaint.[109]

However, it is well settled that "[a] plaintiff may not amend the complaint or alter his theory of liability in a memorandum of law in opposition to summary judgment." *Pugh v. Casimir*, No. 18-CV-7350(EK)(RLM), 2021 WL 4463103, at *7 (E.D.N.Y. Sept. 29, 2021) (collecting cases).[110] Accordingly, to the extent Plaintiff may be belatedly attempting to assert claims for employment discrimination, IIED, or Invasion of Privacy, without ever having amended his pleading,[111] they are dismissed.

---

[107] *See, e.g.*, Pl. Memo of Law at pp. 26-29 (arguing that Plaintiff suffered emotional injuries from discrimination while working as a graduate assistant).

[108] Plaintiff indicates that he believes Defendant's counsel "may have" violated his mother's privacy obtaining her "consumer credit file." Pl. Memo of Law at p. 29.

[109] Pl. Memo of Law at p. 28.

[110] *See also, Durr v. Slator*, No. 520CV00662MADTWD, 2023 WL 8277960, at *8 (N.D.N.Y. Nov. 30, 2023) ("In response to the City Defendants' motion for summary judgment, Plaintiff argues that 'he was not intoxicated at the time of his arrest,' but even if he was, then 'said intoxication is a qualifying disability under the ADA.' Dkt. No. 78 at 6-8. Because neither the complaint nor the amended complaint mentions alcoholism or an alcohol-related disability, the Court will not consider intoxication as a qualifying disability with respect to the ADA claims. *See Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016) ("It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment"); *see also Avillan v. Donahoe*, 483 Fed. Appx. 637, 639 (2d Cir. 2012) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summary judgment).").

[111] January 20, 2020, was the deadline for amendment of pleadings. Amended Scheduling Order, ECF No. 45.

The Complaint also does not expressly state a claim for discrimination on the basis of sexual orientation, although, it mentions that Plaintiff is a "gay man" and makes passing reference to him having told Nearpass that he believed the denial of his request for an extension of the missed February 26, 2016, deadline was "on the basis of race and sexual orientation."[112] Rather, the Complaint expressly asserts that it is only alleging claims for "gender and race discrimination." Complaint at ¶ 1. But, more importantly, at his deposition Plaintiff unequivocally testified that he is *not* claiming in this lawsuit that he was discriminated against on the basis of his sexual orientation. Pl. Dep. At p. 78 ("Q. Are you claiming in this lawsuit that you were discriminated against based on your sexual orientation?  A. No.  Q. Are you claiming that you were discriminated against  based on your sex, your gender?  A. That is correct."). Additionally, in his memorandum of law in opposition to Defendant's motion Plaintiff asserts that he "is a member of *two* protected classes," "Black" and "male."[113]

Consequently, while Plaintiff's opposition papers do, like his Complaint, make passing references to his sexual orientation,[114] the Court finds that any claim of discrimination on the basis of sexual orientation was expressly abandoned at the deposition.[115] *See*, *Porter v. Uhler*, No. 9:17-CV-47 (MAD/TWD), 2019 WL 1292226, at *6 (N.D.N.Y. Mar. 21, 2019) ("Unlike in *Jackson*, which held that courts should not infer that a *pro se* plaintiff intends to abandon his

---

[112] Complaint at ¶ 95 (Stating that in his questionnaire response to Nearpass he had stated, "I believe this request/appeal was denied on the basis of race and sexual orientation.").

[113] Pl. Memo of law at p. 15 (emphasis added).

[114] *See, id*. (Noting that, "the Plaintiff in addition to the two other protective class also identifies as gay.")

[115] Defendant's summary judgment motion is directed at the claims Plaintiff claimed to be asserting.  It would be patently unfair to Defendant to allow Plaintiff to attempt to defeat summary judgment by raising other claims that he disavowed in his sworn deposition testimony.

claim when the plaintiff does not respond to an argument against that claim, here Plaintiff has affirmatively stated that he is not bringing a procedural due process claim. *Cf. Jackson*, 766 F.3d at 197-98. Therefore, the Court agrees that Plaintiff has abandoned his procedural due process claim."), *aff'd*, 790 F. App'x 329 (2d Cir. 2020).

With these clarifications, the Court will now proceed to consider the claims that Plaintiff is legitimately raising, namely, claims of race and sex discrimination under Title VI and Title IX, respectively, and a claim for breach of contract.

<u>Claims under Title VI and Title IX</u>

Liberally construed, Plaintiff's Complaint primarily asserts claims of discrimination, retaliation, and a hostile educational environment under Title VI and Title IX.  "Title VI provides that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'"  *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (quoting 42 U.S.C. § 2000d).  The provisions of Title IX mirror those of Title VI, providing that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). Due to the similarity of the statutes, "cases brought under Title IX are generally to be analyzed in the same way as cases under Title VI." *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103 (2d Cir. 2022).

There is an implied private right of action to sue for money damages under Title VI and Title IX for intentional discrimination by a recipient of federal funds.[116]  However, a university

---

[116] *See, e.g., Vengalattore v. Cornell Univ.*, 36 F.4th at 105 ("[T]he implied right of action under Title IX encompasses claims for monetary damages for intentional violations of Title IX, although not for unintentional

cannot be held liable for damages under Title VI or Title IX for the acts of its employees under theories of vicarious liability or constructive notice. *See, DT v. Somers Cent. Sch. Dist.*, 348 F. App'x 697, 699 (2d Cir. 2009) (Claims under Title IX and Title VI "require[ ] evidence of actual knowledge of discrimination to hold a defendant liable for money damages."); *see also, Goonewardena v. New York*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007) ("Liability under Title VI, which parallels that of Title IX, cannot be imputed to institutions based on the actions of their employees. *Cf. Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 287–88, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (school district cannot be held liable for harassment of student by teacher based on principles of constructive notice or vicarious liability under Title IX.)").

Instead, a university may be held liable for money damages under Title VI and Title IX only where the university itself has discriminated against a plaintiff through an official action or policy, or where the university has actual notice of discrimination by a third party under its control and responds with deliberate indifference.[117] *See, Gebser v. Lago Vista Indep. Sch. Dist.*, 524

---

violations.") (citations omitted). There is no private right of action to sue under Title VI or Title IX for disparate impact discrimination. *See, Joseph v. Metro. Museum of Art*, 684 F. App'x 16, 17 (2d Cir. 2017) (affirming dismissal of Title VI disparate-impact discrimination claim); *see also, Klaneski v. Bristol Hosp., Inc.*, No. 3:22-CV-1158 (VAB), 2023 WL 4304925, at *4 (D. Conn. June 30, 2023) ("Although a private plaintiff may bring a claim under Title IX for instances of intentional discrimination, courts have held that a private right of action based on the alleged disparate impact of a policy on a protected group is not cognizable under Title IX.") (citations and internal quotation marks omitted).

[117] This principle also applies to retaliation and hostile educational environment claims, meaning that the plaintiff cannot rely on vicarious liability, and must instead show that the retaliation/hostile environment was an official policy of the defendant or that the defendant was deliberately indifferent to retaliation/creation of a hostile environment by a third party under its control, after receiving actual knowledge of the retaliation/hostile environment. *See, e.g., Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 (5th Cir. 2020) ("A retaliation plaintiff must show that the funding recipient or its representatives took an adverse action against him because he complained of discrimination. That typically means the funding recipient itself signed off on the adverse action. *E.g. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171–72, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (school board terminated teacher's coaching duties after he complained about unequal treatment of girls' basketball team). But Sewell's claim is different. He says that Rankins—not the school board—retaliated against him for complaining about the verbal abuse by trumping up the sexual assault charge that got him suspended and recommended for expulsion. When a case does not involve the funding recipient's "official policy," Title VI and Title IX require deliberate indifference. *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989[.]") (some citations omitted); *see also, Garrett v. Ohio State Univ.*, 60 F.4th 359, 367 (6th Cir.) ("[P]laintiffs have failed to plead a retaliation claim. At a minimum, they have failed to allege that the funding recipient, Ohio State, retaliated against them. They

U.S. at 290, 118 S. Ct. at 1999 ("[I]n cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.  We think, moreover, that the response must amount to deliberate indifference to discrimination."); *Soule v. Connecticut Ass'n of Sch., Inc.*, No. 21-1365, 2023 WL 8656832, at *17 (2d Cir. Dec. 15, 2023) ("[I]ntentional conduct may be established by way of deliberate indifference to the acts of employees *or* by way of an official policy.") (concurring opinion; emphasis in original); *Naumovski v. Norris*, 934 F.3d 200, 221 (2d Cir. 2019) ("[A]n educational institution is liable for money damages under Title IX when an official 'with authority to take corrective action to end the discrimination' is given 'actual notice' of the discrimination and responds with 'deliberate indifference.'") (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. at  290–91; *DT v. Somers Cent. Sch. Dist.*, 348 F. App'x 697, 699 (2d Cir. 2009) ("Under Title VI, a plaintiff may sue a school district for money damages based on alleged student-on-student harassment only if the school district acts with deliberate indifference to known acts of harassment.") (emphasis in original, citations and internal quotation marks omitted).[118]  Further, "deliberate indifference must be a 'deliberate choice' rather than negligence

---

broadly claim retaliation by "OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU" in the form of public interviews, emails, texts and calls to some plaintiffs. But there is neither individual liability nor respondeat superior liability under Title IX; instead "an educational institution is responsible under Title IX only for its 'own official decision[s].'"), *cert. denied sub nom. The Ohio State Univ. v. Gonzales*, 143 S. Ct. 2659, 216 L. Ed. 2d 1237 (2023).

[118] *See also, Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644–45, 119 S. Ct. 1661, 1672, 143 L. Ed. 2d 839 (1999) ("If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment.  That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or

or bureaucratic inaction." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (citations omitted).[119]

Deliberate indifference in this context means that the defendant university's response to actual notice of discrimination or harassment against a student by someone under its control "is clearly unreasonable in light of the known circumstances." [120]   Short of that, universities and other recipients of funds under Title VI and Title IX have flexibility on how to deal with alleged harassment and discrimination directed at students, and courts generally should not second-guess their decisions.[121]

---

vulnerable to it.  Moreover, because the harassment must occur under the oper0ations of a funding recipient, the harassment must take place in a context subject to the school district's control.") (Citations and internal quotation marks omitted); *Soule v. Connecticut Ass'n of Sch., Inc.*, 2023 WL 8656832 at *10 ("[I]n cases 'that do not involve official policy' of the school receiving federal funding, private damages are unavailable unless an official with authority to act on the school's behalf has 'actual knowledge of discrimination in the recipient's programs' and is deliberately indifferent. *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989."); *Shore v. Mirabilio*, No. 3:16-CV-2078 (VLB), 2019 WL 13293059, at *7 (D. Conn. Mar. 8, 2019) ("To prove a violation of Title VI, plaintiff must prove either that AMT itself took discriminatory action to violate the statute or that AMT failed to address alleged harassment by Tim or another third party. *See Davis Next Friend LaShonda D. v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 640-41, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (holding that "... a recipient of federal funds may be liable [under Title IX] only for its own misconduct"); *Gebser v. Lago Independent School Dist.*, 524 U.S. 274, 283, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1989) (noting that Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs.").

[119] An example of intentional discrimination pursuant to an official policy in this context would be where a school board retaliatorily fired an employee for reporting discrimination.  An example of intentional discrimination arising from deliberate indifference would be where the school board was given actual notice that the employee was being harassed by another employee but unreasonably failed to take action to address the harassment.

[120] *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. at  648, 119 S. Ct. at  1674.

[121] *See, Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. at  648-649, 119 S. Ct. at 1674 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators. School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.  . . .  In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law.") (citation and internal quotation marks omitted).

Additionally, to show deliberate indifference, the information conveyed must have been sufficiently clear to put the University on notice,[122] and the person who received the information must have had the requisite authority to take corrective action on the university's behalf to end the discrimination.  In this regard, not every university employee has such authority, and it is the plaintiff's burden to demonstrate that the person to whom he complained had been given that authority by the university. *See, Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. at 643, 119 S. Ct. at 1671 ("The high standard imposed in *Gebser* sought to eliminate any "risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." 524 U.S., at 290–291, 118 S.Ct. 1989."); *Kesterson v. Kent State Univ.*, 967 F.3d 519, 528 (6th Cir. 2020) ("[A] university employee's ability to mitigate hardship or refer complaints does not make them an 'appropriate person.'  Otherwise, every employee would qualify and schools would face a form of vicarious liability that Title IX does not allow."); *Roskin-Frazee v. Columbia Univ.*, 474 F. Supp. 618, 625 (S.D.N.Y. 2019) ("Plaintiff does not add any allegations to her amended complaint suggesting that the SVR staff advocate had the authority to take corrective action to end the discrimination. Therefore, the new details of her conversations with the SVR staff advocate do not establish that Defendant had actual knowledge of the Oct. 2015 Assault on October 13 or 14, 2015.").

Whether a particular employee of the defendant had the requisite authority to take action on the defendant's behalf to correct a particular form of discrimination is a fact-specific inquiry.

---

[122] *See, Roskin-Frazee v. Columbia Univ.*, No. 17 CIV. 2032 (GBD), 2018 WL 6523721, at *7 (S.D.N.Y. Nov. 26, 2018) (Holding that conversation between college student and academic advisor in which student "alluded to having been raped" was not sufficient to provide actual notice to university, but that subsequent express claim of rape to university vice president was sufficient:  "Plaintiff alleges that [when speaking to her advisor] she merely "alluded ... that [she] had been raped." (Compl. ¶ 39.) This is not enough. While an insinuation of assault may constitute constructive knowledge, it plainly does not rise to the level of actual knowledge and is therefore insufficient for purposes of Title IX liability.").

*See, Biondo v. Kaledia Health*, 935 F.3d 68, 76 (2d Cir. 2019) ("[A]n 'official' or 'policymaker' must be someone who has some discretion at a key decision point in the administrative process. Given the hierarchy of a hospital, the key decision point will vary with the decision to be made, and the official or policymaker with discretion to make the decision will vary accordingly. But that observation is already embedded in our requirement that an official have authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf.") (citations and internal quotation marks omitted); *see also, Saphir by & through Saphir v. Broward Cnty. Pub. Sch.*, 744 F. App'x 634, 638 (11th Cir. 2018) ("Whether a particular school employee is an appropriate person is necessarily a fact-based inquiry because officials' roles vary among school districts.  Thus, we look beyond title and position to the actual discretion and responsibility held by an official, and consider the type and number of corrective measures available to an official.") (citations and internal quotation marks omitted); *Najera v. Indep. Sch. Dist. of Stroud No. I-54 of Lincoln Cnty.*, No. CIV-14-657-R, 2015 WL 4310552, at *2 (W.D. Okla. July 14, 2015) ("A teacher may be an "appropriate person" under Title IX if s/he "exercised control over the harasser and the context in which the harassment occurred." *Murrell*, 186 F.3d at 1248. There is no evidence in the record that Jim Cooper or Silas Guerrero, as teachers or coaches, had any authority over Ms. Guerrero such that they could "take corrective action to end the discrimination." The same is true of Lou Cooper, who works in the middle school office. Therefore, any knowledge they had about the harassment cannot support supervisory liability of Defendant under Title IX.").

Further, to be actionable, a university's deliberate indifference must put the student in danger of experiencing additional discrimination of the same type as that about which the university received actual notice. *See, Doe v. Syracuse Univ.*, No. 22-2674, 2023 WL 7391653,

at *1 (2d Cir. Nov. 8, 2023) ("Deliberate indifference is found . . . when a defendant's "response to known discrimination is clearly unreasonable in light of the known circumstances[.]  Deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it.") (citations and internal quotation marks omitted); *see also, Wyler v. Connecticut State Univ. Sys*., 100 F. Supp. 3d 182, 190, 193 (D. Conn. 2015) ("Further, the prior harassment about which the University had knowledge must have been sufficiently similar to the harassment about which plaintiff complains.  . . .  In the absence of evidence sufficient to establish that an official with authority at the University had actual knowledge of prior, sufficiently similar sexual harassment, the University cannot be liable under Title IX for its alleged failure to take appropriate action prior to the date of plaintiff's complaint.") (citations omitted); *cf., Kraft v. Yeshiva Univ*., No. 00 CIV. 4899 (RCO), 2001 WL 1191003, at *7 (S.D.N.Y. Oct. 5, 2001) ("[T]he Complaint alleges that, because he was Dean of Wurzweiler and held other executive posts at the school during the course of the events, Gelman had the authority to take corrective measures to remedy the alleged sexual harassment.").

"If the conduct of which the school district becomes aware does not itself amount to sex-based discrimination, the school cannot have the requisite "notice that it will be liable for a monetary award" under Title IX if it fails to take corrective action.  No doubt the observation is something of a truism—Title IX liability can attach only to violations of Title IX—yet it bears repeating because at times our cases have employed language clouding this basic principle." *C.S. v. Madison Metro. Sch. Dist*., 34 F.4th 536, 541–42 (7th Cir. 2022) (citation omitted).

In sum, to prevail under Title VI and Title IX, the plaintiff must show both that he experienced discrimination in violation of those statutes, and that the funding recipient (the University) intentionally committed the discrimination through either an official policy or

deliberate indifference after receiving actual notice.  With these general principles of law in mind, the Court will proceed to consider the particulars of Defendant's motion.

*Timeliness of Plaintiff's Claims Under Title VI and Title IX*

Defendant maintains that certain incidents about which Plaintiff complains are time barred by the applicable statute of limitations.  As Defendant correctly notes, there is a three-year limitations period for claims under Title VI and Title IX.[123]  Defendant maintains, therefore, that since Plaintiff commenced this action on May 22, 2019, any incidents that occurred prior to May 22, 2016, are time-barred.

Specifically, Defendant maintains that the following claims are untimely:  1) the Title VI/Title IX claim that in 2013 Hazen told Plaintiff, on approximately six-to-nine occasions, to "stay out of trouble," and, when Plaintiff objected on two occasions, responded that "African-American male doctoral students should stay out of trouble;" 2) the Title VI claim that in 2014, during an email discussion outside of class, French made a racially insulting statements about African Americans; 3) the Title IX claim that in May 2014 Lynch "sexually manhandled" Plaintiff on one occasion; 4) the Title VI/Title IX claim that in January 2016 Volpe stated that "African American males struggle in doctoral programs"; 5) the Title VI/Title IX claim that in or about January 2016, after learning that Plaintiff had been sexually assaulted, Swanson and Volpe failed to

---

[123] In that regard, neither Title VI nor Title IX contain a statute of limitations provision, so federal courts look to the relevant state statute of limitations for personal injury actions.  *See, Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir. 2004); *Morse v. Univ. of Vermont*, 973 F.2d 122, 124–25 (2d Cir. 1992).  In New York, personal injury actions must be filed within three years from the time at which the cause of action accrued, *see*, N.Y. C.P.L.R. § 214(5), and that limitations period is applied to Title VI and Title IX claims. *See, Purcell v. New York Inst. of Tech. – Coll. Of Osteopathic Medicine*, 931 F.3d 59, 65 (2d Cir. 2019) (applying three-year statute of limitations to Title IX claims); *Singh v. Wells*, 445 F. App'x 373, 376 (2d Cir. 2011) (applying three-year statute of limitations to Title VI claims).  But "[f]ederal law governs the question of when a federal claim accrues," even when a state statute of limitations is applied, and a "federal claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action."  *Morse*, 973 F.2d at 125 (internal quotation marks and citation omitted); *see also, Allen v. Artal*, 665 F. App'x 9, 12 (2d Cir. 2016) (summary order) ("The standard rule is that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." (internal quotation marks and citation omitted)).

"accommodate him" by unilaterally[124] extending the deadline for the third resubmission of his Methods paper; and 6) the Title VI/Title IX claim that the entering of Plaintiff's failing grade on the comprehensive exam on May 18, 2016 (and the assignment of failing grades to particular papers prior to that date) was discriminatory and/or retaliatory.[125]  These incidents all occurred more than three years before Plaintiff commenced this action.

Plaintiff opposes Defendant's argument but does not attempt to show how any of these incidents are timely, except to assert that all his claims are timely since they form a single pattern of discrimination by University employees.[126]  Liberally construing Plaintiff's papers, the Court understands him to argue that the subject claims are timely under the "continuing violation doctrine" since they are part of single discriminatory policy or practice of the University, namely, a hostile educational environment, that continued into the three-year limitations period.  Plaintiff's argument seems to be that since all the matters about which he complains happened while he was a student at the University and involved university employees,[127] they must be viewed as a single hostile environment.[128]

---

[124] Although Plaintiff contends that he told Swanson and Volpe in January, 2016, that he had been sexually assaulted, he did not request an extension of the February, 2016, deadline until after he received a failing grade on May 18, 2016.  He nevertheless maintains in this action that the Committee discriminated against him by not granting him an extension before he requested one.

[125] Defendant's Memo of Law at pp. 12-14.

[126] *See*, Pl. Memo of Law, ECF No. 184 at p. 8 ("Defendants attempt to parse Plaintiff's claims, including hostile educational environment claims, which involved sustained and multiple acts of discriminations and retaliation over a seven-year period, into separate and discrete acts.  This neglects the fact that the actors employed by the Defendant discriminatory acts were so regular and persistent, and that the collectively form a persistent policy and pattern of discrimination against the Plaintiff." [sic]).

[127] Volpe was not a member of the Defendant University's faculty.

[128] Pl. Memo of Law at pp. 13-15.

However, the Court disagrees with Plaintiff since the specified incidents are isolated, discrete events that are not related to any ongoing policy or practice. In this regard, it is clear that the continuing violation doctrine,

> "applies to claims composed of a series of separate acts that collectively constitute one unlawful practice," *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alterations and internal quotation marks omitted), and "functions to delay the commencement of the statute[-]of[-]limitations period until the last discriminatory act in furtherance of that broader unlawful practice," *Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) (internal quotation marks omitted). But the Supreme Court has made clear that "discrete discriminatory acts are not [themselves] actionable if time[-]barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002) (explaining that "acts such as termination, failure to promote, denial of transfer, or refusal to hire" are clearly discrete adverse actions). To toll [the] statute of limitation, a plaintiff must instead "allege both the existence of an ongoing policy ... and some non-time-barred acts taken in furtherance of that policy." *Lucente v. County of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020). Indeed, "[t]o hold otherwise would render meaningless the time limitations imposed on discrimination actions." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907–08 (2d Cir. 1997).

*Freud v. New York City Dep't of Educ.*, No. 22-879, 2023 WL 3103588, at *1 (2d Cir. Apr. 27, 2023).

Here, Plaintiff has not shown that any of the specified incidents are related to each other or to any of the incidents that occurred within the limitations period, let alone that they are all part of a single policy of the University.[129]  Rather, the incidents appear to be completely random,

---

[129] Plaintiff contends that after Lynch "sexually manhandled" him in May 2014, he also took retaliatory/discriminatory actions toward Plaintiff, within the limitations period, because Plaintiff refused his advance. As will be discussed below, that claim lacks merit, but, in any event, the alleged "sexual manhandling" and the alleged retaliation/discrimination are discrete acts that cannot be strung together to create a continuing violation. *See, e.g., Nunez v. New York State Dep't of Corr. & Cmty. Supervision*, No. 14-CV-6647 JMF, 2015 WL 4605684, at *8 (S.D.N.Y. July 31, 2015) ("To be sure, the Complaint alleges that Lima later retaliated against Plaintiff for rebuffing his advances. But such discrete acts, standing alone, cannot be used to pull in a time-barred discriminatory act, such as the unwanted sexual advances that form the bedrock of Plaintiff's sexual harassment claim.") (citation and internal quotation marks omitted), *aff'd sub nom. Nunez v. Lima*, 762 F. App'x 65 (2d Cir. 2019).

isolated events spread out over several years.  For instance, the alleged "verbal microaggressions" by Hazen, French, and Volpe, in 2013, 2014, and January 2016, respectively, were all separated by more than a year in between them and involved different locations (including two that were off campus) and different alleged perpetrators (including one, Volpe, who was not even employed by the Defendant).  Therefore, the events cannot be reasonably viewed as comprising a single policy or practice of the University. *See, e.g., Higgins v. 120 Riverside Boulevard at Trump Place Condo.*, No. 21-CV-4203 (LJL), 2021 WL 5450205, at *7 (S.D.N.Y. Nov. 19, 2021) ("The only thread that ties together each of these events is that Higgins was aggrieved. Otherwise, each involves different persons, engaged in different conduct at different times, seemingly without any knowledge of or any connection to the conduct of other persons."); *see also, Matthews v. Corning Inc.*, 737 F. Supp. 2d 133, 135 (W.D.N.Y. 2010) ("Here, Matthews has not alleged a course of similar conduct, or an ongoing policy of engagement in discrimination: rather, Matthews alleges a series of distinct and dissimilar actions, involving different defendants and non-party Corning employees, and entirely different circumstances."); *cf., Abdallah v. City of New York*, No. 95 CIV. 9247 (MGC), 2001 WL 262709, at *4 (S.D.N.Y. Mar. 16, 2001) ("[P]laintiff has not proffered evidence of a relationship or connection among the alleged acts of discrimination. The conduct that plaintiff complains of involves discrete and isolated incidents of alleged discrimination, involving different individuals in different departments and different supervisors. The fact that some of these alleged discriminatory comments and conduct were similar does not sufficiently establish the presence of a policy or practice of discrimination to connect them.").

Consequently, there being no triable issue of fact as to whether the continuing violation doctrine applies, the Court agrees with Defendant that the specified incidents, along with

anything else that occurred prior to May 22, 2016, are time barred. *See, Alleyne v. Four Seasons Hotel--New York*, No. 99 CIV. 3432 (JGK), 2001 WL 135770, at *8 (S.D.N.Y. Feb. 15, 2001) ("The plaintiff, however, has failed to present evidence raising a genuine issue of material fact that these individual incidents were part of a continuing violation. As the defendant points out, there is no evidence of anything other than isolated complaints alleged against different people in different departments over the course of a five-year period. There is no basis in the record to conclude that there was any connection between the alleged discrimination*[.]"), aff'd sub nom. Alleyne v. Four Seasons Hotel New York*, 25 F. App'x 74 (2d Cir. 2002).

*Merits of Plaintiff's Claims Under Title VI and Title IX*

Defendant also contends that Plaintiff's claims fail on their merits.  In that regard, Plaintiff is alleging disparate-treatment discrimination, retaliation, and hostile educational environment claims, on the basis of both race and sex.  The elements of these claims are well settled.

A plaintiff establishes a prima facie case of disparate-treatment discrimination under Title VI and Title IX by showing that: "(1) [he] is a member of a protected class; (2) [he] suffered an adverse action in pursuit of [his] education by [the] defendant; (3) [he] was treated differently from similarly situated students who are not members of the protected class; and (4) [he] was qualified to continue in [his] educational pursuit." *Williams v. Pace Univ.*, 192 F. Supp. 3d 415, 422 (S.D.N.Y. 2016) (internal quotation marks and citation omitted).

"A plaintiff claiming retaliation under Title[s VI and] IX must establish a prima facie case by showing: '(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action.'" *Sutton v. Stony Brook Univ.*, No. 21-2055, 2022 WL 4479509,

at *3 (2d Cir. Sept. 27, 2022) (quoting *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011)).

Meanwhile, "[t]o state a hostile educational environment claim, a plaintiff must plead that the defendant is deliberately indifferent to the harassment, of which the defendant has actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school." *Cain v. Mercy Coll.*, No. 20-CV-2262 (LLS), 2020 WL 4194637, at *4 (S.D.N.Y. July 20, 2020) (citations and internal quotation marks omitted).

In actions such as this where there is no direct evidence of discrimination,[130] claims of disparate treatment discrimination and retaliation are evaluated using the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Doe v. Columbia Univ.*, 831 F.3d 46, 53–54 (2d Cir. 2016); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d at 91–92. The plaintiff must first establish a prima facie case of discrimination or retaliation. *McDonnell Douglas Corp.*, 411 U.S. at 802. Once the plaintiff establishes a prima facie case, "the defendants have the burden of showing a legitimate,

---

[130] Plaintiff of course contends that University employees made various racially- and sexually-insulting comments, but such comments are not "direct evidence" since they were not made in connection with the particular alleged acts of disparate-treatment discrimination or retaliation. *See,e.g., McCall v. Genpak, LLC*, No. 13-CV-1947 KMK, 2015 WL 5730352, at *11 (S.D.N.Y. Sept. 30, 2015) ("The Second Circuit has noted that 'direct evidence' would roughly equate to a 'smoking gun' indicating that a plaintiff's firing was discriminatory. There is direct evidence where, for example, a company's policy related to an adverse employment action explicitly relies on a protected characteristic. Similarly, there is direct evidence where the decisionmaker made comments evincing a discriminatory mindset when terminating a plaintiff's employment. Although Plaintiff proffers circumstantial evidence from which a jury may be able to conclude that adverse employment actions were taken for discriminatory purposes, the comments here were, in large part, not made by decisionmakers, were not made in the context of evaluating Plaintiff's work, and were not made in close temporal proximity to the decisions, and thus do not provide direct evidence that the demotion and termination were discriminatory.") (citations omitted, collecting cases).

nondiscriminatory [or nonretaliatory] reason for their actions." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004).  The defendant's explanation "must, if taken as true, '*permit* the conclusion that there was a nondiscriminatory [or nonretaliatory reason] for the adverse action.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)) (emphasis in original).  If the defendant articulates a legitimate, nondiscriminatory or nonretaliatory reason for its actions, the plaintiff "then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [or retaliation]." *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  "To defeat summary judgment, 'the plaintiff is not required to show that the [educational institution's] proffered reasons were false or played no role in the [adverse] decision, but only that they were not the only reasons and that the prohibited factor was at least one of the "motivating" factors.'" *Williams v. Pace Univ.*, 192 F. Supp. 3d 415, 422 (S.D.N.Y. 2016) (quoting *Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d at 123)).[131]

The Second Circuit has described the burden of showing a prima facie case of discrimination as "not onerous" and "*de minimis*," but to defeat a properly supported summary judgment motion the Plaintiff must nevertheless come forward with enough evidence to allow a reasonable juror to find the various elements. *See, e.g., Lugo v. City of New York*, 518 F. App'x 28, 29–30 (2d Cir. 2013) ("While this burden 'is not onerous,' *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, Lugo has failed to adduce any admissible evidence to support an inference of

---

[131] The Second Circuit has declined to decide whether the "but-for" causation standard for Title VII retaliation cases applies to Title IX's antiretaliation provision.  *See, Radwan v. Manuel*, 55 F.4th 101, 130–32 (2d Cir. 2022). Defendant does not argue that the "but-for" standard applies, so the Court will hold Plaintiff to the less exacting "motivating factor" standard.  *See, Terry v. Ashcroft*, 336 F.3d 128, 140–41 (2d Cir. 2003).

discriminatory intent.  It is true that a showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case.   However, Lugo's list of 'similar' incidents does not provide any information from which a reasonable jury could conclude that the officers referenced were similarly situated to Lugo.  . . .  Thus, we conclude that Lugo failed to even make the de minimis showing necessary to make out a prima facie case of discrimination.").

> *Plaintiff Cannot Show a Prima Facie Case*
> *of Disparate Treatment Discrimination*

Defendant here maintains that Plaintiff cannot make out three elements of a prima facie case of disparate-treatment discrimination, namely, disparate treatment, adverse action, and qualification to continue his educational pursuits.  Defendant maintains, firstly, that Plaintiff cannot produce any evidence that he was treated less-favorably than any similarly situated student who was not a member of his protected classes, since he was actually treated more-favorably.   Defendant notes, for example, that Plaintiff has not "presented any evidence comparing the quality of his work to other students who passed the comprehensive examination."[132]

The Court agrees with Defendant, since although Plaintiff maintains that Defendant's argument lacks merit, he has not produced any evidence showing that he was treated less-favorably than a similarly situated student outside of his protected classes, which he refers to as

---

[132] Def. Memo of Law at p. 15.

"Black" and "male."[133]   Plaintiff attempts to do so by citing two pieces of evidence:   First, a statement from the registrar that between 1976 and 2008, "zero (0) Black males [were] conferred the HD4 degree, while 8 males of another race [were] awarded the HD4 degree"; and, second, deposition testimony from Douthit that she could recall one doctoral candidate, who was "a White male," who had "passed all three [Comprehensive] exam sections on the first submission without revisions."[134]   However, neither piece of evidence is probative of whether Plaintiff was treated differently than any similarly situated student outside of his protected classes.[135]

Otherwise, Plaintiff merely *opines* that he was treated differently, and argues that *Defendant has failed* to show that he was *not*.  For example, Plaintiff baldly contends that he was denied an "accommodation" (referring to an extension of a deadline) that "would have been afforded to any other student irrespective of their race, gender, sexual orientation, or disability." But that is his opinion, not evidence.  He has not even attempted to identify a particular instance in which a similarly-situated student outside of his protected classes was granted such an accommodation.  Further, Plaintiff argues that *Defendant* "cannot produce any viable evidence that at the time of the notification of the [assault in Atlanta] they [sic] provided any accommodations, services, or resources or that their [sic] treatment of the Plaintiff would have been the same regardless of his race, gender, sexual orientation, or disability," and that, "*Defendant* [has not] provided any evidence that disputes the notion that it does not treat Black

---

[133] He also reiterates that he "identifies as gay," but the Court has already found that he abandoned any claim based on sexual orientation.

[134] Pl. Memo of Law at p. 21.

[135] Also, the evidence from the registrar is not evidence of intentional discrimination.

gay male students differently from their White female counterparts."[136]  However, Plaintiff's argument is misguided, since under the *McDonnell Douglas* framework he has the initial burden to make his prima facie case, and Defendant has no burden until he does so.  And, Plaintiff has not met that initial burden, since he has not made even the minimal evidentiary showing required to create a triable issue of fact concerning disparate treatment as to any of the alleged instances of discrimination.[137]

This fact alone entitles Defendant to summary judgment on Plaintiff's Title VI and Title IX disparate-treatment claims.  Consequently, while Defendant raises additional arguments for why Plaintiff has not demonstrated a prima facie case of disparate-treatment discrimination, the Court need not consider them.

### Plaintiff Cannot Show a Prima Facie Case of Retaliation

Defendant next maintains that Plaintiff cannot show a prima facie case of retaliation under Title VI or Title IX, since there is no evidence of a causal connection between any adverse action and Plaintiff's protected activity.  In particular, with regard to Plaintiff's claim that his poor grades on the Comprehensive Exam were retaliatory, Defendant contends that there is no direct evidence of a causal nexus, and that Plaintiff cannot rely on a temporal nexus to establish causation since he received consistently negative evaluations of his papers beginning on March 18, 2014, long before he first engaged in protected activity in November 2014.[138]

---

[136] Pl. Memo of Law at p. 16 (emphasis added)  Again, while Plaintiff refers to sexual orientation and disability, claims for discrimination on those bases are not before the Court.

[137] This is not merely a technical failure by the *pro se* Plaintiff to *articulate* such evidence.  Rather, the Court has carefully reviewed the record and notes that there simply is no such evidence.

[138] *See*, Def. Memo of Law at p. 19 ("Plaintiff made this complaint (his first alleged protected activity) on November 18, 2014—almost a week **after** he received (and confirmed receipt) of his first failing grade on his comprehensive examination.") (emphasis in original); *see also*, *id*. at p. 20 ("The consistent, unchanged negative

In opposition to this argument, Plaintiff first maintains that he actually engaged in protected activity before November 2014, when he told Swanson in "Spring of 2014" that Lynch had "sexually manhandled" him.  Plaintiff contends, therefore, that such alleged protected activity "was several months before the first onset of the first adverse educational decision in November 2014."[139]  Plaintiff also contends that this alleged protected activity in "Spring 2014" led to Lynch retaliating against him, via "retaliation in academic mentorship and evaluation."  Plaintiff further argues that it is false for Defendant to assert that he had poor grades prior to November 2014, since he had received passing grades on the Theory and Literature Papers.  Beyond that, Plaintiff asserts that he,

> has shown causation indirectly through evidence such as disparate treatment, making inappropriate and insulting comments based on race, subjecting Plaintiff to sexual manhandling/sexual harassment/sexual assault, and denying/not affording him reasonable services for victims of sexual assault in comparison to his White female counterparts.  These acts all suggest the type of retaliatory animus to establish the requisite causation.

Pl. Memo of Law at p. 23.

However, the Court agrees with Defendant that Plaintiff "cannot establish the requisite causal connection between his protected activity and any adverse educational decision," since he has failed to make even the minimal showing of causal nexus that would be required to create a triable issue of fact.

To begin with, Plaintiff's statement to Swanson in "Spring 2014" about the "sexual manhandling" by Lynch does not qualify as protected activity for purposes of a retaliation claim,

---

feedback provided to Plaintiff before and after his alleged protected activity negates any causal nexus or retaliatory animus by the University.").

[139] Pl. Memo of Law at p. 22.

since there is no indication that Plaintiff told Swanson about the incident in a manner that made it clear he was opposing what he believed to be unlawful sexual harassment by Lynch. *See, e.g., Reed v. Fortive Corp.*, No. 21-CV-6312 CJS, 2023 WL 4457908, at *14 (W.D.N.Y. July 11, 2023) ("[T]o find that Plaintiff engaged in protected activity that was known to [defendant], the Court must find that the Amended Complaint plausibly alleges both that Plaintiff had a good faith, objectively reasonable belief that McCauley's alleged sexual advances . . . violated Title VII and the NYSHRL, and that she communicated such belief to McCauley in a manner that sufficiently indicated she was opposing sexual harassment.") (collecting cases).  In this regard, assuming *arguendo* that this conversation took place (which Swanson denies), Plaintiff offers no details about it, except to indicate that he told Swanson about the event but did not ask her to do anything with the information.[140]   Consequently, any finding that Plaintiff thereby engaged in protected activity would be based on speculation.

Moreover, the suggestion that Plaintiff was "opposing" alleged sexual harassment by mentioning the incident to Swanson in conversation is completely inconsistent with the rest of the record, which indicates that Plaintiff *intentionally refrained* from seeking any corrective action from the University concerning the alleged "sexual manhandling," prior to filing this lawsuit.  For example, the Complaint alleges that the alleged "sexual manhandling" was "disturbing, *but out of fear of retaliation Ellis continued his work*," id. at ¶ 18 (emphasis added), which strongly implies that Plaintiff refrained from reporting the incident because he feared retaliation.  And, indeed, there is no allegation in the Complaint that Plaintiff ever reported the incident to the University.

---

[140] Subsequently, Plaintiff sat on the information for five years, until he filed this action.  To the extent Plaintiff may now attempt to claim that he told others besides Swanson about the alleged sexual manhandling prior to commencing this action, he has not provided any evidentiary proof in admissible form to support the belated assertion.

Further, it is undisputed that when Plaintiff spoke to Levy, the University's Title IX Officer, concerning a *different* alleged sexual assault against him, he never mentioned the alleged "sexual manhandling" by Lynch.  Significantly, even though Levy told Plaintiff that she could not investigate the alleged sexual assault against him in Atlanta since it did not involve a perpetrator affiliated with the University, Plaintiff did not disclose to her that Lynch, *a professor at the University*, had also sexually assaulted him.[141]

Additionally, Plaintiff never disclosed the alleged "sexual manhandling" by Lynch in any of his myriad submissions supporting his academic appeals of grades *assigned by Lynch*. Indeed, Plaintiff's contention in this action, that the failing grades given to him by Lynch were somehow related to the "sexual manhandling" incident, never made it into any of his academic appeals to the University, including his most-comprehensive, last-ditch, 27-page appeal, in which he essentially purported to detail every argument that he could think of to dispute his failing grade on Comprehensive Exam.[142]

---

[141] While it has no bearing on the outcome of this Decision and Order, this fact adds to the Court's impression that when Plaintiff contacted Levy in June 2016, he was not legitimately seeking either an investigation of the sexual assault in Atlanta or "services" for sexual assault victims, but merely wanted Levy's assistance in appealing the Committee's denial of his request for an extension of the missed February 2016 deadline, which she provided.  As to this point, Plaintiff never contacted Levy until approximately six months after the assault in Atlanta, on the same day that the Committee denied his request for an extension of the missed February 26th deadline.  Moreover, while Plaintiff purported to "file a sexual assault report" with Levy, and to inquire about "services" for sexual assault victims, he also asked for her assistance in appealing the Committee's denial of his request.  Indeed, Levy testified that she recalled the academic appeal being the primary focus of Plaintiff's telephone call to her.  Meanwhile, Plaintiff has never articulated what he hoped an "investigation" of the Atlanta assault by the University six months after the fact would achieve, or what particular "services" he needed from the University that he had not already obtained in Atlanta.  Consequently, Plaintiff's insistence that he was harmed by Levy's "denial" of his request for an "investigation" and "services" seems highly dubious.

[142] *See, e.g.,* Supp. Brent Decl. at ¶ 12 ("[D]espite submitting several grievances to my attention[,] . . . Plaintiff never once alleged that he had been sexually 'manhandled' or sexually harassed by Dr. Lynch, and the first time I was made aware of his 'sexual manhandling' allegation was when Plaintiff filed his Complaint in this action.").

On these facts, Plaintiff has not raised a triable issue of fact as to whether he engaged in protected activity in "Spring 2014," or at any time thereafter, by complaining to the University about the alleged "sexual manhandling" by Lynch.

However, even assuming *arguendo* that Plaintiff's alleged statement to Swanson about Lynch's "sexual manhandling" qualified as protected activity, Plaintiff has still not shown any causal nexus between such protected activity and any adverse educational action by the University.  Plaintiff has not shown, or even alleged, that Swanson ever told Lynch or anyone else at the University about his accusation, and consequently the only person who could have retaliated against Plaintiff based on that protected activity would have been Swanson herself.

However, the only potential retaliation by Swanson that Plaintiff has alleged is first, her alleged failure to "accommodate" him by extending his February 26, 2016, due date after he told her that he had been sexually assaulted in Atlanta (even though he did not ask for an extension of the deadline at that time), and, second, her participation in the Committee's denial of his request, in June 2016, to have that deadline extended retroactively.  Regarding the alleged "failure to accommodate" in January 2016, the incident is time-barred, and, in any event, Plaintiff has not shown that Swanson had the power to unilaterally extend his due date.  Furthermore, there is absolutely no evidence to suggest that either or those decisions by Swanson (made two years after the alleged protected activity) was related to what Plaintiff told her about Lynch.

Plaintiff's alternative argument on this point is similarly meritless.  In particular, Plaintiff asserts that a causal nexus is established by a combination of "disparate treatment, making inappropriate and insulting comments based on race, subjecting Plaintiff to sexual manhandling/sexual harassment/sexual assault, and denying/not affording him reasonable services for victims of sexual assault in comparison to his White female counterparts."  However,

the Court has already found that Plaintiff has not produced any evidence of "disparate treatment." Further, to the extent that anyone made "inappropriate and insulting comments based on race," Plaintiff has not shown a connection between such comments and any protected activity.  In particular, he has not shown that the persons who allegedly made such comments – Hazen, French, and Volpe—were aware of any protected activity by him when they made the comments. Indeed, Plaintiff does not even claim to have engaged in protected activity when Hazen and French allegedly made their insulting comments.  Similarly, Plaintiff has not made any showing that the "sexual manhandling/sexual harassment/sexual assault" by Lynch was related to any protected activity.[143]  Rather, Plaintiff asserts that Lynch sexually assaulted him because he found Plaintiff physically attractive.[144]  Finally, Plaintiff has not identified any evidence of a causal nexus between his protected activity and the alleged denial to him of "services for victims of sexual assault."[145]

Defendant's argument, on the other hand, concerning Plaintiff's inability to show that his failing grades on the comprehensive exam were retaliatory, has merit.  That is, Plaintiff cannot demonstrate a causal nexus, temporal or otherwise, between such grades and his protected activity, since the evaluations of his papers consistently pointed out the same problems before and after he complained about discrimination.  Plaintiff argues that this is untrue, since he received passing grades on the Theory and Literature papers, and only failed the Methods paper

---

[143] Plaintiff does not claim to have engaged in any protected activity prior to the alleged sexual assault by Lynch.

[144] Pl. Memo of Law at p. 22.

[145] Plaintiff alleges that Morgan Levy denied him such services, but he has not shown that Levy was aware of any protected activity by him, or that such knowledge had any effect on her willingness to provide him with services.

after he complained about discrimination in November 2014.  However, as set forth earlier, that is not an accurate description of what transpired.

To begin with, Plaintiff just barely passed the Theory paper.  Specifically, on March 18, 2014, before Plaintiff ever engaged in protected activity, Swanson and Volpe gave the Theory a "marginal passing grade," after noting a host of problems with it that caused them to consider requiring Plaintiff to make a resubmission, including poor flow, lack of supporting literature, stylistic issues, and poor organization.  Instead, the Committee cautiously gave the paper a passing grade with the expectation that Plaintiff's subsequent submissions would be better.

However, the problems with Plaintiff's writing persisted.  In March 2014, again before Plaintiff engaged in any protected activity, Volpe and Lynch both gave his Literature paper a failing grade, with Volpe remarking that the paper suffered from many of the same problems as the Theory paper, as well as from a lack of proficiency with citations, unsystematic evaluation of relevant literature, and omission of key research.  Lynch, meanwhile, indicated that he found too many problems with spelling, grammar, and style, to give the paper a passing grade.  In June 2014, Volpe and Lynch gave the Literature paper a passing grade upon resubmission, but Lynch noted that the resubmitted paper still had numerous problems, including "a number of grammatical problems" and a general failure to follow "APA format," and that Plaintiff "need[ed] to put substantial effort into improving his academic writing skills, including making use of all of the resources available . . . perhaps even taking a doctoral-level course in academic writing, such as those offered at Warner."[146]

---

[146] Lynch Decl., Ex. E, p.2, ECF No. 169-94; *see*, Def. Statement of Facts at ¶¶ 21–22.  It is unclear whether the Committee's evaluation of the resubmitted Literature paper came before or after Plaintiff told Swanson about the alleged sexual manhandling by Lynch, since Plaintiff is so vague about the date of that conversation. ("Spring 2014") Again, however, even assuming that such conversation occurred before June 2014, Plaintiff has not shown that Swanson ever told anyone about Plaintiff's allegation, and Swanson was not involved in grading Plaintiff's Literature or Methods papers.  Additionally, the fact that Lynch gave Plaintiff's resubmitted

Subsequently, in November 2014, Plaintiff received a failing grade on his Methods paper resubmission (resulting in his failure of the Comprehensive Examination overall) due to the very same problems that the Committee had been pointing out all along,[147] and it was only after this that he began complaining about the alleged racially discriminatory "climate" at the University. Notably, though, even when Plaintiff first began alluding to the alleged racially-hostile climate at the University, he acknowledged that the Committee's feedback about his writing had been valid, and, indeed, valuable to him.

Thereafter, Plaintiff continued to receive failing grades on his various resubmissions of the Methods paper (after being given additional opportunities for resubmission that were not afforded to other students), with the Committee members pointing out the same types of problems that they had identified before he ever engaged in protected activity.  It was only then, after these later resubmissions, that Plaintiff began to claim that the Committee's evaluations were unfair.

Consequently, the Court agrees with Defendant that Plaintiff cannot rely on temporal proximity to establish a causal link between his protected activity and the failing grades that he received on the Comprehensive Exam.  *See, e.g., Lopez v. New York City Dep't of Educ.*, No. 17-CV-9205 (RA), 2020 WL 4340947, at *13 (S.D.N.Y. July 28, 2020) ("[E]ven assuming that

---

Literature paper a passing grade in June 2014, after both the alleged sexual manhandling and Plaintiff's alleged conversation about it with Swanson, negates any inference of causation between any prior protected activity and any failing grade which Lynch subsequently gave to Plaintiff. *See, Philippeaux v. Fashion Inst. of Tech.*, No. 93 CIV 4438 (SAS), 1996 WL 164462, at *9 (S.D.N.Y. Apr. 9, 1996) ("[I]f FIT was aware of Philippeaux's protected activity and intended to retaliate against such activity, it would not make sense to wait eight months (until the end of the next semester) before failing him in his photography courses. Despite engaging in protected activity, Philippeaux's grades for the Fall 1992 semester did not suffer."), *aff'd*, 104 F.3d 356 (2d Cir. 1996).

[147] The record clearly indicates that the Committee members became increasingly frustrated at Plaintiff's failure to fix problems that they had pointed out in earlier drafts.  While the Court finds this completely understandable, Plaintiff cites it as proof of the Committee members' "inherent bias."

Plaintiff's allegations are sufficient to satisfy this second prong, he nevertheless fails to allege a "causal connection" between these emails and any of the alleged retaliatory acts. Although Plaintiff alleges that he received a "letter to file" "[s]everal days after" he emailed Hulla, and on the same day as his email to Title IX Inquiries, his emails demonstrate that the investigation relating to the disciplinary charges was already in progress in December 2016, over a month before he purportedly engaged in these protected activities. . . . Plaintiff [also] does not plausibly allege any causal connection between [his January 2017] complaint and the disciplinary investigation, which was already underway in December 2016.") (citations omitted); *see also, Peeples v. Wayne State Univ.*, No. CV 18-14049, 2022 WL 4292311, at *14 (E.D. Mich. Sept. 16, 2022) ("Plaintiff told Keashly and Frost that if his appeal was denied, he intended to file a federal lawsuit against Defendants. However, it was Barnes' and Dion's grades and the resulting dismissal that caused Plaintiff harm, not the rejection of his appeal. The appeal dismissal simply upheld the grades and dismissal. A plaintiff cannot demonstrate causality to support a retaliation claim where an adverse decision already was contemplated or made before the plaintiff engaged in the alleged protected activity."), appeal dismissed, No. 22-1945, 2023 WL 7183126 (6th Cir. Mar. 31, 2023).[148]

Nor is there any other evidence of record to support a causal nexus. Consequently, the Court finds that Plaintiff has failed to make the minimal showing required to create a triable issue

---

[148] In the instant case, Plaintiff essentially failed the Comprehensive Exam in November 2014, with the failure of the resubmission of the Methods Paper, prior to engaging in protected activity. The subsequent failures all involve extra opportunities that Plaintiff was given over and above what was normally permitted under the University's standard policies for the Comprehensive Exam.

of fact as to the causal nexus element of his retaliation prima facie case.  For this reason, Defendant is entitled to summary judgment on Plaintiff's Title VI and Title IX retaliation claims.[149]

*Defendant Has Offered Non-discriminatory Reasons for Its Actions*

Defendant further contends that even if Plaintiff could meet his burden of showing a prima facie case of discrimination or retaliation, the University has produced legitimate, non-discriminatory reasons for its actions, which Plaintiff cannot show are pretextual.  Primarily, on this point, Defendant states that Plaintiff received a failing grade on the Comprehensive Exam based on the Committee members' evaluation of the quality of his writing, and that such an academic judgment is entitled to great deference by this Court, citing *Powell*, 364 F.3d 79, 88 (2d Cir. 2004).   Defendant maintains that Plaintiff cannot show that discriminatory animus or retaliatory animus played any role, let alone that they were motivating factors, in the relevant grading decisions.

Defendant states, for example, that the alleged verbal microaggressions by Hazen, French, and Volpe, upon which Plaintiff relies so heavily, do not create a triable issue of fact concerning pretext, since such "stray remarks" generally are insufficient to create a triable issue of fact as to pretext, particularly where, as here, they were made outside of the grading context. Defendant further maintains that Hazen and French were not involved in grading the Comprehensive Exam, and that Volpe was not even employed by the University, but, instead, was chosen by Plaintiff to be a member of the Committee.

---

[149] While the Court does not need to conduct an extended discussion on this point, it notes that even assuming Plaintiff could otherwise establish discrimination or retaliation by individual University employees, he cannot demonstrate that the University itself was deliberately indifferent to such discrimination or retaliation since Douthit and/or Brent later granted his various appeals. *See, Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 587 (5th Cir. 2020) ("Sewell has not pleaded deliberate indifference to Rankins's retaliatory conduct. On the contrary, once board officials became aware of the questionable circumstances surrounding Sewell's suspension and recommended expulsion, they rejected it. The decision was not deliberately indifferent to possible retaliation; it helped put a stop to it.").

Defendant further maintains that Plaintiff's contention that Lynch "sexually manhandled" him once, in May 2014, is insufficient to show that Lynch acted with discriminatory or retaliatory animus in grading Plaintiff's papers, as opposed to making legitimate academic judgements, since "Lynch was critical of Plaintiff's writing (and repeatedly identified the same deficiencies throughout in his evaluation) months before Plaintiff alleges that Lynch 'sexually manhandled' him."[150]   More specifically, Defendant points out that Lynch consistently noted problems with Plaintiff's spelling, grammar, style, and citation formatting, both before and after the alleged "sexual manhandling," and that "Plaintiff did not even contest Dr. Lynch's evaluations of his Methods paper in his first two grade appeals (let alone suggest any inference of discriminatory bias), which further undermines [his] effort to establish pretext."[151]

Defendant similarly maintains that the other alleged instances of discrimination and retaliation are based on nothing more than Plaintiff's "unsupported beliefs," "speculation," and "conjecture," while the University has offered legitimate non-discriminatory reasons for its actions.   Defendant contends, for example, that Plaintiff cannot produce any evidence that the decision by the Committee to deny his request for an extension of the missed February 26, 2016, deadline was due to discriminatory or retaliatory animus, and that, in any event, the University reversed that decision and granted him the extension.[152]

---

[150] Def. Memo of Law at p. 25.  (The evaluation to which Defendant refers here was also made by Lynch prior to any protected activity by Plaintiff).

[151] Def. Memo of Law at p. 26.

[152] Apart from how this argument relates to the *McDonnell Douglas* analysis, the Court notes that even if Plaintiff could show that the individual Committee members had acted with discriminatory or retaliatory intent in this instance, the University itself would not be liable for intentional discrimination or retaliation since it was not deliberately indifferent to such action, inasmuch as Douthit reversed the Committee's ruling and gave Plaintiff exactly what he asked for, namely, an extension of time and a removal of the failing grade.

Defendant also argues that Plaintiff cannot produce any evidence that the reasons it has given for failing to provide him with either an "investigation" or "resources," related to the sexual assault against him in Atlanta, are pretextual.[153]   In particular, Defendant asserts that it "could not investigate the reported assault or provide Plaintiff with *direct* services because the alleged assailant was not affiliated with the University, and Plaintiff was living outside of Rochester, New York," in Atlanta.[154]   Further, Defendant notes that, as Plaintiff admitted, Levy assisted him in another way, by helping him with his request for an extension of the missed February 26th deadline, which refutes his  bald assertion that Levy harbored discriminatory animus toward him.[155]

Plaintiff disagrees and argues that, "[f]irst, it is undisputed that [he] is Black and male," and "also identifies as gay."[156]   Next, he contends that the alleged verbal microaggressions by Hazen and French are evidence of pretext, since he worked as a graduate assistant for both of them, which indicates that they had "managerial/supervisor roles [that] they both played in the Plaintiff's employment which resulted in constructive discharge/dismissal."  Plaintiff further baldly

---

[153] Plaintiff contends that these denials of services were disparate-treatment discrimination.  There is no evidence of retaliation by Levy, since, for example, it is undisputed that she had no notice that he had engaged in protected activity.

[154] Def. Memo of Law at p. 28 (emphasis added).  Morgan Levy's undisputed deposition testimony is that she offered to help Plaintiff find resources for sexual assault victims *in Atlanta*, where he was living, but that he refused her offer.

[155] As discussed earlier, in response to the University's Policy 106 questionnaire, Plaintiff admitted that Levy provided assistance with his appeal: "After the denial, I appealed to the Department Chair of my degree program with the assistance of Morgan Levy to further advocate my Title IX request given that the extension request was further predicated on [a] sexual assault incident."

[156] Pl. Memo of Law at p. 25.

asserts that "their [Hazen's and French's] actions establish a pretext to the adversarial education and employment outcomes of the Plaintiff."[157]

Next, Plaintiff maintains that Volpe's "verbal microaggression," *i.e.*, her statement that "African American males struggle in doctoral programs," is evidence of pretext by the University since Volpe "was employed as a paid nurse practitioner at the University," and also served on Plaintiff's Committee and was therefore involved in grading his papers.[158]

However, the Court agrees with Defendant that Plaintiff has not come forward with evidence sufficient to raise a triable issue of fact as to pretext.  To begin with, the fact that Plaintiff may be "Black," "male," and "gay" is not evidence of pretext, and his mere suspicion that he was discriminated against on the basis of those attributes is insufficient to raise a triable issue of fact. For example, Levy's undisputed deposition testimony is that when she spoke to Plaintiff on the telephone, she had no idea that he was Black or gay. And, again, Plaintiff expressly abandoned any claim that he was discriminated against on the basis of his sexual orientation.

Further, the fact that Plaintiff may have worked at one time as a graduate assistant to Hazen and French is also not evidence of pretext and, again, the Court has already ruled that he is not legitimately raising any employment-discrimination claim in this action.

Additionally, the fact that Volpe may have opined to Plaintiff, in January 2016, that African American students, or even African American male students, struggle in doctoral programs, is not evidence of pretext.  On this point, the comment is at most a stray remark that is not indicative of discriminatory animus and not related to any discriminatory action by Volpe.  To the contrary, Volpe allegedly made the comment while taking time out of her schedule to meet with Plaintiff

---

[157] Pl. Memo of Law at p. 25.

[158] Pl. Memo of Law at p. 25.

at a restaurant, at his request, to *assist him* with his third resubmission of the Methods paper. Plaintiff's theory that Volpe agreed to this, and to serve on his Committee, all while secretly harboring discriminatory animus toward him, is simply speculative and implausible.

Meanwhile, Volpe gave consistent and specific reasons for assigning a failing grade to Plaintiff's Methods paper, both initially and on the multiple re-submissions that followed, and Plaintiff has not provided any evidence that those reasons were false, or that Volpe's grading decisions were motivated by discriminatory animus. Instead, he makes only bald and conclusory assertions of bias and disparate treatment.

Plaintiff also baldly asserts that other reasons the Committee gave for assigning his Methods paper a failing grade were false, and, as an example of this, contends that Lynch's assertion, that he came close to committing plagiarism, was false, since he properly cited his sources. However, in one of Plaintiff's appeals (dated 11/2/2016) he *admitted* to at least three instances in which he had failed to attribute what he wrote as being a quote taken from a source:

> After reviewing the claim that internal reviewer Dr. Martin Lynch attested to as it relates to an instance close to plagiarism, I want to make the following correction. On page 24 (comment 52) of the exam document it appears that I did cite the text (Romer et al., 2009), <u>however a grammatical error of lack of quotation is missing that I stand to be corrected for. The same goes for the sentence on page 25 and page 26.</u>

Exhibits to Pl. Stmt. Of Facts at p. 34 (ECF No. 185-1 at p. 34) (emphasis added). Consequently, this argument also fails to create a triable issue of fact as to pretext.

In sum, even assuming that Plaintiff could make out prima claims of disparate-treatment discrimination and retaliation, Defendant has come forward with legitimate non-discriminatory reasons for its actions, and Plaintiff has not shown that those reasons are pretextual or that discriminatory animus was a motivating factor for anything that happened to him. Consequently,

for this additional reason Defendant is entitled to summary judgment on the disparate-treatment claims and retaliation claims.

*Plaintiff Cannot Prove a Hostile Educational Environment*

Defendant next maintains that Plaintiff cannot prove a race- or sex-based hostile educational environment claim, since he cannot show either that such an environment existed or, even if it did, that the University had notice of it and responded with deliberate indifference. Defendant maintains, in particular, that the verbal microaggressions by Hazen, French, and Volpe, in addition to being time-barred, "fall woefully short of the requisite standard to establish a hostile educational environment . . . as a matter of law" since they were not sufficiently severe or pervasive.[159]  Further, Defendant contends that to the extent Plaintiff is claiming that a hostile environment existed because the University was deliberately indifferent to his condition following the sexual assault in Atlanta, by failing to investigate the incident or to provide direct services to him, the claim fails as a matter of law since the University had no authority or control over the assailant or the location where the assault occurred, and therefore could not have taken any remedial action.  Finally, Defendant reiterates that to the extent Plaintiff is claiming a hostile environment based on the alleged "sexual manhandling" by Lynch in May 2014, the claim is time-barred.

Plaintiff disagrees by baldly maintaining, much as he did in response to Defendant's argument concerning the statute of limitations, that all the matters about which he complains in this action are elements of a single hostile educational environment. *See*, Pl. Memo of Law at p. 26 ("The string of indignities that the Plaintiff was subjected to is eminently suitable under the continuing violation theory.  The discriminatory acts complained of were of consistent policy of

---

[159] Def. Memo of Law at p. 28.

systematic discrimination against the Plaintiff. [sic]   The disparate claims are based on the cumulative effect of individual acts.").   In doing so, Plaintiff reiterates his position concerning the timeliness of the claims, which the Court has already said lacks merit, but offers no evidence to show that an actionable hostile educational environment actually existed, or, if one did, that the University was deliberately indifferent to it after receiving actual notice.

The Court agrees with Defendant that Plaintiff has not raised a triable issue of fact as to whether a hostile educational environment existed, or to whether the University acted with deliberate indifference.   For example, the Court agrees with Defendant that the alleged "verbal microaggressions" by Hazen, French, and Volpe did not create a hostile educational environment.   Rather, the comments are mere stray remarks that are insufficient to establish a racially- or sexually-hostile or abusive educational environment. *See, Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2001) (providing that offensive language "may fail to demonstrate a hostile environment" if the "[i]ncidents . . . are few in number and . . . occur[red] over a short period of time" (internal quotation marks and citation omitted)); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("[W]hether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, . . . considered cumulatively in order to obtain a realistic view of the work environment." (internal quotation marks and citation omitted)).

Additionally, even assuming that the comments were sufficiently severe and pervasive to create a hostile environment, the University was not deliberately indifferent to Plaintiff's situation after learning of it.   Rather, the University, which was not even made aware of the comments until long after the fact in each case, investigated all of Plaintiff's claims of discrimination. Notably, Plaintiff does not allege that he suffered any further alleged

discrimination of the same kind after complaining to the University about such "verbal microaggressions."

Nor has Plaintiff shown that any of the other alleged discrimination about which he complains, such as the alleged failure by Levy to investigate his sexual assault claim or provide him with services, amounted to a hostile educational environment on the basis of sex or race.

Similarly, while sexual abuse of a student by a professor may create an actionable hostile educational environment,[160] Plaintiff here has not shown that the alleged one-time "sexual manhandling" by Lynch, in May 2014, was sufficiently severe or pervasive to create a hostile educational environment.[161]   To the extent Plaintiff is alleging that Lynch created a sexually hostile educational environment for him *after* May 2014, the claim is still time-barred, since he has not shown that Lynch ever engaged in similar conduct after May 2014, let alone within three years of the date he filed this action.  Nor has Plaintiff provided evidence that Lynch did anything after May 2014 that created a severe or pervasive sexually-hostile educational environment.  To the contrary, Plaintiff states that the alleged harassment occurred on a single occasion, and that almost immediately thereafter Lynch traveled to Russia, where he spent the next year.  Indeed, as discussed earlier, one of Plaintiff's complaints to the University, after failing the Comprehensive Exam, was that Lynch had been "unavailable" to him during the comprehensive exam process.  There is no indication that Plaintiff and Lynch were ever in each other's physical presence after May 2014, nor has Plaintiff alleged that any communication between himself and Lynch, which was by email only, was ever sexually inappropriate.  To the extent Plaintiff is

---

[160] *See, e.g., Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d at 88–89 ("Title IX affords "a remedy to a student who is subjected to sexual harassment by a teacher or professor at an educational institution receiving federal funds.").

[161] Plaintiff provides almost no information about the alleged incident, not event the date it happened.

maintaining that Lynch's grading decisions created a hostile environment, he has not created a triable issue of fact as to whether Lynch's evaluations were related to his sex.

Further, even assuming *arguendo* that Plaintiff could show that Lynch had created a sexually-hostile educational environment, he has not provided any evidence that the University was deliberately indifferent to any prior notice that Lynch might commit such an act against a student,[162] or that the University acted with deliberate indifference after being notified of the alleged assault against Plaintiff.[163]

For all these various reasons, Defendant is entitled to summary judgment on Plaintiff's hostile educational environment claim.

<u>Breach of Contract Under New York Law</u>

Lastly, Defendant maintains that it is entitled to summary judgment on Plaintiff's claim for breach of contract under New York State law.  Defendant maintains that Plaintiff cannot establish a breach of contract based on the University's alleged failure to provide him with a discrimination-free educational experience, since "[i]t is well established that a plaintiff cannot premise a breach of contract claim on a general statement of a university's adherence to anti-discrimination laws."

---

[162] Plaintiff has not identified any evidence from which a reasonable jury could conclude that the University was deliberately indifferent in preventing the incident, since he has not shown that the University had any prior notice that Lynch was likely to sexually assault a student. *See, e.g., Doe v. Yeshiva University*, No. 22-CV-5405 (PKC), 2023 WL 8236316, at *7 (S.D.N.Y. Nov. 28, 2023) ("The Complaint contains no allegations of any harassing acts, including sexual misconduct or violence, by Perry prior to the alleged rape; it thus does not allege any such acts by Perry of which any Yeshiva official was aware. The Complaint therefore does not adequately plead that the rape was due to deliberate indifference by Yeshiva to known harassment, including sexual misconduct or violence, by Perry.").

[163] Again, Plaintiff contends that prior to filing this lawsuit the only person he told about the "sexual manhandling" incident was Swanson, whom he has not shown had any authority granted by the University that would have allowed her to take action against Lynch.  Besides that, Plaintiff, who clearly knew the process for filing a Title IX complaint if he had wanted to do so, admits that he never asked Swanson to do anything with the information.  Accordingly, Plaintiff has not shown that Swanson was deliberately indifferent to the situation, let alone that the University was.  In short, even assuming that Lynch created a hostile environment, which Plaintiff has not shown, to hold the University liable for it under these circumstances would amount to imposing vicarious liability on the University for Swanson's inaction, which is not permitted under Titles VI or IX.

On this point, Defendant notes that at Plaintiff's deposition, he testified that his breach of contract claim was based on the University's violation of its published pledge to provide a discrimination-free campus and to abide by anti-discrimination laws. Defendant further contends that as a matter of law Plaintiff also cannot establish a breach of contract based on a claim that the University failed to award him a degree or to provide him with an effective education.

In response, Plaintiff contends that when he signed the University's offer of admissions, an implied contract was formed that incorporated the University's catalog, and that the University breached that contract when Lynch "sexually manhandled" him and gave him retaliatory grade evaluations.[164] Plaintiff also maintains that the University breached a contract because the Committee members deviated from the Comprehensive Exam "comps policy" in various ways, including by ignoring the established timeline and allowing the process to drag on too long. As another alleged example of the University failing to follow its own procedures, Plaintiff claims that he "appealed" to Borasi in a letter that he sent to Brent and Borasi on May 17, 2017, and that Borasi never responded, which resulted in his "constructive discharge" from the University. Pl. Memo of Law at P. 18.

However, the Court finds that Plaintiff has not demonstrated a triable issue of fact as to whether the University breached a contract. In that regard, the applicable law is clear concerning claims for breach of contract by a student against a university:

> Under New York law, a student and the college or university in which the student enrolls enter into an implied contract, the essence of which is that the "academic institution must act in good faith in its dealings with [the] student[ ]." *Matter of Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 414, 426 N.Y.S.2d 248, 402 N.E.2d 1150 (1980); *see Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011). The precise terms of the implied contract are established by "the university's bulletins, circulars and regulations made available to the student."

---

[164] Pl. Memo of Law at pp. 27-28.

*Papelino*, 633 F.3d at 93 (quoting Vought v. Teachers Coll., Columbia Univ., 127 A.D.2d 654, 511 N.Y.S.2d 880, 881 (2d Dept 1987)).

> To state a valid claim for breach of contract in that unique context, the student must first identify an express promise for "certain specified services" in the university's relevant materials. *Baldridge v. State*, 293 A.D.2d 941, 740 N.Y.S.2d 723, 725 (3d Dep't 2002) (quoting *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 454 N.Y.S.2d 868, 873 (2d Dep't 1982)). He then "must state when and how the defendant breached [that] specific contractual promise." *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021) (internal quotation marks omitted). "[W]ithout the identification of a specific breached promise or obligation," the claims of a "disgruntled student" do not suffice to state a claim on which relief can be granted. *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998).

*Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023).

The Court finds that, insofar as Plaintiff alleges that the University breached the anti-discrimination provisions in its catalog/handbook by allowing staff members to discriminate or retaliate against him, the claim lacks merit, since, as Defendant correctly indicates, "a university's general policy statements, rules, or guidelines about fair and equal treatment cannot support a breach of contract claim." *Posso v. Niagara Univ.*, 518 F. Supp. 3d 688, 703–04 (W.D.N.Y. 2021) (citations omitted).  Additionally, for the reasons already discussed, Plaintiff has not shown that any such discrimination or retaliation actually occurred in the grading process for his Comprehensive Examination.

As for Plaintiff's remaining arguments, concerning the University's alleged failure to follow its own procedures concerning the Comprehensive Exam and Plaintiff's academic appeals, the Court also finds that he has not stated actionable breach-of-contract claims under New York law, first, because such claims are generally excluded from judicial review by New York law:

> New York courts have repeatedly refused to interfere in the academic procedures of educational institutions and cannot and will not intervene in disputes involving an educational institution's grading system.

As the New York Court of Appeals has stated quite clearly in *Susan M. v. New York Law School*, 76 N.Y.2d 241, 246–247, 557 N.Y.S.2d 297, 556 N.E.2d 1104 (1990)[:]

As a general rule, judicial review of grading disputes would inappropriately involve the courts in the very core of academic and educational decision making. Moreover, to so involve the courts in assessing the propriety of particular grades would promote litigation by countless unsuccessful students and thus undermine the credibility of the academic determinations of educational institutions. We conclude, therefore, that, in the absence of demonstrated bad faith, arbitrariness, capriciousness, irrationality or a constitutional or statutory violation, a student's challenge to a particular grade or other academic determination relating to a genuine substantive evaluation of the student's academic capabilities is beyond the scope of judicial review.

*Keefe v. New York L. Sch.*, 25 Misc. 3d 1228(A), 906 N.Y.S.2d 773 (Sup. Ct. 2009), aff'd, 71 A.D.3d 569, 897 N.Y.S.2d 94 (1st Dept. 2010); *see also*, *Bhatnagar v. New Sch.*, No. 22-363-CV, 2023 WL 4072930, at *3 (2d Cir. June 20, 2023) ("Strong policy considerations militate against the intervention of courts in controversies relating to an educational institution's judgment of a student's academic performance. . . . Courts applying New York law routinely reject claims involving grading decisions (or other matters of academic discretion)."); *Zanelli v. Rich*, 127 A.D.3d 774, 774–75, 8 N.Y.S.3d 217, 218–19 (2d Dept. 2015) ("[T]o preserve the integrity of the credentials conferred by educational institutions, the courts have long been reluctant to intervene in controversies involving purely academic determinations. Although determinations made by educational institutions as to the academic performance of their students are not completely beyond the scope of judicial review, that review is limited to the question of whether the challenged determination was arbitrary and capricious, irrational, made in bad faith, or contrary to Constitution or statute.").

Plaintiff here is challenging matters involving grading decisions and other matters of academic discretion, and he has not raised a triable issue of fact as to whether the University acted in bad faith, or acted arbitrarily, capriciously, irrationally, or in violation of law.

Beyond that, Plaintiff also has not shown that the University actually deviated from its policies, or, even if did, that such deviation harmed him.  For example, Plaintiff's assertion that the University failed to strictly follow the "comps policy" lacks merit, since to the extent there was any such deviation it was because the University was bending its rules to benefit him.  Such alleged failure to follow procedures, even if shown, did not harm Plaintiff, but helped him, in that it allowed him several additional opportunities to pass the Comprehensive Exam, including the two final opportunities offered by Brent that Plaintiff rejected.  Indeed, if the University had strictly adhered to its rules and policies, Plaintiff would have been dismissed from the program in 2015.

Plaintiff ignores this fact, and argues, for example, that Brent's decision to allow him to completely re-start his Methods paper was actually inappropriate and discriminatory, since it would have meant the re-started paper would be reviewed by the same Committee as before, including Lynch, his "sexual abuser."[165]  However, this argument is disingenuous, for several reasons.  First, it asserts that re-writing the Methods paper would have required Plaintiff to be "in a classroom" with Lynch, which is clearly untrue.[166]  More importantly, it misleadingly implies that Brent was aware, when he made that decision, that Plaintiff was claiming to have been sexually assaulted by Lynch, which has simply not been shown.  Rather, even accepting Plaintiff's deposition as true, the only person that he ever told about the alleged "sexual

---

[165] See, Pl. Memo of Law at p. 7 ("[Brent] informed Plaintiff that he must 'restart' is comprehensive exam with the Committee including the faculty member whom sexually assaulted him.  The Plaintiff declined and refused to be placed back into the classroom of his sexual abuser.");*see also, id.* at p. 8 (same argument).

[166] See the prior footnote.

manhandling" (prior to commencing this action) was Swanson, and there is no evidence that she ever told anyone else.  Nor, apart from Plaintiff's bald assertions of discrimination (that he only began making after he failed the Comprehensive Exam in November 2014), did Brent have any other reason to think that it would be discriminatory, retaliatory, even unfair, to have the same Committee members review Plaintiff's re-started Methods paper.  Neither has Plaintiff shown that the relevant academic policies required Brent or the University to accede to his various requests during the appeal process, such as his request to replace the existing Committee members with a new, "independent committee."

Nor has Plaintiff otherwise shown that he was harmed by the University's failure to follow its procedures.  For example, Plaintiff alleges that on April 12, 2017, he sent an appeal to Borasi, asking her to create an "independent review committee," but that she never responded, which resulted in his "constructive discharge" from the University.[167]  However, the record indicates that it was Plaintiff who violated University's policies on this occasion, since he was appealing a determination by Douthit, which required that the appeal be made to Brent, not Borasi.[168]  Additionally, Plaintiff's contention that Borasi's failure to respond to his appeal resulted in his "constructive discharge" is baseless, since Brent decided the appeal in Plaintiff's favor, even though Plaintiff insists that Brent's ruling was unfavorable to him.[169]  Plaintiff's arguments therefore lack merit, since "bald assertions and conclusory allegations claiming that the

---

[167] Pl. Memo of Law at p. 6.

[168] *See, e.g.*, Def. Memo of Law at p. 8 (summarizing the academic appeal procedure).  Plaintiff actually sent the appeal to both Brent and Borasi, so his contention that he sent the appeal "to Borasi" but she failed to decide the appeal is, again, somewhat disingenuous.

[169] If Plaintiff had appealed Brent's ruling, the appeal would have gone to Borasi, but Plaintiff never did so.

University's rules or procedures were not followed, do not state a valid claim [for breach of contract]." *Ward v. New York Univ.*, No. 99 CIV. 8733 (RCC), 2000 WL 1448641, at *5 (S.D.N.Y. Sept. 28, 2000).

In sum, having considered Plaintiff's various arguments in support of his breach of contract claim, the Court finds that Defendant is entitled to summary judgment.[170]

### CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment (ECF No. 169) is GRANTED.  Plaintiff's complaint is DISMISSED, and the Clerk of the Court is directed to close this action.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

CHARLES J. SIRAGUSA
United States District Judge

DATED:  February 8, 2024
              Rochester, New York

---

[170] Alternatively, even if Plaintiff had demonstrated a triable issue of fact as to his breach of contract claim, the Court would decline to exercise supplemental federal jurisdiction over this sole remaining state-law claim, pursuant to 28 U.S.C. § 1367(c)(3).